# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:20-cr-228-SI |
| v. | **OPINION AND ORDER DENYING MOTIONS TO SEVER AND OTHER MATTERS** |
| **ROBERT J. JESENIK, N. SCOTT GILLIS, ANDREW N. MacRITCHIE, AND BRIAN K. RICE**, | |
| Defendants. | |

Natalie K. Wight, United States Attorney, and Ryan W. Bounds, Christopher L. Cardani, Siddharth Dadhich, and Hannah Horsley, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Bryan Francesconi, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204; and Scott L. Mullins, MULLINS LAW OFFICE LLC, 1000 SW Broadway Street, Suite 2300, Portland, OR 97205. Of Attorneys for Defendant Robert J. Jesenik.

Michael Tremonte and Anna Maria Estevao, SHER TREMONTE LLP, 90 Broad Street, 23rd Floor, New York, NY 10004; and Samuel C. Kauffman, KAUFFMAN KILBERG LLC, 1050 SW Sixth Avenue, Suite 1414, Portland, OR 97204. Of Attorneys for Defendant Andrew N. MacRitchie.

Angelo J. Calfo, Patricia Anne Eakes, Damon C, Elder, and Kendall S. Cowles, MORGAN, LEWIS & BOCKIUS LLP, 1301 Second Avenue, Suite 2800, Seattle, WA 98101. Of Attorneys for Defendant Brian K. Rice.

**Michael H. Simon, District Judge.**

The superseding indictment in this case charges Defendants Robert J. Jesenik (Jesenik), Andrew N. MacRitchie (MacRitchie), and Brian K. Rice (Rice) (collectively, Defendants) with multiple counts of fraud and other financial crimes relating to their involvement with the Aequitas group of companies, including Aequitas Management LLC, Aequitas Holdings LLC, Aequitas Commercial Finance LLC (ACF), Aequitas Capital Management Inc., and Aequitas Investment Management LLC (collectively, Aequitas). The Court has scheduled trial to begin on April 3, 2023. Now before the Court are eight motions filed by Defendants, seeking severance of parties and offenses, dismissal, striking of surplusage, early disclosure of coconspirator statements, and early determination of admissibility of coconspirator statements. The Court addressed each motion below.

## BACKGROUND

In July 2020, a grand jury indicted four individuals: Jesenik, MacRitchie, Rice, and N. Scott Gillis (Gillis). The indictment charged all four with one count of conspiracy to commit mail and wire fraud, 19 counts of wire fraud, one count of conspiracy to commit money laundering, and ten counts of money laundering. The indictment also charged Jesenik and Gillis with one count of bank fraud, one count of conspiracy to commit bank fraud, and one count of making a false statement on a loan application. In May 2022, Gillis pleaded guilty to making a false statement on a loan application and is awaiting sentencing.

In July 2022, a grand jury returned a superseding indictment against Jesenik, MacRitchie, and Rice. Against these three individuals, the superseding indictment charges one count of conspiracy to commit mail and wire fraud, 28 counts of wire fraud, and one count of conspiracy to commit money laundering. The superseding indictment also charges Jesenik with one count of making a false statement on a loan application.

The charges relate to Defendants' alleged activities when they were affiliated with Aequitas. Defendants allegedly conspired to mislead investors in the Aequitas entities by soliciting investments in notes and funds for the purported purpose of buying trade receivables, when in fact the investments were to be used mostly to pay off earlier investors and defray Aequitas's operating expenses. Aequitas collapsed in early 2016, owing its investors more than $600 million. Aequitas allegedly had been insolvent from July 2014 through the date of its collapse in February 2016.

Jesenik founded Aequitas in Lake Oswego, Oregon, and served as its Chief Executive Officer. He controlled the structure of Aequitas and had ultimate decision-making authority over its various activities. MacRitchie served as Aequitas's Chief Compliance Officer and as one of its Executive Vice Presidents. MacRitchie was responsible for the development and implementation of risk management and compliance processes and procedures. He also oversaw accounting, legal, and audit functions, as well as fundraising. Rice was another of Aequitas's Executive Vice Presidents. He oversaw the solicitation of investments through registered investment advisors (RIAs) and managed those RIAs. These three Defendants remain for trial.[1]

---

[1] As noted, Gillis has already pleaded guilty. He was the Chief Operating Officer and Chief Financial Officer at Aequitas. He directed Aequitas's overall financial policies and accounting functions, maintained Aequitas's accounting practices and procedures, prepared its financial reports, and presented findings and recommendations to the executive team. Gillis also oversaw all financial functions and designed and coordinated a variety of accounting and statistical data and reports for Aequitas.

Along with Gillis, Olaf Janke (Janke), who was the Chief Financial Officer and an Executive Vice President of Aequitas Capital Management through June 2015, has pleaded guilty to conspiring to commit mail and wire fraud and conspiring to commit money laundering in connection with his activities at Aequitas. Janke is awaiting sentencing. *See United States v. Janke*, Case No. 3:19-cr-237-SI (D. Or.). Also, Brian A. Oliver (Oliver), who was an Executive Vice President of several Aequitas entities, has pleaded guilty to conspiring to commit mail and wire fraud and conspiring to commit money laundering in connection with his activities at

Jesenik, MacRitchie, and Rice, as well as other persons affiliated with Aequitas, allegedly used Aequitas-related entities to solicit investors through the issuance of promissory notes and interests in Aequitas-created investment funds, many of which were purportedly backed by trade receivables in education, health care, transportation, and other consumer credit areas. Defendants allegedly used invested funds not only to pay Aequitas's operating costs but also to repay other investors. Defendants allegedly made material misrepresentations, half-truths, and omissions when soliciting and discussing investments with investors and investment advisors. Defendants also allegedly used an intercompany loan to Aequitas Holdings, LLC to prop up other Aequitas entities and mislead investors, concealing from investors information that the intercompany loan was significantly under-collateralized and could not be repaid without the occurrence of several speculative contingencies. Individuals allegedly invested more than $400 million between January 2014 and February 2016.[2]

---

Aequitas. Oliver, too, is awaiting sentencing. *See United States v. Oliver*, Case No. 3:19-cr-132-MO (D. Or.).

[2] On March 2016, the Securities and Exchange Commission (SEC) commenced a civil action in the District of Oregon, captioned *Sec. and Exch. Comm'n v. Aequitas Mgmt., LLC, et al.*, No. 3:16-cv-438-JR (D. Or.) (Receivership Case). Along with its complaint in that case, the SEC filed a stipulation between the SEC and the Aequitas-entity defendants, requesting a preliminary injunction and the appointment of a receiver. The district court appointed Ronald Greenspan as receiver (Receiver) of the Aequitas-entity defendants and their subsidiaries and majority-owned affiliates (collectively, the Receivership Entity). Besides freezing the assets of the Receivership Entity, the court authorized the Receiver to take possession of all books and records of the Receivership Entity. The court also authorized the Receiver to investigate, prosecute, defend, intervene in, or otherwise participate in actions in any state, federal, or foreign court or proceeding to recover or conserve property of the Receivership Entity. The Receivership Case is continuing.

## DISCUSSION

### A.  Defendants' Motions for Severance of Parties

#### 1.  Standards

Rule 8(b) of the Federal Rules of Criminal Procedure provides that an indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Further, "[t]he defendants may be charged in one or more counts together or separately," and "[a]ll defendants need not be charged in each count." *Id*. Under Rule 14(a), if the joinder of defendants in an indictment "appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

"It is well-established that in the federal system there is a preference for joint trials where defendants have been jointly indicted." *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001 (9th Cir. 2008) (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *see also United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999) ("[J]oinder is generally favored because it promotes efficiency[.]"); *United States v. Tootick*, 952 F.2d 1078, 1080 (9th Cir.1991) ("Joinder is favored in federal criminal cases largely for reasons of judicial economy and efficiency, despite some degree of bias inherent in joint trials."). The Ninth Circuit notes that joint trials are "particularly appropriate where the codefendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir. 2004).

"[W]hen defendants have been properly joined under Rule 8(b), a district court should grant severance under Rule 14 only if there is serious risk that a joint trial would prejudice a

specific trial right of one of the defendants[] or prevent the jury from making a reliable judgment about guilt or innocence." *Mayfield*, 189 F.3d at 899 (quoting *Zafiro*, 506 U.S. at 539). "Mere inconsistency in defense positions is insufficient" to warrant severance. *Id.* (cleaned up). "However, the probability of reversible prejudice increases as the defenses move beyond the merely inconsistent to the antagonistic." *Id.* (cleaned up). "When defendants present mutually exclusive defenses, the jury often cannot assess the guilt or innocence of the defendants on an individual and independent basis." *Id.* at 899-900 (cleaned up).

The Ninth Circuit has developed a four-part test to aid a district court's determination of whether the joinder of defendants appears to prejudice a defendant, and thus whether a court may sever the defendants' trials. *Hernandez-Orellana*, 539 F.3d at 1001. A district court should consider:

> (1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether [defendants] could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Id.* (cleaned up). The first and second factors are the most important. *See United States v. Sullivan*, 522 F.3d 967, 981-82 (9th Cir. 2008).

The joint trial of defendants pleading mutually exclusive defenses presents risks that the defendants may be prejudiced. *Tootick*, 952 F.2d at 1086. Mutually exclusive defenses exist when acquittal of one codefendant would necessarily call for the conviction of the other. *Id.* at 1081. But even when defendants maintain mutually exclusive defenses at trial, the Ninth Circuit has rejected a per se rule mandating severance. *Id.* at 1083; *see also Zafiro*, 506 U.S.

at 538 (mutually exclusive defenses are not prejudicial per se). To prevail on an argument for severance, the "defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." *Hernandez-Orellana*, 539 F.3d at 1002 (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996)).

### 2. Application

Defendants have filed separate motions for severance of their joint trial. All three argue that their defenses will be mutually exclusive. Jesenik, the former CEO, argues that his codefendants will seek to shift blame onto him for all executive decision-making. Jesenik quotes potentially prejudicial statements from MacRitchie and indications of antagonistic strategy from Rice's attorney. Rice, who was hired in October 2014, contends that his defense, which is that Jesenik lied to Rice when Jesenik recruited him as a "trophy hire" to disguise a failing company, is irreconcilable with Jesenik's acquittal. According to Rice, he must prove Jesenik guilty to secure his own innocence. MacRitchie similarly contends that his codefendants will seek to place all financial decision-making on him, yet he aims to show that he relied on the expertise of others, including his codefendants. MacRitchie also raises evidentiary issues about his codefendants seeking to introduce his otherwise inadmissible proffer statement, and he states that there may be Confrontation Clause violations if his codefendants choose not to testify. All three Defendants argue that their mutually exclusive defenses will result in prejudice to that will deny them a fair trial.

The government opposes severance, arguing that Defendants' anticipated defenses are not mutually exclusive and not prejudicial to the point where acquittal of one would necessarily call for the conviction of another—the standard expressed by the Ninth Circuit in *Tootick*, 952 F.2d at 1081. The government states that it will show that all three Defendants are guilty of fraud

based on misrepresentations, half-truths, and omissions made both jointly and individually, but the jury could find all three Defendants innocent. The government suggests that this possibility shows that any potential prejudice can be cured with appropriate rulings on motions *in limine* and jury instructions. On MacRitchie's concerns about the use of his own proffer statements against him and potential Confrontation Clause issues, the government asserts these are speculative and can be addressed at trial.[3]

Defendants' proposed defenses are not mutually exclusive. This case is not like *Tootick*, in which there were only two possible assailants, at least one of whom committed a stabbing, and the jury could not acquit one defendant without disbelieving the other. Here, by contrast, every Defendant might be acquitted by the jury. No Defendant presents a convincing argument that their defenses are so irreconcilable that the acceptance of a codefendant's theory by the jury necessarily precludes any other Defendant's acquittal. *See Hernandez-Orellana*, 539 F.3d at 1002. Unlike in *Tootick*, the jury should be able to assess the guilt or innocence of each Defendant on an individual and independent basis, even if the codefendants seek to shift some degree of any blame onto others. Moreover, in *Tootick*, no evidence supported a finding that someone other than one or both of two defendants was responsible for the crime. Here, the jury could find that someone other than the three Defendants on trial committed the alleged fraud, if fraud was committed, such as one or more of the three coconspirators who have already pleaded guilty, Gillis, Oliver, and Janke. Thus, severance is not warranted.

---

[3] Jesenik's original motion implied that he would seek to exclude MacRitchie's proffer statement as prejudicial against Jesenik. At oral argument, however, counsel for Jesenik stated they might seek to admit certain portions of MacRitchie's proffer. It remains unclear which portions of MacRitchie's proffer, if any, will be introduced or allowed at trial.

Rice also argues that his defense is more than merely routine blame-shifting among codefendants. Rice asserts that his defense is mutually exclusive because his goal is to show that Jesenik purposefully misled Rice to facilitate and cover up the charged scheme. In short, Rice states that he wants to help the government prove its case-in-chief against Jesenik and show that Rice had nothing to do with the alleged fraud. Rice says that he will "prosecute" Jesenik for fraud committed at Aequitas and against Rice personally. Rice believes this approach will exonerate him because he counts himself among the victims whom Jesenik misled.

For three reasons, Rice fails to prove that his planned defense is mutually exclusive. First, both Rice and Jesenik could be acquitted. The jury might believe Rice's argument that Jesenik "defrauded" Rice during recruitment and hid the dire financial situation at Aequitas from Rice throughout his employment. Even so, the jury may still acquit Jesenik on the basis that the misrepresentations of which he is accused fall short of a crime. Second, the superseding indictment alleges a conspiracy to defraud investors, and Rice does not claim to have been an investor. The government is not charging Jesenik with misleading Rice. Even if misleading Rice were part of the manner and means of enacting the conspiracy, proving this point would not require the jury to convict Jesenik on the alleged charges. Third, Rice misinterprets the requirement for severance. Under *Throckmorton*, "a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury preludes acquittal *of the defendant*." 87 F.3d 1069, 1072 (9th Cir. 1996) (emphasis added). Rice is not alleging that the jury could not acquit *him*, only that they could not acquit Jesenik. Rice suggests that Jesenik's defense will attack Rice's credibility, but credibility attacks need not preclude the jury from acquitting Rice. Thus, Rice fails to show that he necessarily will face prejudice from a joint trial.

Further, even if these defenses were found to be mutually exclusive, or at least mutually antagonistic, Defendants must clear the high bar of showing that a joint trial will infringe on their trial rights or create undue prejudice. This is the fourth factor under *Hernandez-Orellana*— Defendants must show, with some particularity, a risk that a joint trial would compromise a specific trial right. 539 F.3d at 1001. Severance is warranted only when "joinder is so *manifestly prejudicial* that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever." *United States v. Brashier*, 548 F.2d 1315, 1323 (9th Cir. 1976) (emphasis added). Even where the risk of prejudice seems high, that risk often can be cured by providing appropriate limiting jury instructions. *Id.* at 539. "The prejudicial effect of evidence relating to the guilt of codefendants is generally held to be neutralized by careful instruction by the trial judge." *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980). Further, juries are presumed to follow their instructions. *Zafiro*, 506 U.S. at 540.

At oral argument, Defendants MacRitchie and Jesenik discussed concerns that Rice's antagonistic defense might violate their due process rights by reducing the burden on the government to prove its case beyond a reasonable doubt, thereby denying them a fair trial. But as the Court explained in a similar fraud case involving multiple codefendants, joint trial is particularly important in conspiracy cases and any prejudice caused by conflicting defenses can be mitigated by appropriate jury instructions. *See United States v. Heine*, 2016 WL 1048895, at *8-9 (D. Or.  Mar. 14, 2016). Even in *Tootick*, severance would not have been required had the court given appropriate cautionary instructions. *Id.* at *8 (citing *Tootick*, 925 F.2d at 1086). Should Rice's counsel act a "second prosecutor" during trial, the Court can mitigate the effects by properly directing counsel, adequately instructing the jury that counsel's arguments are not evidence, and rigorously giving the jury limiting instructions. *United States v. Olivas*, 2021

WL 3085563, at *3 (D. Ariz. June 15, 2021) (citing *Zafiro*, 506 U.S. at 541). Unlike in *Mayfield*, Rice's counsel will not have "free rein to introduce evidence against [codefendants] and act as a second prosecutor." 189 F.3d at 897. Because the Court can counter any prejudice that may arise from Defendants' defenses by "instructing the jury on the limited purposes for which certain evidence may be used," a joint trial satisfies the test stated in *Hernandez-Orellana*. 539 F.3d at 1001.

Defendants also fail to show how, even with appropriate jury instructions, other speculative issues that may arise during a joint trial would be "manifestly prejudicial." *Brashier*, 548 F.2d at 1323. On MacRitchie's evidentiary concerns, the Court agrees with the government that the issue of his proffer and potential Confrontation Clause concerns are too speculative at this stage of the case to warrant the relief of severance. The Court will address these issues, if they arise, when considering motions *in limine* and requested jury instructions, including preliminary jury instructions and limiting instructions during trial. Accordingly, the Court denies Jesenik, MacRitchie, and Rice's motions to sever parties.

## B. Defendant Jesenik's Motion for Severance of Offenses

### 1. Standards

Rule 8(a) of the Federal Rules of Criminal Procedure provides that an indictment may charge a defendant in separate counts with two or more offenses "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a); *see also United States v. Jawara*, 474 F.3d 565, 572 (9th Cir. 2007) ("The offenses charged must be: (1) of the same or similar character; (2) based on the same act or transaction; or (3) connected with or constituting parts of a common scheme or plan.") (cleaned up). At least one of Rule 8(a)'s three conditions must be satisfied to join an offense, but "those conditions, although phrased in general

terms, are not infinitely elastic." *Jawara*, 474 F.3d at 573 (quoting *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996)). Under Rule 14(a) of the Federal Rules of Criminal Procedure, if the joinder of offenses in an indictment "appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

The Ninth Circuit has explained that joinder of offenses may prejudice a defendant if:

> (1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find.

*United States v. Johnson*, 820 F.2d 1065, 1070 (9th Cir. 1987). "Charging several crimes may also create a latent feeling of hostility toward the defendant." *Id*. If, however, all "the evidence of the separate count would be admissible upon severance, prejudice is not heightened by joinder" and a "trial court does not abuse its discretion in denying severance under Rule 14 under such circumstances." *Id*.

Further, "[m]isjoinder of charges under Rule 8(a) is a question of law." *Jawara*, 474 F.3d at 572. Courts look only at the face of the indictment when assessing whether severance is warranted. "Because Rule 8 is concerned with the propriety of joining offenses in the indictment, the validity of the joinder is determined solely by the allegations in the indictment." *Id*. (citation omitted; brackets in original).

### 2. Application

Jesenik moves to sever Count 31 of the superseding indictment. Count 31 alleges that on January 15, 2016, Jesenik made a false statement to Wells Fargo Bank so that Aequitas could receive a loan advance of $4.2 million. No other Defendant is charged in this count. Jesenik

disputes that joinder is proper under Rule 8(a) of the Federal Rules of Criminal Procedure because Count 31 is insufficiently linked to Counts 1-30. Jesenik argues that the crimes have different elements, characteristics, and evidence, and that there was no "common scheme or plan" between Count 31's alleged false statement to Wells Fargo and the allegations of investment fraud in other counts. He asks the Court to sever Count 31 to avoid unfair prejudice before the jury.

The government responds that Count 31 is connected to the broader scheme of fraudulently paying prior investors because Aequitas pursued the Wells Fargo loan to secure funding to continue that scheme. Jesenik disputes this connection as "overly simplistic and inaccurate," arguing that the loan money was used to purchase proper healthcare receivables, not to pay investors. He raises a concern that the government's response goes beyond the allegations in the indictment: Jesenik asserts that Count 31 does not allege that he improperly used Wells Fargo money to pay investors back, nor does it state that Wells Fargo's money furthered the alleged investment scheme.

Rule 8 is construed in favor of joinder. *Jawara*, 474 F.3d. at 573. In fact, "[j]oinder is the rule rather than the exception." *United States v. Whitworth*, 856 F.2d 1268, 1277 (9th Cir. 1988). Under *Johnson*, if "the evidence of the separate count would be admissible upon severance, prejudice is not heightened by joinder." 820 F.2d at 1070. Joinder in this case promotes judicial efficiency and avoids prejudice, as at least some of the evidence for Count 31 may overlap with evidence for other counts and the government plans to call similar witnesses. Although the count must also satisfy at least one condition of Rule 8(a), the Court finds Count 31 meets two conditions, thus making joinder permissible.

Count 31 satisfies the "common scheme or plan" condition on the face of the indictment. Under the "common plan or scheme" test, counts may be joined if they "grow out of related transactions," that is, "commission of one of the offenses either depended upon or *necessarily led* to the commission of the other; proof of the one act either constituted or depended upon proof of the other." *Jawara*, 474 F.3d at 574 (cleaned up; emphasis added). The parties dispute how Aequitas used the Wells Fargo loan money. But even if Jesenik did not pay investors with this loan money, he could have pursued the loan to fortify Aequitas's alleged Ponzi scheme. The government argues that the loan money was used to perpetuate the ongoing fraud because the source of the default and, thus, the need for additional funding were rooted in the scheme to misuse investor money. That is, the commission of the alleged scheme to defraud investors necessarily led to the making of a false statement to Wells Fargo because Aequitas was experiencing defaults within their main vehicle to defraud investors and needed additional funds.

This connection between the alleged false statement to Wells Fargo and the alleged fraudulent conspiracy at large is apparent on the face of the indictment. The superseding indictment alleges that Jesenik knew that Aequitas had experienced "defaults on more than $2.5 million in principal repayments due to investors in ACF Private Note, with millions of dollars more in such defaults expected in the coming weeks." Superseding Indictment, ¶ 35. It is immaterial that the government did not expressly incorporate into Count 31 its allegation that the ACF Private Note was a principal vehicle to defraud investors. *Id.*, ¶ 12. *Jawara* instructs courts to look at the face of the indictment, not the face of only a specific charge. *See* 474 F.3d at 573. And unlike the situation in *United States v. Rothenberg*, the face of the indictment suggests that the allegedly false statement made to Wells Fargo flows directly from the scheme to defraud investors, at least as to the source of the default. 2021 WL 6807580, at *3 (N.D. Cal. Oct. 25,

2021) (granting severance only for two counts which failed to allege any connection between bank-related charges and the investor offenses). Therefore, a plausible reading of the indictment is that there is a "common plan or scheme" between Count 31 and the alleged fraud conspiracy.

Count 31 also satisfies the test for "same or similar character." This test is a broad review that considers six factors, "the elements of the statutory offenses, the temporal proximity of the act, the likelihood and extent of evidentiary overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims . . . ." *Jawara*, 474 F.3d at 578. No factor is dispositive; "the bottom line is that the similar character of the joined offenses should be ascertainable—either readily apparent or reasonably inferred—from the face of the indictment. Courts should not have to engage in inferential gymnastics or resort to implausible levels of abstraction to divine similarity." *Id.* at 578. The Court looks at the allegations in the indictment, including any "reasonable inferences of the connections and similarities that may be drawn" between Count 31 and the broader conspiracy to defraud investors. *Jawara*, 474 F.3d at 579. The government argues that the temporal proximity, evidentiary overlap, and common modus operandi favor joinder. Despite the different elements of the statutory offenses and the identity of the victims, the remaining factors, and the reference to the ACF Private Note, connect Count 31 to the same alleged fraud scheme. The Court finds that the similar character of the joined offenses is reasonably ascertainable from the face of the indictment.

Finally, Jesenik has not shown that joinder of one more claim is manifestly prejudicial under Rule 14. The only prejudice that Jesenik identifies is fear that the jury may "consider him a bad actor" based on the large number of charges against him. The Ninth Circuit has found prejudice in cases in which "'the jury may consider that the defendant must be bad' because of the number of crimes alleged against him." *Rothenberg*, 2021 WL 6807580, at *4 (quoting

*United States v. Ragghianti*, 527 F.2d 586, 587 (9th Cir. 1975)). This one extra count on top of 30 others is not likely to tip the scale. The Court thus denies Jesenik's motion to sever Count 31 from the superseding indictment.

## C. Defendants' Motions to Dismiss or Strike: Duplicity, Surplusage, and Sufficiency

### 1. Standards

#### a. Duplicity

An indictment is duplicitous if it joins two or more distinct offenses in the same count. *United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988). By requiring separate counts, Rule 8(a) is intended to eliminate the constitutional problems created when two or more offenses are joined in a single count. *See United States v. W.R. Grace*, 429 F. Supp. 2d 1207, 1216-17 (D. Mont. 2006).

When addressing an assertion of error in the drafting of an indictment, the terms "duplicity" and "multiplicity" are sometimes confused. Although both describe an improper grouping of charges or defendants, there are important differences. As explained in a leading treatise:

> "Duplicity" is the joining of two or more separate offenses in a single count. An indictment that accuses a defendant of two burglaries normally should allege these crimes in separate counts, and if they are not—if the indictment is "duplicitous"—it can create several problems for the accused. A jury may wish to convict [the] defendant of one crime while acquitting him of the other, but it cannot do so when the two crimes are fused in a single count. A related problem is that, because the jurors have two crimes to consider, they might convict without reaching a unanimous agreement on either. . . . This uncertainty could prejudice defendant in sentencing, in appellate review, and in guarding against double jeopardy. . . .

> "Multiplicity" is spreading a single offense over several counts in the indictment or information. This can occur when the indictment alleges that the defendant committed two separate crimes, but one is simply a lesser included offense of the other. Or, multiplicity

> may occur where the indictment charges multiple violations of the
> same statute, but these counts are predicated on the same criminal
> conduct and should be treated as a single offense. The vice of
> multiplicity is that it may lead to multiple punishments for a single
> crime, an obvious double jeopardy violation.

Charles Wright and Arthur Miller, 1A Fed. Prac. & Proc. Crim. § 143 (5th ed. 2022) (cleaned
up).

When considering duplicity claims directed at the face of the indictment before trial,
courts apply the "limited review" test from *United States v. King*. 200 F.3d 1207, 1212 (9th
Cir. 1999). In *King*, a case in which the defendant was convicted of one count of bank fraud and
three counts of wire fraud, the Ninth Circuit explained that a "duplicitous indictment
compromises a defendant's Sixth Amendment right to know the charges against him, as well as
his Fifth Amendment protection against double jeopardy." 200 F.3d at 1212. The court added
that "[w]hether an indictment is duplicitous is a question of law" and "[t]he court limits its
review to a reading of the indictment itself to determine whether it may be read to charge a single
violation." *Id*. The Ninth Circuit rejected the defendant's contention of duplicity and, in the
context of multiple fraud counts, held "that each execution of a scheme to defraud need not give
rise to a charge in the indictment." *Id*. at 1213.

After trial and on appeal, a different legal standard applies. Courts focus on a defendant's
right to a unanimous jury verdict when assessing whether a single count should have been
charged as two conspiracies. The test for this assessment, known as the "overall
agreement/relevant factors" test, comes from the Ninth Circuit's decision in *United States v.
Gordon*. 844 F.2d 1379 (9th Cir. 1988). In *Gordon*, several defendants were convicted of
conspiracy, obstruction of justice, and perjury. The Ninth Circuit rejected an argument that the
conspiracy count was duplicitous. The court held that because "a duplicity claim is directed at
the *face* of the indictment and not at the evidence presented at trial," a defendant who "first

raised the duplicity issue in his Rule 29 motion at the close of the government's case-in-chief"
without any showing of good cause waived "an objection to the *form* of the indictment" and his
"right to force the government to divide a single count into two separate conspiracy counts."
*Gordon*, 844 F.2d at 1400 (emphases in original). The Ninth Circuit, however, also held that the
defendants have a constitutional right "to a unanimous jury verdict" and that this argument was
not waived. *Id*. Thus, the court considered the merits of whether the single count of conspiracy
should have been charged as two conspiracies. In evaluating this question, the Ninth Circuit
explained that "relevant factors," including "the nature of the scheme, the identity of the
participants, the quality, frequency and duration of each conspirator's transactions, and the
commonality of times and goals," are pertinent to whether there was "one overall agreement
among the various parties to perform various functions in order to carry out the objectives of the
conspiracy." *Id*. at 1401. The court reversed the conspiracy convictions, concluding that because
a single conspiracy count "charged two conspiracies, there was a distinct possibility of a
nonunanimous jury verdict." *Id*.

### b. Sufficiency

An indictment also must be sufficient. "An indictment is sufficient if it contains the
elements of the charged crime in adequate detail to inform the defendant of the charge and to
enable him to plead double jeopardy." *United States v. Buckley*, 689 F.2d 893, 896 (9th
Cir. 1982). "Two corollary purposes of an indictment are: (1) to ensure that the defendants are
being prosecuted on the basis of the facts presented to the grand jury, and (2) to allow the court
to determine the sufficiency of the indictment." *Id*. "Indictments alleging a scheme to defraud
must provide sufficient facts to fulfill the purposes of an indictment." *Id*. at 897.

As to allegations of wire and mail fraud, the Ninth Circuit has explained that "the
government is not required to prove any particular false statement was made. . . . Rather, there

are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements." *United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003) (cleaned up). In addition, "an element of mail or wire fraud is that the statements made or the facts omitted as part of the scheme be material." *Id*. A statement is material "if it is of a kind that would reasonably influence a person to part with money or property." *Id*. at 1000.

### c. Surplusage

Rule 7(c) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). Rule 7(d) provides that upon a motion by a defendant, a court may strike surplusage from the indictment. Fed. R. Crim. P. 7(d). The purpose of allowing a court to strike surplusage "is to protect the defendant against prejudicial allegations of irrelevant or immaterial facts." Charles Wright and Arthur Miller, 1 Fed. Prac. & Proc. Crim. § 128 (5th ed. 2022). "Words in the indictment describing what is legally essential to the charge in the indictment cannot be stricken as surplusage. Instead, a motion to strike should be granted only if it is clear that the particular allegations are not relevant to the charge and are inflammatory and prejudicial." *Id*. (footnotes omitted). "The presence of surplusage is not fatal to the validity of an indictment." *Id.* (footnote omitted); *see, e.g.*, *United States v. Root*, 366 F.2d 377, 381 (9th Cir. 1966) (surplusage "may be subject to a motion to strike at the instance of the [defendants] but surplusage is not fatal.").

### 2. Application

#### a. Duplicity

Both Jesenik and MacRitchie move to dismiss Count 1 as duplicitous. They argue that Count 1 of the superseding indictment charges two offenses under the same count: a conspiracy to defraud investors as well as a conspiracy to conceal Aequitas' declining financial situation.

They ask the Court to dismiss Count 1, or in the alternative, order the government to choose one or the other offense.

These Defendants also ask the Court to view as a separate offense an "omissions conspiracy" to hide information from their lawyers and accountants. Defendants purport to locate this separate conspiracy in the following paragraph within Count 1:

> Defendants, their coconspirators, and others under their control intentionally did not disclose the following material facts to outside accounting and legal firms: the Aequitas companies were consistently in liquidity and cash-flow crises; defendants and others used new investor money to repay earlier investors and to pay operating expenses rather than to buy trade receivables or other investments; and there was insufficient collateral to secure the notes sold to investors.

Superseding Indictment, ¶ 24. According to Jesenik and MacRitchie, Count 1 reasonably cannot be considered a single scheme because different groups were deceived: in one group, investors and investment advisors, and in the other, Aequitas's own lawyers and accountants. Applying the "overall agreement/relevant factors" test from *Gordon*, 844 F.2d at 1401, Defendants argue that the "omissions conspiracy" should be considered discrete because there was no "commonality of times and goals" between defrauding investors and misleading their own lawyers and accountants. And, they argue, the intent behind defrauding these two groups would have been different. Defendants also suggest that the superseding indictment does not connect the omissions made to lawyers and accountants with the conspiracy to defraud investors.

The government responds that at this stage of litigation, for objections to the *form* of the indictment, the Court should apply the "limited review" test from *King*. 200 F.3d at 1212. Only after evidence is presented at trial, the government states, should courts apply the more stringent test from *Gordon*. The government also argues that it is unambiguous on the face of the superseding indictment that the allegation of Defendants' intentional nondisclosure of material

facts to lawyers and accountants was one of the "manner and means" that Defendants used to carry out the single conspiracy of defrauding investors.

The Court agrees with the government that a "limited review" is the appropriate test at this phase of litigation. *See United States v. W.R.Grace*, 429 F. Supp. 2d 1207, 1218-19 (D. Mont. 2006) (explaining that the "overall agreement/relevant factors" test applies after trial and that the "limited review" test is used when the defendant makes a pretrial objection to the form of the indictment as duplicitous). Thus, the task now before the Court is solely to assess "whether the indictment itself can be read to charge only one violation in each count." *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013) (quoting *United States v. Martin*, 4 F.3d 757, 759 (9th Cir.1993)). The proper inquiry is whether Count 1 can be read to charge a single conspiracy, looking only at the face of the indictment.

The Ninth Circuit takes a "broad view" of what constitutes a "single scheme" to defraud. *United States v. Morse*, 785 F.2d 771, 774 (9th Cir. 1986). Here, that "single scheme" is alleged to be a scheme to defraud investors. On the face of the superseding indictment, Defendants' alleged misrepresentations to accounting and legal firms were but a "manner and means" that Defendants used to "carry out the scheme to defraud." *See* Superseding Indictment ¶¶ 11, 24, 25. Further, an indictment alleging conspiracy often describes its means without having those means treated as separate, stand-alone crimes. *United States v. Lischewski*, 2019 WL 2251104, at *3 (N.D. Cal. May 24, 2019). Categorizing the alleged deception under "manner and means" distinguishes this case from *United States v. Hardy*, in which a single count charged more than one conspiracy. 762 F. Supp. 1403, 1408 (D. Hawaii 1991). Unlike in *Hardy*, however, the government here is not claiming that Count 1 is "a single conspiracy which has as its object the commission of several crimes." *Id.* at 1410.

Thus, the government is not adding a distinct "omissions conspiracy" to deceive Aequitas's own lawyers and accountants, nor do they allege a separate crime. Rather, the alleged deception of Defendants' own lawyers and accountants *furthers* the conspiracy to defraud investors. Moreover, as in *Lischewski*, it is not just the face of the indictment that supports reading Count 1 as a single charge. *See* 2019 WL 2251104, at *3. The Court has no difficulty finding a logical relationship between the conspiracy to defraud investors and the alleged omissions made to the lawyers and accountants for Aequitas. Indeed, it may have been necessary to lie to the outside lawyers and accountants to continue defrauding investors.

Finally, the defrauding of different people may constitute one scheme. *Morse*, 785 F.2d at 774. That Aequitas' lawyers and accountants were distinct from the investors is immaterial. There is no risk that the facts presented at trial about the alleged conspiracy to defraud investors will lead to a separate "omissions conspiracy" conviction for misleading this other set of people. *See Lischewski*, 2019 WL 2251104, at *3. Because Count 1 can be plausibly read on its face to charge only one conspiracy, the Court denies Defendants' motion to dismiss Count 1.

### b. Sufficiency of Allegations

MacRitchie, joined by Jesenik, argues that the superseding indictment is flawed and that the Court should dismiss the wire fraud counts under Rule 12(b)(3)(B)(v) for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). These Defendants argue that the superseding indictment fails sufficiently to allege an essential element of wire fraud: that the alleged scheme to defraud was material. Any false statements were not material, Defendants argue, because the "sales talk" alleged to be a misrepresentation lacked the objective capacity to mislead those who purchased Aequitas' securities—sophisticated, accredited investors. Moreover, rather than alleging that Defendants intended to defraud investors when soliciting funds, the superseding indictment alleges only that most of the funds were not *used* to purchase trade receivables. According to

Defendants, the investors' expectations about how their money would be used amount, at most, to a breach of contract for "unfulfilled promises," rather than a scheme to defraud.

The government responds that the superseding indictment meets the standards applicable at this stage of the case under *Buckley,* because it goes beyond reciting only the statutory text and charges a cognizable and sufficient offense of wire fraud. The government describes Defendants' motion as a challenge to the sufficiency of the evidence, responding that a pretrial challenge to the indictment is not the appropriate time to require the government to present its proof.

The Court has already found that the original indictment was valid on its face and contained enough facts to enable Defendants adequately to prepare for trial. ECF 121 at 10 ("The Court finds that the Indictment and the government's discovery adequately inform Defendants of the nature of the charges against them with sufficient precision to enable them to prepare for trial, reduce the risk of unfair surprise, and avoid double jeopardy."). That is all that is required at this stage. *Buckley*, 689 F.2d at 897 ("[T]he issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the government can prove its case."). The superseding indictment has not eliminated facts or otherwise transformed the allegations so drastically as to deprive Defendants of their right to be informed of the charges against them. For the same reasons stated in the Court's earlier ruling, the Court finds that the superseding indictment is sufficient to the extent that it repeats the original indictment.

As for any newly alleged misstatements contained in the superseding indictment, Defendants argue that they fail to sufficiently allege materiality. Although a fraud indictment need not allege any specific false statements, it must at least allege proof of a scheme or artifice to defraud. *See United States v. Omer*, 395 F.3d 1087, 1098 (9th Cir. 2005) (per curiam);

*Woods*, 335 F.3d at 999. When an indictment's scheme to defraud relies on and alleges false statements, those statements need to be material. *United States v. Holmes*, 202 WL 666563, at *12 (N.D. Cal. Feb. 11, 2020). For wire fraud allegations, a statement is material "if it is of a kind that would reasonably influence a person to part with money or property." *Woods*, 335 F.3d at 1000. But "[t]he test for sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Holden*, 806 F.3d 1227, 1233 (9th Cir. 2015) (quoting *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009)). To be constitutionally sufficient, the government "need not allege . . . supporting evidence, but only the essential facts necessary to appraise a defendant of the crime charged." *See Buckley*, 689 F.2d at 897.

Here, the government meets the standard stated in *Buckley*. The superseding indictment alleges facts showing a scheme to defraud, as permitted in *Woods*. *See* Superseding Indictment, ¶ 11. It does so by charging that Defendants made material misrepresentations and misleading half-truths about the use of investor money, the financial health of Aequitas, Aequitas's investments and investment strategies, the risks of those investments and investment strategies, the use of investor money to repay prior investors and to pay operating expenses rather than buy trade receivables, the value of the Holdings Note, and the sufficiency of collateral securing the notes sold to investors. *Id.* ¶¶ 13, 16, 18, 19. The superseding indictment lists which concealed facts were material. *Id.* ¶ 16. And it demonstrates materiality, the ability to influence, by alleging that based on these misrepresentations and half-truths, victims invested more than $400 million. *Id.* ¶ 19. Having sufficiently alleged a scheme to defraud, the government need not add specific false statements adequately to inform Defendants of the nature of the charges against them.

The government also meets the sufficiency standard when the superseding indictment alleges specific misrepresentation. The superseding indictment states:

> Defendants, their coconspirators, and others under their control counted the Holdings Note as an asset even though defendants and others knew that the note was woefully under-collateralized and could not be repaid without the occurrence of several speculative contingencies. Defendants, their coconspirators, and others under their control concealed these facts from investors, misrepresenting the Holdings Note as ACF's most valuable asset and misleadingly describing it in marketing materials as "corporate debt."

Superseding Indictment, ¶ 18. This allegation is not far from the allegations contained in *Holmes*, which that court found sufficiently material because the misrepresentations at issue could give false impressions with a "natural tendency to influence." 2020 WL 666563, at *13 (finding sufficient an allegation that the defendants "told doctors and patients that their devices could provide 'accurate, fast, reliable, and cheap blood tests . . .' when, in fact, they knew that these tests could not 'consistently produc[e] accurate and reliable results'"). Rephrased to match the structure in *Holmes*, this allegation could be read to state that Defendants made misrepresentations to investors about the Holdings Note, when, in fact, they knew the note was not ACF's most-valuable asset and was under-collateralized. In their reply, Defendants dispute the materiality of this allegation. Their analysis, which questions whether the Holdings Note truly had no value and whether sophisticated investors could be influenced by this implied falsehood, dives into questions best suited for trial. That Defendants can "pick apart" this statement's falsity and its capacity to influence indicates that the superseding indictment "is constitutionally sound—it means Defendants know what they will face at trial." *Holmes*, 2020 WL 666563, at *7. The Court finds that the superseding indictment is sufficient to appraise Defendants of the crimes charged.

### c. Surplusage

In their motion to dismiss and strike surplusage, Defendants MacRitchie and Jesenik argue that the superseding indictment makes overly broad and prejudicial allegations that the Court should strike as surplusage. In the alternative, these Defendants seek further specification through a bill of particulars. Defendants point to the use of the words "including," "similar," and "among others" as open-ended terms that suggests additional, unspecified criminal conduct. These terms are prejudicial, Defendants argue, because they could lead the jury to speculate that Defendants are responsible for actions beyond those charged, in violation of the Fifth Amendment. Defendants also contend that the extrapolated calculations of total investments and total amounts owed to investors are misleading and prejudicial because not all investors were defrauded. Defendants alternatively seek a bill of particulars that would specify which investors were defrauded.

The government responds that the superseding indictment does not contain any unfairly prejudicial or inflammatory allegations. Rather, the government says, the purportedly broad terms simply reflect what the government plans to prove at trial. In any event, the government proposes to cure any prejudicial effect by withholding the indictment from the jury, consistent with local practice. Defendants are not satisfied with this proposal and argue that withholding the indictment from the jury overlooks the real risks associated with the broad text: that convictions could be based on evidence other than what was presented to the grand jury.

The Court partially agrees with Defendants that withholding an indictment from the jury, by itself, does not necessarily cure all constitutional issues that could arise from surplusage. But the Court disagrees with Defendants that the superseding indictment contains broadening text sufficient to risk a Fifth Amendment violation. At issue are open-ended terms like "including," "similar," and "among others," used to refer to alleged material misrepresentations and the

alleged scheme to defraud. Courts have struck broad terms and phrases like "among other things" from indictments when they add nothing to the charges and invite Fifth Amendment concerns. *See, e.g.*, *United States v. Lonich*, 2016 WL 324039, at *5-6 (N.D. Cal Jan. 27, 2016) (striking the phrase "and others" from portions of an indictment that identified victims and the phrase "among other things" from the paragraph charging an offense). Broadening phrases "are potentially prejudicial because they could lead the jury to speculate that the defendant was guilty of or responsible for actions in addition to those charged in the indictment, or permit the prosecution to go beyond the specific charge . . . made by the grand jury when presenting evidence at trial." *United States v. Menendez*, 137 F. Supp. 3d 688, 707 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016) (cleaned up). Here, however, the terms used in the "manner and means" section do not present the same risks as broadening terms contained in specific charges themselves. "[C]ourts have approved the use of broadening [phrases] in the 'means' section of indictments because it goes only to the matter of proof and does not constitute a basis for asserting that the notice provided in a charge is constitutionally defective." *Lonich*, 2016 WL 324039, at *6 (cleaned up) (quoting *Menendez*, 137 F. Supp. 3d at 707).

The challenged terms and phrases here are only found in the "manner and means" sections. These sections do not imply further criminal conduct or expand the charges but merely provide detail on how Defendants allegedly engaged in the charged conspiracy. Unlike in *Lonich*, the broadening phrases here do not create a "danger that the prosecutor at trial may impermissibly enlarge the charges contained in the Indictment returned by the grand jury," 2016 WL 324039, at *6. Instead, they simply reflect the government's intended proof relevant to the charges at trial.

Defendants also argue that the broadening words "including" and "similar" appear in allegations of material misrepresentations and half-truths, and are thus essential elements of the offense, even though they are contained in the manner and means section. But as the Court discussed regarding sufficiency, the superseding indictment sufficiently alleged materiality in the scheme to defraud investors on the face of the indictment, without needing to rely on broadening phrases. The phrases here do not "constitute impermissible delegation of authority to the prosecution to enlarge the charges contained in the indictment," as Defendants suggest. *See United States v. Pope*, 189 F. Supp. 12, 26 (S.D.N.Y. 1960). If an issue arises at trial with specific statements that may impermissibly go beyond the groundwork in the superseding indictment, jury instructions and evidentiary rulings can ensure that the jury will hear the same alleged material misrepresentations that the grand jury heard.

Finally, Defendants argue that the use of dollar amounts for total investments and total sums owed to investors at the time of Aequitas's collapse is not specific enough to enable Defendants to prepare for trial. They suggest that these over-inclusive calculations create a risk that the government will present evidence at trial that was not before the grand jury. Yet, as the government stated at oral argument, it is not the government's position that the loss attributable to the allegedly fraudulent scheme totals $600 million. "The purpose of a motion to strike under Fed. R. Crim. P. 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988) (cleaned up). The dollar amounts are not prejudicial or inflammatory allegations because the jury will not see the indictment containing these numbers. If the government plans to introduce these numbers to the jury, the Court expects that they will be appropriately and clearly phrased so as not to unfairly mislead the jury. The Court will hear

motions *in limine* as needed on this issue. The Court denies the motion to strike and again denies

Defendants' request for a bill of particulars. The Court finds that Defendants are on fair notice of

the government's theory of the case. *See* ECF 121.

## D. Defendants' Motions to Dismiss: Statute of Limitations

### 1. Standards

An indictment tolls the statute of limitations for charges contained in the indictment.

*United States v. Wilsey*, 458 F.2d 11, 12 (9th Cir. 1972). "Tolling continues when a superseding

indictment on the same charges is returned while a previous indictment is still pending." *United*

*States v. Liu*, 731 F.3d 982, 996 (9th Cir. 2013) (cleaned up). "If the counts in the superseding

indictment broadened or substantially amended the charges in the original indictment, the statute

of limitations would not have been tolled as to those charges." *Id*. (cleaned up). "To determine

whether a superseding indictment substantially broadens or amends a pending timely indictment,

it is appropriate to consider whether the additional pleadings allege violations of a different

statute, contain different elements, rely on different evidence, or expose the defendant to a

potentially greater sentence." *Id*. at 996-97 (cleaned up). Superseding indictments that add detail

to the original charges, narrow the charges, or contain amendments to form but not substance,

relate back to the original indictment. *See United States v. Babichenko*, 2020 WL 4462066, at *3

(D. Idaho Aug. 3, 2020) (citing *United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir. 1999)); *United*

*States v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777, 779 (9th Cir. 1986) (holding that one added

detail did not constitute a major change in the superseding indictment).

"The central concern in determining whether the counts in a superseding indictment

should be tolled based on similar counts included in the earlier indictment is *notice*." *Liu*, 731

F.3d at 997 (quotation marks omitted; emphasis added). "If the allegations and charges are

substantially the same in the old and new indictments, the assumption is that the defendant has

been placed on notice of the charges against him. That is, he knows that he will be called to account for certain activities and should prepare a defense." *Id*. (cleaned up).

### 2. Application

Defendants ask the Court to dismiss Counts 1, 3, 4, 9-13, 15, 22, 26, and 30 as barred by the applicable statute of limitations. The statute of limitations for wire fraud, money laundering, and conspiracy is five years. 18 U.S.C. § 3282. Defendants argue that the superseding indictment fails to toll the statute of limitations because it broadens or substantially amends the charges in the original indictment. The government responds that the key inquiry under Ninth Circuit precedent, as stated in *Liu*, is whether Defendants have previously received adequate notice of the charges contained in the superseding indictment. The government argues that Defendants had adequate notice, and therefore the superseding indictment properly tolls the statute of limitations. As more fully explained below, the Court finds that the original indictment adequately put Defendants on notice of all contested charges in the superseding indictment and the superseding indictment relates back to the original indictment.

### a. Counts 1 and 30

Regarding Count 1, Defendants assert that the superseding indictment introduces substantive factual changes that rely on different evidence and expand the scope of liability. They argue that the superseding indictment expanded the conspiracy allegation in four ways: (1) replacing the phrase "others, known and unknown" with "others under their control," which implicates the conduct of all Aequitas employees; (2) adding or replacing "omissions" with "half-truths"; (3) adding a theory of fraud by misrepresentation when elaborating upon how Defendants concealed facts about the Holdings Note from investors; and (4) introducing a "kick-back theory of fraud," by which conspirators sought unduly to influence independent fiduciaries. According to Defendants, these expansions of liability alter the evidence and trial preparation

required. The government responds that the only significant differences between the allegations in the two indictments are added details, not different or distinct conduct or transactions, and thus the Defendants were adequately notified of the charges.

Rgearding Count 30, Defendants argue for dismissal because the superseding indictment incorporates impermissible factual changes, new counts, and impermissibly transformed certain counts. According to Defendants, Count 30 incorporates substantial amendments because it relies on new allegations of monetary transactions in the Count's "Manners and Means" section. They argue these allegations, including the use of investor money to pay for fringe benefits and for MacRitchie's New York apartment, are materially different from those in the original indictment. The government responds that these additions do not materially broaden the conspiracy allegation, but rather, add specific details in a manner previewed in the original indictment.

For Counts 1 and 30, the Court finds that the statute of limitations was properly tolled. In both counts, the alleged crimes remain the same. Superseding indictments that add detail to the original charges, narrow the charges, or contain amendments to form but not substance, relate back to the original indictment. *See Babichenko*, 2020 WL 4462066, at *3. This is what these counts do.

On Count 1, none of the four allegations of substantial factual changes broaden or amend the charges so significantly as to fail the notice test in *Liu*. Under *Liu*, to "determine whether a superseding indictment substantially broadens or amends a pending timely indictment," courts consider "whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence." 731 F.3d at 996-97. The new Count 1 charges the same statute, elements, and

sentence as the old Count 1. The only question here is whether the new factual allegations contained in the superseding indictment, presented as "different evidence," are permissible. The Court finds that they are.

First, the term "others under their control" simply adds detail. Although the original phrase, "others, known and unknown," may be a term of art that sometimes refers to coconspirators, the new phrase clarifies how Defendants engaged in their conspiracy—by directing subordinates to aid them in the scheme to defraud investors. This detail narrows, rather than expands, the research and preparation that Defendants must do for trial. Speculative evidentiary issues, such as whether any employee's specific statement could be admissible as a statement made by a coconspirator, may be addressed in evidentiary hearings, motions *in limine*, or at trial.

Second, the substitution of the word "omissions" for "half-truths" in Count 1 also simply adds detail to the original indictment. The term "half-truths" specifies, rather than expands, the theory of liability under the broader term "omissions." Omissions by themselves are rarely liability-creating under a theory of fraud unless there is a duty to speak, either because of a special or other similar relationship or because of a theory of half-truths. *See United States v. Manion*, 339 F.3d 1153, 1157 n.2 (9th Cir. 2003) (finding an indictment charging a scheme to defraud, premised on omissions, tracked a jury instruction that statements could be "misleading and deceptive" based on "half-truths and concealment of material facts"); *United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010) (holding that the duty to disclose arises from "a fiduciary relationship or a similar relationship of trust and confidence," but explaining that it may also arise "from the telling of a half-truth, independent of any responsibilities arising from a trust relationship"). This substitution, therefore, merely clarifies that the duty to disclose in this

case arises from the allegedly misleading half-truths, not from any independent duty to disclose. Other portions of the superseding indictment abandon, and therefore narrow, allegations of Defendants' omissions. Further, Defendants previously moved to dismiss Count 1 in the original indictment because it alleged omissions rather than half-truths. ECF 142 at 4-7. This earlier motion indicates that Defendants were on notice of a half-truth theory of liability, thereby satisfying the key inquiry in *Liu*.

Third, the superseding indictment does not add a new theory of fraud by misrepresentation when elaborating upon how Defendants concealed facts about the Holdings Note from investors. The original indictment alleges that Defendants used the Holdings Note to mislead investors and lists facts about the Holdings Note as "things that were concealed from investors." The new indictment explains *how* Defendants concealed those facts through their representations and marketing materials. This is a detail, not a broad amendment or a new theory of fraud.

Fourth, the government is not introducing a "kick-back theory of fraud" by which conspirators sought unduly to influence RIAs. The government confirmed at oral argument that they may call RIAs to testify as trial witnesses, but this "kick-back theory" is not part of any new theory of liability under which the prosecution will proceed. Any efforts to the contrary can be addressed at trial.

The other contested portions in Count 1 and Count 30 do not broaden or expand the charges against Defendants. In Count 1, additions such as specifying the internal nickname for the "blue light special" and the reference to Bank of America's CashPro system as the online digital banking platform used in the alleged wire fraud charges, merely add detail to the original charges and thereby relate back to the original indictment. *Babichenko*, 2020 WL 4462066, at *3.

Similarly, the added "manner and means" allegations in Count 30, simply provide greater detail to the allegations by specifying three ways in which Defendants used the fraud proceeds. The government need not provide proof of overt acts in a money laundering conspiracy. *Whitfield v. United States*, 543 U.S. 209, 214 (2005). That they did so here narrows, rather than expands, the research and preparation that Defendants must do for trial.

Moreover, the changes in Count 30 are well within the bounds of additional clarification that courts have routinely affirmed. The original indictment placed Defendants on notice that the money laundering conspiracy would focus on diversion of new investor money for salaries, operating expenses, "private jets and pilots, office renovations, an office expansion, . . . and extravagant events . . . ." Original Indictment, ¶ 21. Count 30 in the superseding indictment alleges that investor money was diverted for salaries, fringe benefits, and MacRitchie's personal residence. These are "approximately the same facts" used to charge identical offenses and may be used for the basis of the new indictment. *United States v. Charnay*, 537 F.2d 341, 354 (9th Cir. 1976); *Liu*, 731 F.2d at 997 (explaining that the defendant has been placed on notice of the charges against him if "allegations and changes are substantially the same in the old and new indictments"). Therefore, for Counts 1 and 30, which merely add details to the original indictment without broadening the charges, the Court finds that the statute of limitations was properly tolled.

### b.  Counts 3, 4, and 15

Defendants also argue that Counts  3, 4, and 15 are new counts that do not toll the statute of limitations. Regarding Counts 3 and 4, Defendants move to dismiss new charges of wire fraud because the specific transactions at issue do not appear in the original indictment. The government responds that these new charges took place in the same timeframe and had the same purpose, so the charges overall are substantially the same and the original indictment fairly

alerted the Defendants to the new wire fraud charges. Regarding Count 15, Defendants argue that this count contains a distinct financial transaction, although related to one in the original indictment, and is therefore time-barred. In the superseding indictment, this count is now charged as wire fraud, instead of money laundering, which was the related charge in the original indictment. In their reply, Defendants add that the government did not even know about this transaction until March 2022, and its belated addition is barred by the statute of limitations.

It has been clear since the outset of this case that the government has charged these Defendants with defrauding investors. The specific wire fraud counts added as Counts 3 and 4 in the superseding indictment are part of the broader alleged conspiracy, the same conspiracy charged in the original indictment. Although Counts 3 and 4 involve different wire transactions, with different monetary amounts and subscription agreements (and likely based on different representations to different underlying investors) than was alleged in the original indictment, both counts are alleged to have taken place on August 13, 2015, which is *during* the timeframe of the conspiracy alleged in the original indictment. The original indictment alleged that the conspiracy to commit fraud began "no later than in or about June 2014, and continu[ed] through in or about February 2016." Original Indictment, ¶ 8. Therefore, "the original indictment fairly alerted the defendant[s] to the subsequent charges against [them] and the time period at issue." *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003) (applying the "broadens or substantially amends" test to overt acts which did not appear in the original indictment and finding that they tolled the statute of limitations). As in *United States v. Kuper*, another conspiracy case in which the superseding indictment added new counts of mail fraud, Defendants "cannot credibly claim that . . . additional mail fraud Counts . . . caused unfair surprise." 2009 WL 1119490, at *4 (E.D. Pa. Apr. 27, 2009). Because the superseding indictment charges a

scheme to defraud, it is distinct from the facts in *Liu*, where the later indictment included a novel charge of movie piracy. In that case, the Ninth Circuit held that Liu had "no notice whatsoever that he should prepare to be prosecuted for willfully infringing a motion picture work." *Liu,* 731 F.3d at 997. As previously explained, notice is the "central concern" of the *Liu* standard. *Id*. Here, by contrast, the original indictment gave Defendants notice that they could be called to account for any transactions during the timeframe of the alleged conspiracy and should prepare their defense accordingly.

Other considerations under the *Liu* standard support this finding. Counts 3 and 4 charge the same statute, involve the same elements, are based on the same evidence, involve the same defendants, and allegedly execute the same scheme to defraud. The only remaining factor under *Liu* is that the two new counts charge new criminal allegations, nominally exposing Defendants to a potentially greater sentence. But the potential for imposition of a greater penalty "does not render the charges in the superseding indictment broader than those in the original indictment." *Sears, Roebuck & Co., Inc.*, 785 F.2d at 779. The government argues that an increase here to Defendants' potential sentences is "implausible" in this context when compared to the underlying scheme these wires helped effect. *Cf. United States v. Wetselaar*, 2015 WL 10734178, at *3 (D. Nev. Dec. 1, 2015), *report and recommendation adopted*, 2016 WL 1659918 (D. Nev. Apr. 25, 2016) (striking a transaction that was added to the superseding indictment "because its inclusion may affect the applicability of the penalty enhancement provisions"). Following the rationale explained in *Sears, Roebuck & Co.*, the Court does not place outsized weight on this factor and finds that Counts 3 and 4 relate back to the original indictment. For the same reasons, Count 15 also relates back.

### c.   Counts 9-13, 22, and 26

Regarding Counts 9-13, 22, and 26, Defendants argue that the government's transformation of seven counts of money laundering into seven counts of wire fraud impermissibly changes the statute, elements, and penalties of the crimes charged. Wire fraud carries a maximum penalty of 20 years of imprisonment; money laundering carries a maximum sentence of ten years. To these counts, as with Count 15, the government responds that the statute charged is immaterial to the statute of limitations inquiry when the factual allegations underlying the counts in the two indictments are identical. The government also states that Defendants previously moved to dismiss the original indictment on the grounds that the transmissions at issue should have been charged solely as wire fraud offenses, not as money laundering, proving that Defendants were on notice of the need to defend these activities. According to the government, the greater maximum sentence does not preclude relation-back, and this concern is "academic" in the context of so many other wire fraud charges.

Transforming Counts 9-13, 22, and 26 from money laundering charges to wire fraud allegations does not fail to toll the statute of limitations if Defendants had adequate notice that they would be called upon to defendant these activities and transactions. Under *Liu*, "if the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him." 731 F.3d at 997. Here, as Defendants admit, these counts involve the same monetary transactions, the same dates, the same amounts, and the same investors as described in the previous counts. It is immaterial that the statute, elements, and punishment have changed because "[t]he central concern . . . is notice." *Id*.[4] Defendants in this case were aware from the original indictment that they would be

---

[4] The parties do not agree about the relevance of *Sears, Roebuck & Co.* as applied to these facts. In that case, the Ninth Circuit held that twelve counts charged under a different

called to account for these activities and should prepare their defense. Defendants previously challenged the framing of the transactions at issue, arguing that these counts should have been charged as wire fraud, not money laundering. After the superseding indictment changed these counts to wire fraud, Defendants cannot persuasively claim they were not on *notice* that they would be called to account for these activities and transactions.

In summary, the Court denies Defendants' motion to dismiss Counts 1, 3, 4, 9-13, 22, 26, and 30 because these charges are sufficiently related to the original indictment to put Defendants on notice that they should prepare defenses for these activities.

**E.  Defendants' Motion for Early Disclosure of Coconspirator Statements**

Jesenik, joined by MacRitchie, moves the Court to schedule and conduct a hearing in which the government is required to identify and establish the basis for each out-of-court statement by an alleged coconspirator that the government intends to offer at trial under Rule 801(d)(2)(E) of the Federal Rules of Evidence.[5] In support, these Defendants rely on the Fifth Circuit's decision in *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc). That decision, however, has been overruled in significant respects. *See United States v. Chestang*, 849 F.2d 528, 531 (11th Cir. 1988) ("Thus, our decision in *James* has been overruled to the extent

---

statute in a superseding indictment did not broaden the original indictment and thus were not barred by the statute of limitations. 785 F.2d at 779. Although the counts were brought under a different statute, none of the elements had changed because the superseding indictment merely substituted a lesser included offense of the prior statute charged. *Id.* That is not the case here. Even so, *Sears, Roebuck & Co.* indicates that both the statute *and* the punishment can change, and the superseding indictment may still relate back to the original indictment. *Id.* Three decades later, the Ninth Circuit clarified that changes in the statute, elements, evidence, and punishment are relevant to the "central concern" of notice. *Liu*, 731 F.3d at 997. Notice, then, is the Court's key inquiry.

[5] This rule provides that an out-of-court statement offered against an opposing party is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

that it did not allow district courts, in making preliminary factual determinations under Rule 801(d)(2)(E), to examine the coconspirator statements sought to be admitted."); *see also United States v. Martinez-Perez*, 941 F.2d 295, 300 n.1 (5th Cir. 1991) (noting that *Chestang* states that *James* has been partially overruled by the Supreme Court in *Bourjaily v. United States*, 483 U.S. 171 (1987)). In *Bourjaily*, the Supreme Court ruled that in preliminary questions over the admissibility of evidence, a court is not bound by the rules of evidence except with respect to privileges. 483 U.S. at 177-78. Thus, contrary to the ruling in *James*, a court may consider a statement made by a putative coconspirator in deciding whether a statement is admissible against another putative coconspirator under Rule 801(d)(2)(E).

Jesenik and MacRitchie, however, argue that a portion of *James* that suggests that a court make a pretrial determination of the admissibility of a coconspirator's statement remains unchanged after *Bourjaily*. That may be so, but it is not the approach taken in the Ninth Circuit. *See, e.g.*, *United States v. Perez*, 658 F.2d 654, 658 n.2 (9th Cir. 1981) ("Unlike the Fifth Circuit, this court has declined to express a 'preference' for pretrial determination of admissibility of the coconspirator's statements."); *United States v. Gere*, 662 F.2d 1291, 1294 (9th Cir. 1981) ("The trial judge may make a preliminary determination of admissibility or may admit the testimony conditionally, subject to 'connecting up' with the foundation to be eventually laid by the prosecution."); *see also United States v. Zemek*, 634 F.2d 1159, 1169 n.13 (9th Cir. 1980) ("In light of consistent Ninth Circuit precedent allowing conditional admission, we reject [the] argument for a mandatory pretrial determination.").

Such a departure from standard practice in this circuit is especially unnecessary in this case. Defendants have access not only to the reports of interviews generated by the FBI, IRS, and the Department of Labor, but also to the transcripts and recordings of most of those interviews.

Defendants also have access to copies of the SEC's investigative files and enjoy the same access to Aequitas's books and records (including emails from Aequitas employees) that the government does. Moreover, under the Court's scheduling order, the government has provided Defendants with the government's preliminary exhibit list, ECF 256, which identifies the documentary statements that the government may seek to admit under Rule 801(d)(2)(E), and the government soon will be disclosing its witness list. If Defendants have any specific objections to specific statements, they may raise them when they file their motions *in limine*, which are due January 10, 2023, almost four months before trial begins.

As an alternative to ordering a *James* hearing, Defendants ask the Court to order the government to summarize the statements it intends to offer and to provide the foundation for each admission. Defendants assert this is necessary because they do not know who said what to whom in the formation of a conspiracy and the only way to find out is by wading through extensive discovery. This request to be rooted in the same discovery concerns underlying Defendants' prior motion to continue. *See* ECF 253. The Court denies Defendants' request. Defendants already have significant information about the anticipated testimony of government witnesses. They have access to tools that reduce the burden of combing through discovery. And, as stated above, the government's preliminary exhibit list already identifies the documentary statements that the government may seek to admit as coconspirator statements. Further summary is unwarranted in this context.

Following Ninth Circuit practice, the Court denies Defendants' motion for early disclosure of coconspirator statements or for a *James* hearing. The Court also denies Defendants' alternative request for a summary of statements, just as it previously denied Defendants' earlier motion for a bill of particulars. *See* ECF 121.

**CONCLUSION**

The Court DENIES Jesenik's Motion for Severance of Joint Trial (ECF 205). The Court DENIES Jesenik's Motion to Sever Count 31 from Counts 1-30 (ECF 207). The Court DENIES Rice's Motion for Severance (ECF 212). The Court DENIES MacRitchie's Motion for Severance (ECF 217). The Court DENIES Jesenik and MacRitchie's Motion to Dismiss Count 1 (ECF 209). The Court DENIES MacRitchie's Motion to Dismiss and to Strike Surplusage (ECF 216). The Court DENIES Defendants' Motion to Dismiss based on Statute of Limitations (ECF 221). Finally, the Court DENIES Defendants' Amended Joint Motion for Disclosure of Coconspirator Statements and *James* Hearing (ECF 210).

**IT IS SO ORDERED**.

DATED this 20th day of October, 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge