IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **ROBERT J. JESENIK,** <br> **ANDREW N. MacRITCHIE,** <br> **and BRIAN K. RICE**, <br><br> Defendants. | Case No. 3:20-cr-228-SI <br><br> **OPINION AND ORDER ON JOINT MOTION TO DISMISS** |

Natalie K. Wight, United States Attorney, and Ryan W. Bounds, Christopher L. Cardani, Siddharth Dadhich, and Hannah Horsley, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Ave., Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Conor Huseby, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204; Scott L. Mullins, MULLINS LAW OFFICE LLC, 1000 SW Broadway St., Suite 2300, Portland, OR 97205; and Per C. Olson and Megan E. McVicar, HOEVET OLSON PC, 1000 Broadway, Suite 1740, Portland, OR 97205. Of Attorneys for Defendant Robert J. Jesenik.

Michael Tremonte and Anna Maria Estevao, SHER TREMONTE LLP, 90 Broad St., 23rd Floor, New York, NY 10004; and Samuel C. Kauffman, KAUFFMAN KILBERG LLC, 1050 SW Sixth Ave., Suite 1414, Portland, OR 97204. Of Attorneys for Defendant Andrew N. MacRitchie.

Angelo J. Calfo, Patricia Anne Eakes, Damon C, Elder, and Molly A. Terwilliger, MORGAN, LEWIS & BOCKIUS LLP, 1301 Second Ave., Suite 2800, Seattle, WA 98101. Of Attorneys for Defendant Brian K. Rice.

**Michael H. Simon, District Judge.**

Defendants Robert J. Jesenik and Andrew N. MacRitchie have moved for dismissal of the indictment or for other lesser sanctions, as well as discovery and an evidentiary hearing. ECF 345. They argue that the prosecution engaged in misconduct that substantially interfered with one of their expert witnesses. Because the Court finds neither substantial interference nor prosecution misconduct, the Court denies the pending motion.

## BACKGROUND

### A.  The Charges

In July 2020, a grand jury indicted four individuals in this action, Mr. Jesenik, Mr. MacRitchie, Brian K. Rice, and N. Scott Gillis. Mr. Gillis has pleaded guilty and is awaiting sentencing. In addition, two other individuals were indicted in related actions, and they have since pleaded guilty and are awaiting sentencing. In July 2022, a grand jury returned a superseding indictment against Messrs. Jesenik, MacRitchie, and Rice. Against these defendants, the superseding indictment charges one count of conspiracy to commit mail and wire fraud, 28 counts of wire fraud, and one count of conspiracy to commit money laundering. The superseding indictment also charges Mr. Jesenik with one count of making a false statement on a loan application.

The charges all relate to the defendants' alleged activities with the Aequitas group of companies, including Aequitas Management LLC, Aequitas Holdings LLC, Aequitas Commercial Finance LLC (ACF), Aequitas Capital Management Inc., and Aequitas Investment Management LLC (collectively, Aequitas). The defendants allegedly conspired to mislead investors by using ACF and other related Aequitas companies to solicit investments in notes and funds for the purported purpose of buying trade receivables, when in fact the investments were used predominantly to pay off earlier investors and defray Aequitas's operating expenses.

Aequitas collapsed in early 2016, owing its investors more than $600 million. Aequitas allegedly had been insolvent since July 2014 through the date of its collapse in February 2016. In March 2016, the Securities and Exchange Commission brought a civil action in federal court, and the judge appointed a receiver to take control over the Aequitas-entity defendants in that case, their subsidiaries, and all majority-owned affiliates.

Mr. Jesenik founded Aequitas in Lake Oswego, Oregon, and served as its Chief Executive Officer. He controlled the structure of Aequitas and had ultimate decision-making authority over its various activities. Mr. MacRitchie served as an Executive Vice President and Chief Compliance Officer. He was responsible for the development and implementation of risk management and compliance processes and procedures. He also oversaw accounting, legal, and audit functions, as well as fundraising. Mr. Rice served as an Executive Vice President. He oversaw the solicitation of investments through registered investment advisors (RIAs) and managed Aequitas's RIAs.

Defendants and others allegedly used ACF and other Aequitas-related companies to solicit investors through the issuance of promissory notes and interests in Aequitas-created investment funds, many of which were purportedly backed by trade receivables in education, health care, transportation, and other consumer credit areas. Defendants allegedly used invested funds not only to pay Aequitas's operating costs but also to repay other investors. Defendants allegedly made material misrepresentations and omissions when soliciting and discussing the status of investments with investors and investment advisors. Defendants also allegedly used an intercompany loan to Aequitas Holdings, LLC to prop up ACF and other Aequitas entities and mislead investors, concealing from investors information that the intercompany loan was significantly under-collateralized and could not be repaid without the occurrence of several

speculative contingencies. Individuals allegedly invested more than $400 million between January 2014 and February 2016.

**B. Defense Expert Witness Jason Ambers**

Jason Ambers is a Senior Securities Registration & Enforcement Attorney employed by the Oregon Department of Consumer & Business Services (DCBS), Division of Financial Regulation (DFR). At DCBS, Mr. Ambers makes recommendations regarding whether DCBS should take enforcement action against a party for violations of Oregon securities laws. In addition to his work at DCBS, Mr. Ambers privately provides expert reports and testimony on issues related to the application of federal and state securities laws through his consulting business, Aspen Street Consultants. ECF 274 at 11; ECF 274-1 at 8.

On April 29, 2021, Mr. Jesenik's counsel contacted Mr. Ambers about the possibility of Mr. Ambers consulting with and testifying as an expert witness for the defense. ECF 346-1 at 5. The next day, April 30, Mr. Ambers sent an email to Kirsten Anderson, the Deputy Administrator of the DFR at OCBS. *Id*. at 4-6. Mr. Ambers said that he had a "question regarding the Department's Ethics and Conflicts of Interest Policy under EMP-01." *Id*. at 5.[1] In his email, Mr. Ambers explained that he "was asked yesterday by an attorney about consulting and testifying for compensation as an expert in a federal criminal trial that is set to occur in 2023." *Id*. He added: "From what I understand, the defendant was an executive officer of an investment management firm that was alleged to have participated in in [*sic*] a massive ponzi-like scheme in around 2013 to 2016." *Id*. Mr. Ambers also stated that it was his understanding that DFR "decided not to open an investigation against either party or take enforcement action and I played no role in that decision." *Id*. He continued:

---

[1] A copy of the DCBS's EMP-01 is found at ECF 346-5.

PAGE 4 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

> [The U.S. Attorney's Office] has charged the defendant with mail and wire fraud and did not charge him [with] securities fraud. Any testimony or report by me would be based on my experience in the federal securities law and not the Oregon Securities Law. . . . I would also disclose my employment with DFR and my role at DFR, but I would also make clear that I am in no way testifying on behalf of the Division or expressing the policies of the Division. Further, any work that I do on this project would be on my own time and would not use any state resources, including supplies, facilities, or personnel.

*Id*. He concluded by saying that EMP-01 "seems to put the onus on complying with the policy on the employee and the employee can be disciplined for violating that policy." He asked whether he "could get some sort of determination in advance as the last thing [he] would want is to run afoul of the Department's ethics rules." *Id*. at 6.

Ms. Anderson responded that these are "all very good questions" and that she would inquire whether "there's a way to get an ethics opinion on this." *Id*. at 4. Mr. Ambers expressed his appreciation and noted that the attorney who contacted him would like a response "in a week or so." *Id*. On May 10, 2021, Mr. Ambers sends another email to Ms. Anderson, asking whether she had heard back regarding an ethics opinion. *Id*. at 3. She responded that she had not yet heard back. *Id*. The next day, May 11, Mr. Ambers sent another email, this time stating that he has done some further research himself and "I think I was able to find the answer to my question." *Id*. at 2. He added: "ORS 244.284 gives the staff of the Oregon Government Ethics Commission the authority to advice [*sic*] regarding the application of ORS Chapter 244 as it relates to a set of actual or hypothetical facts." *Id*. at 2-3. He concluded his May 11 email by stating: "I mostly wanted to let you know that *I don't think its [sic] necessary to relay my question to Barb at this point*. Thanks for agreeing to facilitate that communication." *Id*. at 3 (emphasis added). Mr. Ambers then accepted the outside private work without first obtaining a staff opinion from the Oregon Government Ethics Commission (OGEC). *See* ECF 346-9 at 3.

PAGE 5 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

Approximately eighteen months later, on November 7, 2022, Mr. Jesenik and Mr. MacRitchie filed their expert witness disclosure in this case, stating their intent to call Mr. Ambers as a securities fraud expert witness, in addition to their accounting expert. This disclosure included Mr. Ambers's biographical information, showing his current work for the DFR at DCBS. ECF 274 and 274-1. In that disclosure, the ethics policy contained in EMP-01 is referenced in a footnote. ECF 274 at 11 n.2.[2]

Christopher Cardani is an Assistant United States Attorney (AUSA) working on this case. Rachel Royston currently works for the U.S. Attorney's Office in Portland as a financial investigator, and she previously worked in that same role for the DFR at DCBS. Ms. Royston told AUSA Cardani that she believed that the DFR previously worked on a matter involving Aequitas at some point in time, but she was uncertain whether Mr. Ambers worked on that project. Ms. Royston also knew from her job at the DFR about some type of ethics policy

---

[2] In that footnote, Defendants state:

> Mr. Ambers will testify in a private capacity. His conclusions and opinions will be his own and were reached in strict compliance with ORS 244 and the administrative rules promulgated thereunder as well as DCBS's internal Ethics and Conflict of Interest Policy (EMP-01) that was in effect as of January 6, 2017. He will not assert in any way that his conclusions and opinions are those of the DCBS, or any staff member or employee of DCBS or the Division of Financial Regulation. He has not consulted with any staff member or employee of DCBS or the Division of Financial Regulation regarding his opinions related to this case. He also did not use any DCBS resources, including any confidential, non-public information, when reaching his conclusions and opinions. His opinions will based on the facts as he understands them. He acknowledges that different facts could lead to a different conclusion.

ECF 274 at 11 n.2.

PAGE 6 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

relating to paid outside work that might be in conflict for Mr. Ambers working on this matter. ECF 385 at 2.[3]

On November 23, 2022, AUSA Cardani and Ms. Royston had a prearranged conference call regarding an unrelated matter with attorney Caroline Smith (a Financial Enforcement Officer with the DFR at OCBS) and Assistant Attorney General Jacob Gill (with the Oregon Department of Justice). After discussing the unrelated matter, which involved an investigation being conducted by the U.S. Attorney's Office in Portland and the FBI, AUSA Cardani told Ms. Smith and Mr. Gill that the defense in the Aequitas criminal case had recently filed a notice stating that Mr. Ambers, an attorney with the DFR at DCBS, would be testifying as one of the expert witnesses for the defense. AUSA Cardani added that the defense filing referenced an Oregon ethics policy. ECF 385 at 2.

AUSA Cardani asked Ms. Smith if her office had worked on any matters related to Aequitas and if so whether Mr. Ambers participated in that work. AUSA Cardani also asked what the DCBS ethics policy provided and whether there were any limits on what Mr. Ambers could say during his testimony. *Id*. Ms. Smith replied that she was unaware of Mr. Ambers's testimony, that she believed that DFR had done some work on an Aequitas matter (although she did not personally work on that project), and that she would forward AUSA Cardani's inquiry to a person named "Dororthy" and someone would get back to him. *Id*.

---

[3] In their motion, Defendants asked the Court to order certain documents be provided by the prosecution and to hold an evidentiary hearing. After reviewing the parties' briefs, the Court directed the prosecution to provide certain documents for the Court's *in camera* review. ECF 383. The prosecution then submitted an unredacted copy of what later became ECF 385. After reviewing that document *in camera*, the Court was satisfied that this document should be provided to defense counsel with one proper last name redacted (*see* ECF 384), no additional documents need be produced, and no evidentiary hearing was needed. The prosecution then filed the document with one unrelated name redacted as ECF 385.

PAGE 7 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

AUSA Cardani asked Ms. Royston to send Ms. Smith a copy of the defense notice of expert witness and its attachment relating to Mr. Ambers, which she did.[4] On November 28, 2022, Ms. Smith sent an email to AUSA Cardani confirming receipt of the defense filings and stating that she had forwarded those materials to Dorothy Bean, Chief of Enforcement, at the DFR. ECF 346-1 at 16-17. Later that day, Ms. Bean informed others within the DCBS that Mr. Ambers had been privately retained to serve as an expert witness for Mr. Jesenik in his criminal trial related to Aequitas. *Id*. at 51. She asked whether anyone else in DCBS knew about Mr. Ambers's agreement to consult and testify and explained that Caroline Smith and Jacob Gill "got a call last week from an FBI agent, which is when we first heard of this plan." *Id*. Still later that day, Ms. Bean sent an email to others at DCBS, including Ms. Anderson, stating: "Just an update from my call with Caroline and Jake – one big concern of the FBI and USAO is that we participate in multiple fraud workgroups where they are sharing confidential case information, and would have serious reservations about doing so in the future if DFR staff is at times serving in this capacity." ECF 346-1 at 7.[5]

In early December 2022, AUSA Cardani told Defendant Jesenik's counsel Scott Mullins about the inquiry with the DFR about Mr. Ambers. ECF 385 at 2-3. On December 21, 2022, Kirsten Anderson, the Deputy Administrator of the DFR, requested from the OGEC "an opinion

---

[4] Ms. Royston directed Ms. Smith's attention to Mr. Ambers's statement about his compliance with Oregon law and ethics rules. *See* ECF 346-1 at 53.

[5] According to the prosecution's response to the motion to dismiss, the FBI did not speak with anyone at DCBS about Mr. Ambers. ECF 363 at 2 n.2. *See also* ECF 385 at 4 ("[AUSA Cardani] asked FBI case agent on Aequitas, as well as other team members, whether they or anyone else were aware of had [*sic*] contacted state/DFR on the Ambers issue. No."). The Court concludes that Ms. Bean's statement was simply a misunderstanding based on her secondhand knowledge about the telephone call on November 23 with AUSA Cardani, Ms. Royston, Ms. Smith, and Mr. Gill. As noted, the topic of Mr. Ambers only came up after these four concluded their unrelated discussion about a different matter in which the U.S. Attorney's Office and the FBI were working with the DCBS.

as to whether it is an ethics violation for an employee to engage in private employment to provide expert testimony in a criminal case." ECF 346-9 at 7. In her request, Ms. Anderson described her understanding of the relevant facts. Among other things, Ms. Anderson explained: "Although the Division [DFR] often works with the US Attorney's Office on federal criminal cases involving securities, the Division is not involved in this particular case." *Id*.

Before receiving the opinion of the OGEC, however, Ms. Anderson sent an email to Mr. Ambers on January 9, 2023, stating:

> We have learned that you are employed by the Federal Public Defender's Office to prepare for and provide expert witness testimony on Oregon Securities Law. This outside employment is not approved and violates the agency policy Ethics and Conflict of Interest Policy, EMP-01[.]

ECF 346-4 at 2. Mr. Ambers responded on January 10, 2023, offering his interpretation of EMP-01 and ORS Chapter 244. *Id*. On January 17, 2023, Ms. Anderson replied, stating: "Providing the testimony disclosed in the expert witness disclosure filed in federal court would violate department policy EMP-01." ECF 346-7 at 2. According to Mr. Jesenik's counsel Scott Mullins, Mr. Ambers contacted the OGEC on or about January 17, seeking a staff interpretation on whether his testifying in this case would violate state ethics rules. OGEC advised Mr. Ambers that Ms. Anderson already had requested a staff interpretation. ECF 346, at ¶ 13 (Mullins Decl.).

On January 24, 2023, the OGEC sent a staff advisory opinion to Ms. Anderson in response to her request from December 21, 2022. ECF 346-9 at 2-6. In that opinion, the OGEC explained:

> Initially, we must clarify that the Commission may not opine on events that have already occurred. Thus, this opinion will not address the Analyst's [Mr. Ambers's] prior engagement in this matter, but it will advise on prospective actions, such as the Analyst's engagement for the March trial, as well as provide guidance on the application of Oregon Government Ethics laws.

PAGE 9 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

*Id*. at 4. After analyzing the relevant facts, the OGEC concluded:

> Based on the information provided, it appears that *the Analyst would be able to accept the engagement* to serve as an expert witness in the federal securities case without engaging in a prohibited use of position or violating ORS 244.040(1) or 244.040(4).

*Id*. at 6 (emphasis added).

Next, according to Defendants' Reply in Support of Joint Motion to Dismiss:

> Mr. Ambers recently indicated his intent to withdraw as an expert. On February 8, 2023, DCBS contacted Mr. Ambers, stating that, notwithstanding the OGEC Staff Advisory Opinion, DCBS has taken the position that (1) its polices are separate and independent of the ORS Chapter 244 statutory obligations; and (2) notwithstanding OGEC's opinion, Mr. Ambers' testimony is not approved and violates DCBS policy. The following day, Mr. Ambers contacted defense counsel to say that he is being forced to choose between resigning from DCBS or withdrawing from the case. He indicated that he does not feel comfortable resigning from DCBS with unfounded ethics allegations against him.

ECF 374 at 3 (footnote omitted).

## DISCUSSION

A district court may dismiss an indictment for prosecution misconduct for one of two reasons, each with its own standard: either because it finds a serious due process violation or because it concludes that dismissal is warranted under its supervisory powers. *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (citing *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). Dismissal for a due process violation requires the prosecution's conduct to "be so grossly shocking and outrageous as to violate the universal sense of justice." *Kearns*, 5 F.3d at 1253. "The [due process argument] is usually raised in situations where law enforcement conduct involves extreme physical or mental brutality or where the crime is 'manufactured by

PAGE 10 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

the government from whole cloth.'" *United States v. Green*, 962 F.2d 938, 942 (9th Cir. 1992) (citation omitted).

A district court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (quoting *United States v. Matta–Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995). "[A] court may not exercise any supervisory power absent a clear basis in fact and law for doing so." *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985) (quotation marks omitted). Separation of powers suggests that any exercise of supervisory power "can be justified only when a recognized right has been violated." *Id*.

"It is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'" *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) (quoting *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984)). In a case of alleged witness interference, however, "[a] defendant's constitutional rights are implicated only where the prosecutor or trial judge *employs coercive or intimidating language or tactics* that substantially interfere with a defense witness's decision whether to testify." *Vavages*, 151 F.3d at 1189 (emphasis added).

The two elements of the *Vavages* test are substantial interference and prosecution misconduct. *United States v. Atalig*, 2020 WL 5028886, at *5 (D. N. Mar. I. June 2, 2020) (citing *Vavages*, 151 F.3d at 1188). To satisfy the substantial interference prong, a defendant must prove by a preponderance of the evidence that *prosecution's misconduct* either dissuaded a witness

PAGE 11 – OPINION AND ORDER ON JOINT MOTION TO DISMISS

from testifying or caused the witness to alter his or her testimony. *Atalig*, 2020 WL 5028886, at *5 (citing *United States v. Juan*, 704 F.3d 1137, 1142 (9th Cir. 2013)).[6]

Here, there was no substantial *interference* by the prosecution with Mr. Amber's testimony. Defendants present no evidence that the prosecution ever asked DCBS to stop Mr. Ambers from testifying or even to limit his testimony in any way. At most, the prosecution simply asked DCBS staff if they knew that Mr. Ambers was testifying and whether there were any "guardrails" on what he could say. Making such an inquiry as part of investigating an adverse expert witness for purposes of fashioning a motion *in limine* or preparing for cross examination is not interference and is not improper. The prosecution also states that, "if it is true that DCBS based its position on a concern that the agency's future participation in fraud workgroups would be jeopardized if Mr. Ambers testifies in this case, the government would welcome an opportunity to notify DCBS that is not correct." ECF 378 at 2. Thus, there was no coercion, actual, threatened, or implied, and no interference by the prosecution.

Further, there was no prosecution *misconduct*. Defendants have not identified any statute or applicable rule that requires the prosecution to notify defense counsel before contacting an unrepresented defense expert or that witness's employer, and the Court is unaware of any such prohibition. Indeed, there does not seem to be any prohibition on doing so. *See Atalig*, 2020 WL 5028886, at *5 (concluding that direct *ex parte* communication with defense expert witness is allowed). Also, the Ninth Circuit has held that the prosecution is allowed to investigate expert

---

[6] Even then, the alteration must amount to a material change in the witness's "prior trial testimony." *Juan*, 704 F.3d at 1142 (stating that when witness recants testimony that was favorable to defendant, "harm to the defense involves not merely the prevention of prospective testimony that might have bolstered its case, but the retraction of testimony that did bolster its case"). "In other words, no matter how flagrant the misconduct, attempted witness tampering must succeed in order to violate a defendant's constitutional rights." *Atalig*, 2020 WL 5028886, at *5 (citing *Thompson v. Patrick*, 2008 WL 4532444, at *3 (E.D. Cal. Oct. 8, 2008)).

witnesses for bias and other impeachment. *See Little*, 753 F.2d at 1439-40 (approving contact even when government investigator lied about his identity and did not notify the defense). Defendants' reliance on civil cases interpreting state ethics rules and Rule 26(b)(4) of the Federal Rules of Civil Procedure are not applicable, and the same argument was expressly rejected by the district court in *Atalig* on that basis. 2020 WL 5028886, at *4.

Finally, Defendants in their reply assert: "The superseding indictment must be dismissed with prejudice. If not dismissed, the trial must be adjourned to allow Defendants' time to retain a new expert." ECF 374 at 2. Because the Court finds no substantial interference by the prosecution and no prosecution misconduct, the Court is denying Defendants' motion as it was initially presented. If Defendants move to postpone trial so that they can find a new securities law expert, they may file such a motion and the Court will consider it. The Court notes, however, that there currently is a motion filed by the prosecution to exclude Mr. Ambers' expert testimony under Rules 702 and 403 of the Federal Rules of Evidence (ECF 361), as well motions *in limine* relating to the subject matter of his testimony (ECF 325). The Court believes that it would be more efficient for the Court to resolve those pending motions before addressing in the abstract whether Defendants need more time (and if so, how much time) to locate a new expert witness on federal securities law to testify on issues that may or may not be allowed at trial.

The Court also notes that after defense counsel for Mr. Jesenik first contacted Mr. Ambers in 2021, Mr. Ambers took initial steps toward obtaining approval from DCBS. On April 30, 2021, Mr. Ambers sent an email to Ms. Anderson to that effect. ECF 346-1 at 4-6. Before Mr. Ambers received a substantive response from his employer, however, he withdrew his request on May 11, 2021. ECF 346-1 at 2-3; *see also* ECF 346-9 at 3. As Defendants explain in their reply brief, Mr. Ambers was recently told: "[N]otwithstanding OGEC's opinion,

Mr. Ambers' testimony is not approved and violates DCBS policy." ECF 374 at 3. Thus, this issue easily could have been recognized and resolved long ago (either with DCBS providing consent or with a different expert witness being retained) had not Mr. Ambers withdrawn his request to DCBS in May 2021.

## CONCLUSION

The Court DENIES the motion to dismiss or for other lesser sanctions filed by Defendants Robert J. Jesenik and Andrew N. MacRitchie (ECF 345).

**IT IS SO ORDERED**.

DATED this 16th day of February, 2023.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge
