i

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:20-cr-228-SI |
| v. | **OPINION AND ORDER ON POST-TRIAL MOTIONS** |
| **ROBERT J. JESENIK**, **ANDREW N. MacRITCHIE**, and **BRIAN K. RICE**, | |
| Defendants. | |

Natalie K. Wight, United States Attorney, and Ryan W. Bounds, Christopher L. Cardani, Siddharth Dadhich, and Hannah Horsley, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Ave., Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Conor Huseby, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204; Scott L. Mullins, MULLINS LAW OFFICE LLC, 1000 SW Broadway, Suite 2300, Portland, OR 97205; and Per C. Olson and Megan E. McVicar, HOEVET OLSON, PC, 1000 SW Broadway, Suite 1740, Portland, OR 97205. Of Attorneys for Defendant Robert J. Jesenik.

Michael Tremonte and Anna Maria Estevao, SHER TREMONTE LLP, 90 Broad St., 23rd Floor, New York, NY 10004; and Samuel C. Kauffman, KAUFFMAN KILBERG LLC, 1050 SW Sixth Ave., Suite 1414, Portland, OR 97204. Of Attorneys for Defendant Andrew N. MacRitchie.

Angelo J. Calfo, Damon C. Elder, and Henry Charles Phillips, MORGAN, LEWIS & BOCKIUS LLP, 1301 Second Ave., Suite 2800, Seattle, WA 98101; and Bakari E. Ziegler, MORGAN, LEWIS & BOCKIUS LLP, One Market, Spear Tower, San Francisco, CA 94105. Of Attorneys for Defendant Brian K. Rice.

**Michael H. Simon, District Judge.**

On May 15, 2023, after a 31-day trial that included three days of deliberations, a jury found Robert J. Jesenik, Andrew N. MacRitchie, and Brian K. Rice (collectively, Defendants) guilty of one count of conspiracy to commit mail and wire fraud and 28 counts of wire fraud. In addition, the jury found Mr. Jesenik guilty of aiding and abetting making a false statement on a loan application to a federally insured bank. The jury also found all three Defendants not guilty of conspiracy to commit money laundering. At trial, the jury received 763 exhibits in evidence and heard testimony from 33 witnesses.

All three Defendants have filed motions for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial under Rule 33. Mr. Jesenik also has moved to join the post-trial motions of Messrs. MacRitchie and Rice. The Court grants Mr. Jesenik's motion to join. The government opposes Defendants' motions for judgment of acquittal or new trial. Only Mr. Jesenik filed a reply. The Court has considered Defendants' motions, the government's opposition, and Mr. Jesenik's reply. The Court does not believe that oral argument will be helpful in resolving these motions. For the reasons stated below, the Court DENIES Defendants' motions for judgment of acquittal and new trial.

## STANDARDS

Defendants ask the Court to set aside their convictions and enter judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. That rule provides, in relevant part: "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). When considering whether evidence is enough to sustain a verdict in a criminal case, the Court must view the evidence in the light most favorable to the prosecution. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (asking whether "after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (cleaned up)); *accord United States v. Grovo*, 826 F.3d 1207, 1213-14 (9th Cir. 2016).

Under this standard, "it is not the district court's function to determine witness credibility" or otherwise substitute its evaluation of the evidence for the jury's. *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). "It is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (cleaned up), *supplemented*, 574 F.2d 476 (9th Cir. 1978). To defeat a Rule 29 motion, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence or rule out every hypothesis except that of guilty beyond a reasonable doubt." *Nevils*, 598 F.3d at 1164 (quotation marks omitted) All conflicting evidence is to be resolved in favor of the jury verdict. *United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir. 2007).

In the alternative, Defendants ask the Court for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. That rule provides, in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *United States v. Showalter*, 569 F.3d 1150, 1157 (9th Cir. 2009) (quoting *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)). A district court "enjoys broad discretion with regard to a new trial motion" because it is "most familiar with the context of the trial." *Freund v. Nycomed Amersham*, 347 F.3d 752, 765 (9th Cir. 2003). Defendants also bear a "heavy burden" in meeting the requirements to establish that a new trial is warranted. *See, e.g.*, *United States v. Cimera*, 459 F.3d 452, 458 (3d

Cir. 2006) (quoting *United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000)). Finally, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded" as harmless error. Fed. R. Crim. P. 52(a).

## BACKGROUND

This federal criminal case concerns Defendants' activities with the Aequitas group of companies based in Lake Oswego, Oregon. These companies include, among others, Aequitas Management LLC, Aequitas Holdings LLC (Aequitas Holdings), Aequitas Commercial Finance LLC (ACF), Aequitas Capital Management Inc., and Aequitas Investment Management LLC, (collectively, Aequitas). Viewed in the light most favorable to the government, the evidence shows that Defendants conspired to mislead investors by using one or more Aequitas-affiliated entities to solicit investors through the issuance of promissory notes (often referred to as "Private Notes") and other interests in Aequitas-created investment funds. These investments were purportedly backed by trade or loan receivables in education, health care, transportation, and other consumer credit areas, but in fact new investments were used predominantly to repay earlier investors and defray Aequitas's operating expenses. Defendants made material misrepresentations and half-truths when soliciting new investments and discussing the status of existing investments and other issues with investors, investment advisors, and others.

Defendants also used intercompany loans to Aequitas Holdings to prop up ACF and other Aequitas entities and mislead investors, concealing from investors and others information that the intercompany loans with Aequitas Holdings were significantly under-collateralized and could not be repaid without the occurrence of several speculative contingencies. Individual accredited investors invested more than $400 million between January 2014 and February 2016, when

Aequitas collapsed, owing its investors more than $600 million. Aequitas had been insolvent at least since July 2014, which continued through the date of its collapse.[1]

In the 1990s, Mr. Jesenik founded JMW Capital Partners, and in approximately 2005, that company was rebranded as "Aequitas." Mr. Jesenik was its Chief Executive Officer. He controlled the structure of Aequitas and had ultimate decision-making authority over its activities. Mr. MacRitchie joined Aequitas in 2007 as an Executive Vice President and Chief Compliance Officer. Mr. MacRitchie was responsible for the development and implementation of risk management and compliance procedures. He also oversaw accounting, legal, and audit functions, as well as fundraising. Mr. Rice joined Aequitas in October 2014 as an Executive Vice President. Mr. Rice oversaw the solicitation of investments through registered investment advisors (RIAs) and managed Aequitas's RIAs.[2]

---

[1] In March 2016, the Securities and Exchange Commission (SEC) commenced a civil lawsuit in the District of Oregon (Receivership Case). Along with a complaint, the SEC filed in the Receivership Case a stipulation between the SEC and the Aequitas-entity defendants, requesting a preliminary injunction and the appointment of a receiver. The district court in that case appointed Ronald Greenspan as Receiver of the Aequitas-entity defendants, their subsidiaries, and their majority-owned affiliates (collectively, the Receivership Entity). Along with freezing the assets of the Receivership Entity, the court in the Receivership Case authorized the Receiver to take possession of all books and records of the Receivership Entity. The court also authorized the Receiver to investigate, prosecute, defend, or otherwise participate in actions in any state, federal, or foreign court or proceedings to recover or conserve property of the Receivership Entity.

[2] Three other individuals affiliated with Aequitas, Brian Oliver, Olaf Janke, and Scott Gillis, were indicted on related conspiracy and fraud charges. They all pleaded guilty. Mr. Oliver, the government's first witness at trial, was an Executive Vice President of several Aequitas entities. Mr. Janke, who also testified at trial, joined Aequitas in 2011 and was its Chief Financial Officer and an Executive Vice President of Aequitas Capital Management through June 2015. Mr. Gillis, who did not testify, was a Chief Operating Officer and Chief Financial Officer of Aequitas. Mr. Oliver passed away after trial and before sentencing. The Court has scheduled the sentencing of Messrs. Janke and Gillis to occur after the sentencing of Messrs. Jesenik, MacRitchie, and Rice.

By 2014, Aequitas was heavily invested in student loan receivables owed to the private, for-profit Corinthian Colleges (Corinthian). Indeed, in early 2014, the largest category of receivables owned by Aequitas was from Corinthian. By 2014, however, Corinthian was suffering from significant financial difficulties. In June 2014, Corinthian defaulted on a multimillion-dollar payment owed to Aequitas, and from that time forward Corinthian made no further payments to Aequitas, including on its agreement to buy back from Aequitas the full value of any student loans that became delinquent by 90 days or more. This caused substantial cash shortfalls for Aequitas, which previously had been experiencing liquidity issues based on the nature of its business.

Aequitas, however, did not disclose to its investors or potential investors the extent of the serious economic problems caused by Corinthian's default and breaches. Aequitas also wanted to avoid defaulting on its own interest and principal obligations owed to its noteholders, which were coming due on a frequent and regular basis. Thus, Aequitas undertook to raise new money from new and existing investors. Aequitas used the vast bulk of this newly raised capital to repay interest and principal (*i.e*, redemption) obligations owed to earlier Aequitas investors and for its own significant operating expenses. Aequitas did *not* use the bulk of this newly raised capital to buy new income-generating receivables, as Aequitas had represented to its new investors and to its earlier investors whom Aequitas persuaded to rollover their earlier investments. Aequitas also misrepresented to investors the extent of the adverse economic consequences caused by Corinthian's default and breaches.

## DISCUSSION

Aequitas may have originally begun as a legitimate financial services company. Indeed, it may have operated lawfully through 2014, although there was some evidence to the contrary.[3] As noted, in June 2014, Aequitas encountered serious economic difficulties caused by Corinthian's default and breaches of its obligations. From at least that point forward until the collapse of Aequitas in February 2016, Robert Jesenik, Brian Oliver, Andrew MacRitchie, Scott Gillis, and Olaf Janke, joined by Brian Rice in October 2014, conspired to defraud investors through material misrepresentations and misleading half-truths. Indeed, during this period they engaged in what several witnesses described as a Ponzi, or Ponzi-like, scheme.

Some Ponzi schemes are simply and utterly frauds from the start; others begin as legitimate businesses but then after a serious investment or business failure become Ponzi schemes when managers desperately try, through misrepresentations or half-truths, to raise new capital to hide the earlier failure or delay its discovery, possibly hoping for some extraordinary recovery.[4] Even if a defendant believes in the ultimate success of an enterprise, however, a belief

---

[3] At trial, Mr. Jesenik called as a witness a former Aequitas general counsel, Andrew Craig. Mr. Craig testified that he was unaware of any "Ponzi" concerns being raised within Aequitas *before 2013*, when outside counsel Steve English suggested that Aequitas might be vulnerable to such a claim. In addition, in rebuttal, the government called Aequitas's former controller Joe Bailey, who testified that he raised concerns *in 2010* that cash flows at Aequitas suggested a potential Ponzi scheme and that Mr. MacRitchie then summoned Mr. Bailey. When Mr. Bailey arrived at Mr. MacRitchie's office, Mr. MacRitchie, in an agitated voice, told Mr. Bailey to stay in his lane. (During trial, counsel for Mr. MacRitchie told the Court that he likely would be calling Mr. English as a witness, but that did not happen.) In any event, both the indictment and the superseding indictment alleged that the conspiracy to commit mail and wire fraud began "no later than in or about June 2014," and the government's evidence at trial primarily focused on events occurring on or after Corinthian's default and breaches of its obligations to Aequitas in June 2014, including the effect of those breaches on Aequitas and Aequitas's actions in response.

[4] *See* Marie Springer, *The Politics of Ponzi Schemes: History, Theory, and Policy* 29-33 (2021).

that investors will sustain no economic loss or will eventually be repaid is no defense to a charge of criminal mail or wire fraud or conspiracy to commit mail or wire fraud.[5] When a jury finds beyond a reasonable doubt that a defendant intended to deceive and cheat (*i.e.*, to defraud) to obtain money or property by intentionally making material misrepresentations or misleading half-truths or conspired to do so, and used interstate mails or wires, that is enough to sustain a conviction. That is what this case was about, and the jury so found.

## A.  Defendants' Motions for Judgment of Acquittal

### 1.  Whether Wells Fargo Bank was FDIC Insured at the Time of the Offense

Mr. Jesenik observes that to find that he aided and abetted a violation of 18 U.S.C. § 1014, there must be evidence that someone made a false statement to a bank or credit union insured by the Federal Deposit Insurance Corporation (FDIC) and that Mr. Jesenik aided and abetted that person. Mr. Jesenik first argues that there is insufficient evidence of FDIC insurance.

At trial, the government called Steve Ellis as a witness. Mr. Ellis testified that he worked as a Managing Director at "Wells Fargo" for about 18 years and was responsible for, among other things, making commercial loans. He added that during this time he had interactions with Aequitas, and he described a $100 Million Receivables Loan Agreement with Aequitas-affiliated entities, which is reflected in Trial Ex. 83. That trial exhibit shows a $100 Million Receivables Loan Agreement with CarePayment Technologies Inc. (CarePayment) as the "Servicer," CP Funding I Trust as the "Borrower," Wells Fargo Securities LLC as the "Administrative Agent," and Wells Fargo Bank National Association as the "Lender." Ex. 83, at 1, 103. Indeed, the

---

[5] *See United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) ("While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all."); *see also United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) ("While good faith is a defense to mail fraud, an honest belief in the ultimate success of an enterprise is not, in itself, a defense.").

Lender's signature line shows that it was signed by Steven J. Ellis, Managing Director, on behalf of Wells Fargo Bank National Association. Ex. 83, at 103. Both CarePayment Technologies Inc. and CP Funding I Trust are Aequitas affiliates.

At trial, the government asked Mr. Ellis whether "Wells Fargo" is or was insured by the FDIC. To be precise, the government asked: "First, I forgot to ask the basic question, is Wells Fargo or was it at the time insured by FDIC?" Mr. Ellis responded "yes," and the government then clarified that the FDIC was the Federal Deposit Insurance Corporation. Both in context and by reasonable inference, it is clear that "Wells Fargo," in this question refers to the Lender on this transaction, Wells Fargo Bank National Association, not the Administrative Agent, Wells Fargo Securities LLC. Also, in context, tone of voice, and by reasonable inference, the government's attorney was simply clarifying his question to ask whether at the time of the events at issue Wells Fargo Bank was insured by the FDIC, not whether it was FDIC insured at the time the question was being asked at trial. The Court rejects Mr. Jesenik's arguments.

### 2. Whether Mr. Jesenik Aided and Abetted Mr. Gillis's False Statement

Mr. Jesenik also argues that there was no evidence showing Mr. Jesenik knew that Scott Gillis intended to make a false statement to Wells Fargo Bank on or about January 15, 2016. Mr. Jesenik observes that to aid and abet a violation of 18 U.S.C. § 1014, a defendant must have acted with the knowledge and intention of helping another commit the crime of making a false statement on a loan application to a bank or credit union. The evidence presented at trial, primarily through emails, however, shows Mr. Jesenik directing that the loan request made to Wells Fargo Bank by Mr. Gillis be submitted to obtain cash to pay the interest obligations owed to Aequitas investors. *See* Trial Exs. 415, 416, 418, 419, and 421.

Several of these communications occurred between 3:01 p.m. on January 13, 2016, and 10:43 a.m. on January 15, 2016. On January 12, 2016, however, Aequitas General Counsel

Robert Holmen sent an email advising both Messrs. Jesenik and Gillis that Aequitas should cease borrowing on the Bank of America and Wells Fargo lines of credit due to the presence of certain cross-events of default. Trial Ex. 412. The misrepresentations to Wells Fargo Bank included the statement that there were no "Events of Default" or even "Potential Events of Default," as those terms were defined and used in the Aequitas's loan agreement with Wells Fargo Bank. *See* Trial Exs. 83, 409, 412, 415, 418, 419, 420, 421.

The government also called Surena Vukovich as a witness. She was Mr. Jenenik's executive assistant from 2012 "until the end." She testified that based on her observations at Aequitas, there was "no way" that Mr. Gillis would have caused Aequitas to ask Wells Fargo for a $4.2 million draw on the Aequitas line of credit without Mr. Jesenik's knowledge and approval. As she testified, Mr. Jesenik "would not have tolerated any kind of signing, especially of that kind of money, without his knowledge or approval." The Court rejects Mr. Jesenik's argument.

### 3. Whether Sufficient Evidence Was Presented Regarding Mr. MacRitchie

Mr. MacRitchie argues that there was insufficient evidence of nearly every element of the conspiracy charge and substantive wire fraud counts of which he was convicted. Mr. MacRitchie states that all relevant information was disclosed to investors in the Private Placement Memoranda (PPMs), financial statements, and other disclosure documents, and thus no statements made during oral sales pitches or in marketing materials could have constituted material misrepresentations or misleading half-truths. Mr. MacRitchie also asserts that the government failed to present sufficient evidence of his knowledge of any material misrepresentations or lack of full disclosure and his knowledge that any statements were false.

Among other things, the evidence at trial shows that Mr. MacRitchie was personally responsible for establishing a Luxembourg bond offering for Aequitas, which came to be known as the "Lux Bond," or simply as "Lux." The Lux Bond was a debt instrument offered to

European investors by a Luxembourg-based Aequitas affiliate that purported to invest the proceeds in Freedom Financial Network LLC (Freedom Financial) receivables (or Credit Strategy Receivables) through a limited partnership based in the Cayman Islands. Mr. MacRitchie intended from the outset to make otherwise idle funds raised by the Luxembourg affiliate available to ACF for general corporate purposes through short-term loans. Consistent with this plan, Aequitas's Luxembourg affiliate raised more than $15 million and advanced $9 million into the greater Aequitas structure before the Aequitas enterprise collapsed. Nearly $4 million was never paid back.

The Lux Bond Prospectus, however, which was distributed to prospective investors, misleadingly indicated that investment proceeds would be used to purchase interests in receivables. Nowhere did the Prospectus disclose any plans to "loan" most of the investment proceeds to ACF. In addition, the government's witness Nicholas Mavrolean testified that he had seen Mr. MacRitchie present the Prospectus and related sales pitch to prospective European investors a minimum of 20 times. Mr. Mavroleon explained that he had been led to believe that this was a "bankruptcy remote vehicle" and that investors would be protected from a catastrophic event like the bankruptcy of the "mother company." He added that he specifically remembered Mr. MacRitchie using the phrase "bankruptcy remote" during the solicitations in Europe. Mr. Mavrolean also repeatedly denied that the sales pitches to Lux Bond investors disclosed the fact that their funds would be loaned to Aequitas affiliates, including ACF.

In addition, Olaf Janke, the Aequitas CFO, confirmed that plan for the Lux Bond had always been to funnel money to ACF, which was strapped for cash. Mr. Janke testified that the Lux Bond project was undertaken to raise money for the same purpose as all of Aequitas's other investor funds, predominantly to pay Aequitas's operating expenses and earlier investors.

PAGE 11 – OPINION AND ORDER ON POST-TRIAL MOTIONS

Mr. Janke explained that Aequitas was consistently missing its fundraising goals and looking for other sources of cash, and so the idea was born to go to Europe.

Mr. MacRitchie's personal knowledge that Aequitas had long failed to generate adequate investment income and relied on investor cash to remain afloat was demonstrated by his agreement with coconspirator Brian Oliver in a September 5, 2015, email about the critical nature of their situation. *See* Trial Ex. 226. In that email, sometimes referred to at trial as the "Train Wreck Email," Mr. MacRitchie stated:

> To be honest though we have been heading towards this point for a couple of years—spending money we don't have, addicted to the Private Note investments. . . . *We are heading for a big train wreck* and I don't know how we avoid it. You, me, and Bob will be the ones that go down with this as we were the three that, on paper, determined investments and signed off on budgets and plans.

Trial Ex. 226 (emphasis added). The Court rejects Mr. MacRitchie's arguments.

### 4. Whether Sufficient Evidence Was Presented Regarding Mr. Rice

Like Mr. MacRitchie, Mr. Rice argues that there was insufficient evidence of nearly every element of the conspiracy charge and substantive wire fraud counts of which he was convicted. The trial record, however, has more than sufficient evidence, in emails and witness testimony, to show that Mr. Rice conspired with Mr. Jesenik and others to obtain money from investors based on material misrepresentations and misleading half-truths.

The agreement in a conspiracy "need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004). "Inferences of the existence of such an agreement may be drawn if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th

Cir. 1980) (cleaned up). In addition, "[a] person may join a conspiracy that has already been formed and is in existence." *United States v. Traylor*, 656 F.2d 1326, 1337 (9th Cir. 1981).

At trial, the jury saw an extensive series of internal emails known as "Cash Dashes," which showed Aequitas's dire financial condition and that the firm needed new investor money to pay off earlier investors and cover Aequitas's significant operating expenses. For almost 11 months, from February 2015 through December 2015, Mr. Rice was copied on these Cash Dash emails. *See* Trial Exs. 94, 99, 103, 106, 135, 137, 200, 234, 247, 283, and 366. These Cash Dash emails show the mechanics of the conspiracy and that Messrs. Jesenik, Janke, Oliver, and Rice conferred frequently to meet a common fraudulent purpose: fundraising (or seeking to delay investor redemptions) by presenting a story about investments in credit strategy receivables to keep the Aequitas scheme going. For example, one Cash Dash email from February 2015 shows that new investor funds received for an Aequitas affiliate known as "Income Opportunity Fund II" (IOF II) would be used to pay for Aequitas's payroll. Trial Ex. 103. Further, Mr. Rice solicited new investor funds for IOF II. Another email from earlier that month shows Mr. Janke's plea to the fundraisers (including Mr. Rice) to roll over investor redemptions to facilitate the payment of operating expenses. Trial Ex. 94.

Still another Cash Dash email from February 2015 indicates that money solicited through RIAs Jeff Sica and Chris Bean was needed for both Aequitas's operating expenses and redemptions owed to earlier investors. Trial Ex. 95. Messrs. Bean and Sica testified that Mr. Rice was their principal contact at Aequitas during this period. A Cash Dash email from April 2015 shows Mr. Rice updating Messrs. Jesenik and Oliver about nearly $11 million in funds coming in through Aequitas Capital Partners, including from clients of RIAs Fariba Ronnasi and Chris Bean. Trial Ex. 135. In that email, Mr. Rice analyzes upcoming redemptions and expresses his concern that Aequitas must redeem a particular Private Note investor "ASAP" while the rest are willing to rollover their investments. *Id*. Trial testimony established that Mr. Rice continued to pitch Messrs. Sica and Bean

PAGE 13 – OPINION AND ORDER ON POST-TRIAL MOTIONS

in the months before Aequitas collapsed. In fact, Mr. Sica testified that in November 2015, Mr. Rice

tried to convince Mr. Sica to roll over his clients' Private Note investments.

Further, in March 2015, Mr. Rice, Mr. Oliver, and others within Aequitas's top

management had been apprised that Aequitas was facing serious financial problems—including a

negative cash flow of $3 million per month. The firm's situation did not improve. On

September 1, 2015, Mr. Oliver commented to Mr. Rice that Aequitas was confronting "$50MM

of cash losses this year" that could be offset only by notional (and dubious) valuation gains in

CarePayment. Trial Ex. 220. That same day, Mr. Oliver sent Mr. Rice a schedule showing that

ACF's biggest asset, the Holdings Note, was deeply undercollateralized. Trial Ex. 221. Also on

that day, as Jessica Cataudella and Robert Holmen both testified, Mr. Rice was told (and he

responded visibly to the information) that the management of funds at Aequitas could be deemed

a Ponzi scheme based on the firm's negative equity. Three weeks later, on September 24, 2015,

with millions in interest payments to investors coming due, Mr. Rice attempted to solicit $10

million in new short-term Private Note investments, at unusually attractive interest rates, from

RIA Chris Bean. Trial Exs. 246 and 253. As Mr. Bean testified, Mr. Rice pitched the investment

during a phone call on September 24, 2015, saying the money was needed to fund a "very time-

sensitive investment opportunity" for the firm, which Mr. Rice implied would be for the

purchase of new "receivables."

Mr. Bean's testimony is corroborated by two contemporaneous emails. In the first,

Mr. Oliver forwarded to Mr. Rice a similar solicitation that Mr. Oliver had sent to Mr. Bean's

colleague, Doug Maurer, the morning before, emphasizing that Aequitas was facing "a $7MM -

$10MM unanticipated cash requirement" to buy new healthcare receivables. Trial Ex. 238.

Mr. Oliver explicitly sent this message to Mr. Rice to ensure they were "singing from the same

song sheet." *Id*.

PAGE 14 – OPINION AND ORDER ON POST-TRIAL MOTIONS

In the second email, sent the morning of Mr. Rice's telephone call to Mr. Bean, Mr. Bean forwarded news of the solicitation to his client, Myles Standish, conveying that Aequitas had a few time-sensitive investment opportunities on which they were trying to capitalize. Trial Ex. 240. The jury was entitled to draw the conclusion from this documentary and testimonial evidence that Mr. Rice solicited these funds for the purported purchase of new receivables, while knowing that the funds instead would be used primarily to make interest and principal redemption payments to earlier investors.

Mr. Rice's solicitation of Mr. Bean yielded a total of $4 million from five of Mr. Bean's clients. Trial Ex. 253. The jury heard from two of them, Todd Holmdahl and Myles Standish, who testified that they would not have invested if they had known of Aequitas's ongoing liquidity crisis and intended use of investor funds to pay principal and interest to prior investors. The Court rejects Mr. Rice's arguments.[6]

---

[6] In his post-trial motion, Mr. Rice also argues that the testimony of Brian Oliver shows that Mr. Oliver lied to Mr. Rice to encourage him to keep fundraising. As explained by Mr. Rice in his post-trial motion, Mr. Oliver testified that in the fall of 2015, Mr. Rice came to Mr. Oliver and asked whether Mr. Oliver would sell Aequitas investments to his own mother, and Mr. Oliver told Mr. Rice that he would. At trial, Mr. Oliver admitted that this had been a lie to keep fundraising going. Mr. Rice argues that this evidence is inconsistent with the conclusion that Mr. Rice was a knowing and willful participant in a scheme to defraud Aequitas's investors. There are several alternative reasonable interpretations of Mr. Oliver's testimony, as the government points out, and Mr. Rice's is one of them. But as the government also shows, there was substantial evidence presented to the jury that Mr. Rice knew that investment proceeds were not being used as he and others represented to investors and RIAs. The trial evidence also shows that Mr. Rice knowingly and willfully pitched investors with false tales about urgent opportunities to buy receivables while fully aware that their money would be used to pay prior investors and operating expenses. That was the both the scheme to defraud and the object of the conspiracy. There is more than enough evidence to sustain the jury's verdict against Mr. Rice. *See Nevils*, 598 F.3d at 1164 (explaining that to defeat a motion for judgment of acquittal, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence or rule out every hypothesis except that of guilty beyond a reasonable doubt" (quotation marks omitted)).

### 5.  Whether Sufficient Evidence Was Presented Regarding Mr. Jesenik

Like Messrs. MacRitchie and Rice, Mr. Jesenik asserts that there was insufficient evidence of nearly every element of the conspiracy charge and substantive wire fraud counts of which he was convicted. Mr. Jesenik, however, merely refers the Court to his first motion for judgment of acquittal, which he made during trial. In his post-trial motion, Mr. Jesenik does not provide any new argument regarding the fraud charges. The evidence discussed above regarding Messrs. MacRitchie and Rice are sufficient to sustain the jury's verdict against Mr. Jesenik. The Court rejects Mr. Jesenik's arguments.

## B.  Defendants' Motions for New Trial

### 1.  Omissions and Half-Truths

The government sought to prove fraud by presenting evidence of intentional and material misrepresentations and half-truths. Defendants argue that when the government presented evidence of material information that Defendants did not disclose to investors or RIAs, the government improperly proceeded on an "omissions" theory without alleging or proving either the existence of a "special relationship" or any other basis for finding a duty to disclose. The premise of Defendants' argument is faulty.

Although a fraud case based *only* on a theory of material omission may require proof of an independent duty to disclose information, *see United States v. Shields*, 844 F.3d 819, 822-23 (9th Cir. 2016), the government need not prove such a duty in a fraud case based on either affirmative misrepresentations or misleading half-truths. *See United States v. Lloyd*, 807 F.3d 1128, 1153 (9th Cir. 2015); *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986). In cases involving misleading half-truths, the duty to disclose *automatically* arises from the misleading nature of the half-truth, not from any independent duty to disclose. *See Lloyd*, 807 F.3d at 1153. The Court properly instructed the jury: "Deceitful statements of half-truths may

constitute false or fraudulent representations. A half-truth is a representation that states the truth only so far as it goes, while omitting critical qualifying information." ECF 622, Instr. No. 17.

Throughout the trial, the government presented testimony and exhibits showing both affirmative misrepresentations and misleading half-truths. Regarding the misleading half-truths, the government also presented at trial extensive testimony and exhibits showing the "critical qualifying information" that Defendants failed to include, information that would have made what *was* disclosed by Defendants not materially misleading. Among other things, this included the true nature of the intercompany promissory note from Aequitas Holdings (the Holdings Note) to other Aequitas entities. Moreover, Defendants did not provide to anyone the unaudited financial statements for Aequitas Holdings, including to Aequitas's outside accountants who audited the financial statements of other Aequitas entities but not Aequitas Holdings.

In addition, the 2014 ACF Private Note PPM (Trial Ex. 497) and Private Note "tear sheets" (Trial Ex. 600) were distributed to investors throughout the entire indictment period. They were written to emphasize that ACF used and would continue to use investor funds to invest new receivables while omitting the critical qualifying information that in fact most of the investors' money would be used to pay for Aequitas's operating expenses or to pay interest and principal (*i.e.*, redemptions) to earlier investors.[7]

---

[7] The October 2014 Private Note PPM told investor that proceeds would be used "[f]rom time to time" to pay earlier investors their principal and interest. Trial Ex. 497, at 14. That was false, or at best materially misleading. *See* Trial Ex. 213, at 12. Similarly, the PPM used for IOF II told investors that their investments would be used to finance the purchase receivables. Trial Ex. 57, at 4, 8, 9, 20. That too was false.

### 2.  Government's Closing Argument

#### a.  Government's comments regarding Mr. MacRitchie's testimony

Mr. MacRitchie testified in his own defense and denied participating in sales presentations to investors and prospective investors in Europe. During closing argument, the government summarized the witness testimony and documents received in evidence that contradicted Mr. MacRitchie's testimony. Referring to Mr. MacRitchie's testimony when he denied that he pitched investors in Europe, the government said during closing argument: "I wrote it down in disbelief." Mr. MacRitchie did not object to the government's statement but now argues that it was improper. Mr. MacRitchie cites *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). That case, however, does not support Mr. MacRitchie's request for a new trial, and the government's comment at closing argument does not warrant a new trial.

#### b.  Government's comment regarding Ms. Cataudella

During trial, the government called as a witness former Aequitas employee Jessica Cataudella. Ms. Cataudella testified that she had worked in the compliance department at Aequitas and previously had worked at the SEC. Ms. Cataudella also told the jury that there is a phrase used by compliance professionals "in the industry," which is "kind of tongue in cheek." She then recited the phrase: "You can't disclose away fraud." In context, it was clear that Ms. Cataudella was describing her compliance duties at Aequitas and explaining that what was disclosed to investors in documents needed to be consistent with what sales and marketing people were saying to them. During closing argument, the government referred to Ms. Cataudella's testimony, including this phrase. Mr. MacRitchie did not object at that time but does so now. Ms. Cataudella's testimony was not inappropriate; nor was the government's reference to it during closing.

### c.  Materiality

Defendants assert that the government argued in closing that disclosures in the PPMs and ACF Financial Statements were "immaterial" and that investment advisors can lawfully disregard disclosures in such documents. Defendants, however, cite to nothing in the record to support this contention. To the contrary, the government repeatedly elicited testimony about misleading statements in the PPMs and argued that they *were material*. To the extent that the government argued that investor negligence is not a defense, that is simply a correct statement of law. Lying to someone to get their money is not excused just because a sharper mark might—or should—have spotted the con. As explained by the Ninth Circuit, if a false statement satisfies the materiality element of mail or wire fraud, proof of reliance or actual harm is not required for criminal liability. *United States v. Lindsey*, 850 F.3d 1009, 1013-14 (9th Cir. 2017).

### 3.  Mr. Mavrolean's Testimony

Mr. MacRitchie argues that the government knowingly presented false testimony from its witness Nicholas Mavrolean. The government disagrees. This dispute largely is based on differing interpretations of Mr. Mavrolean's testimony and potential confusion regarding a specific exhibit. It does not warrant a new trial.

### 4.  Use of the Word "Ponzi"

Defendants object to the use of the word "Ponzi" by several witnesses during trial. During the testimony of the government's dual fact and expert witness, Mr. Charles Bradley Foster, the Court gave the jury a detailed limiting and cautionary instruction. The Court told the jury that Mr. Foster has not stated (and will not be stating) any opinion as to whether any fraud has in fact occurred or whether any defendant in fact had the intent to defraud or the intent to deceive and cheat. The Court added that Mr. Foster has not stated (and will not be stating) any opinion about whether any defendant knowingly or intentionally participated in a Ponzi scheme

or even a Ponzi-like scheme. The Court emphasized that whether fraud has occurred and whether any defendant had an intent to defraud or an intent to deceive and cheat are questions for the jury alone. The Court explained that it is allowing Mr. Foster to express his specific opinions, including those that use the words "Ponzi" or "Ponzi-like," because those opinion relate to certain predicate issues that may be helpful to the jury in deciding the questions the jury will be asked to answer. *See* Trial Tr. (Apr. 18, 2023). With this limiting and cautionary instruction given to the jury, as well as a similar Final Jury Instruction (*see* ECF 622, Instr. No. 11), Mr. Foster's use of the words "Ponzi" and "Ponzi-like" do not warrant a new trial. Also, the use of those words by the fact witnesses and by the government in opening statement and closing argument do not warrant a new trial.

### 5. *Brady* and the Testimony of Ms. Ronassi

The government called as a witness Fariba Ronassi, an RIA. The evening before her expected testimony, the government provided defense counsel with an FBI 302 report, a ten-page spreadsheet created by Ms. Ronassi, and several administrative emails. Mr. Rice object to this late production of documents. The government, however, has shown to the satisfaction of the Court that this delay was inadvertent, not intentional. The government also notes that Mr. Rice received this material, including the spreadsheet, *two days* before his cross-examination of Ms. Ronnasi. Further, the Court did not release Ms. Ronassi from her subpoena after her testimony, which gave Mr. Rice time to recall her as a witness if he wanted to explore anything contained in the recently produced materials. Finally, as described above, several other witnesses testified about misrepresentations made to them by Mr. Rice. The Court is satisfied that there has been no violation of the important rule stated in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) ("We need not decide whether the pages from the Visitor's Register were exculpatory and material; no due

process violation occurred in this case regardless because the government turned over the

documents to the defense. *Brady* does not necessarily require that the prosecution turn over

exculpatory material before trial. To escape the *Brady* sanction, disclosure must be made at a

time when disclosure would be of value to the accused. (quotation marks omitted)).

### 6.  Exclusion of Evidence of Investor Recovery

Defendants argue that the Court improperly limited their presentation of evidence of

investor recovery and actions taken by the Receiver to recover the value of Aequitas's assets.

They assert that this prevented them from correcting the "misimpression" that the investors lost

all the money they had invested because there was no value backing the investments at Aequitas.

In response, the government states that this argument is belied by the trial record, where

Defendants were permitted to call witnesses to testify about the valuation of CarePayment and

Aequitas's other assets. Indeed, Mr. Jesenik called expert witness Serena Morones, CPA, who

testified about the valuation of Aequitas's assets by reputable companies. Ms. Morones also

offered her opinion that "Aequitas endeavored to establish and follow a comprehensive set of

valuation procedures." She testified that CarePayment (the largest of Aequitas's equity assets)

and other companies owned by ACF had a fair market value of $142 million in 2014 and that

CarePayment had been valued at $140 million in 2015. Ms. Morones further testified that,

although she did not do her own valuation, she believed that the valuation procedures were very

credible, detailed, and highly vetted. She added that she found no reason to think that the

valuations were manipulated in any way. Also, Mr. Jesenik called as a witness Craig Froude,

who testified at length about the value of CarePayment and Aequitas's other equity investments.

Mr. Froude testified that, in August 2015, Aequitas received bids ranging from $70 to $175

million to buy Aequitas's assets and that he believed CarePayment alone might be worth

between $400 and $500 million if Aequitas had continued to operate it for another 12 months.

The Court's rulings did nothing to prevent Defendants from presenting evidence about what they call the "critical issue" of the amount of assets backing the investments in Aequitas. Nor did the Court's jury instructions prevent defense counsel from arguing that valuation evidence during closing argument. Defense counsel told the jury that this "story" could have had a "happy ending" if Aequitas "sold the company as valuable as it supposedly was" when they discussed it in August 2015, instead of "waiting out of pride, ego, or greed" that CarePayment might be worth as much as $500 million later.

The jury, however, could have reasonably concluded that this evidence supports the government's case. Perhaps Defendants did believe that a future sale of CarePayment might have been enough to get Aequitas out of the deep hole that had been created by Corinthian. As discussed, that situation caused massive cash flow problems for Aequitas, which simply did not have the available liquidity to pay their obligated interest payments and redemptions of principal as those debts came due, especially with the level of spending that was occurring at Aequitas. *See generally* "Train Wreck Email," Trial. Ex. 226. Rather than explain the situation honestly to investors and creditors, however, Defendants made intentional misrepresentations and misleading half-truths to new and rollover investors. Defendants said that the new investments would be used to purchase income-generating receivables; they did not disclose that new investments would predominantly be used to pay income and principal payments to earlier investors and to Aequitas's operating expenses. *If* Aequitas could keep things afloat long enough and *if* CarePayment or other assets could eventually be sold for a large gain, perhaps no investor would have ultimately suffered any loss. These are big "ifs," however. More importantly, such a result would not provide any defense to criminal mail fraud, wire defraud, or conspiracy to defraud. *See* n.5, *supra*, discussing *Benny*, 786 F.2d at 1417, and *Beecroft*, 608 F.2d at 757.

**7.   Severance and Handling of Closing Arguments**

Defendants argue that the Court erred in denying their motions for severance. This has already been adequately and thoroughly addressed in the Court's earlier rulings. *See* ECF 470; *see also* ECF 267.

Mr. Rice also objects to the Court allowing Messrs. MacRitchie and Jesenik to make additional closing arguments after Mr. Rice's closing argument but before the government's rebuttal argument. As the Court explained at trial, this ruling was consistent with Rule 29.1 of the Federal Rules of Criminal Procedure and appropriate under the circumstances of the case for the reasons explained by the Second Circuit in *United States v. Cardascia*, 951 F.2d 474, 485 (2nd Cir. 1991); *see also United States v. Della Porta*, 653 F.3d 1043, 1051 n.3 (9th Cir. 2011) (noting that Rule 29.1 "merely sets forth the required order for closing arguments following a criminal trial" and "neither sanctions nor prohibits the use of supplemental closing arguments in all cases" (citing *United States v. Evanston*, 651 F.3d 1080, 1088 n.11 (9th Cir. 2011))).

## CONCLUSION

The Court DENIES the motions for judgment of acquittal and alternative motions for new trial filed by Messrs. Jesenik (ECF 659), MacRitchie (ECF 660), and Rice (ECF 662). The Court GRANTS Mr. Jesenik's motion to join the post-trial motions of Messrs. MacRitchie and Rice (ECF 664).

**IT IS SO ORDERED.**

DATED this 30th day of August, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge