# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:20-cr-228-SI |
| v. | **OPINION AND ORDER DENYING RELEASE PENDING APPEAL** |
| **ROBERT J. JESENIK**, **ANDREW N. MacRITCHIE**, and **BRIAN K. RICE**, | |
| Defendants. | |

Natalie K. Wight, United States Attorney, and Ryan W. Bounds, Christopher L. Cardani, Siddharth Dadhich, and Hannah Horsley, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Ave., Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Conor Huseby, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204; Scott L. Mullins, MULLINS LAW OFFICE LLC, 1000 SW Broadway, Suite 2300, Portland, OR 97205; and Per C. Olson and Megan E. McVicar, HOEVET OLSON, PC, 1000 SW Broadway, Suite 1740, Portland, OR 97205. Of Attorneys for Defendant Robert J. Jesenik.

Michael Tremonte and Anna Maria Estevao, SHER TREMONTE LLP, 90 Broad St., 23rd Floor, New York, NY 10004; and Samuel C. Kauffman, KAUFFMAN KILBERG LLC, 1050 SW Sixth Ave., Suite 1414, Portland, OR 97204. Of Attorneys for Defendant Andrew N. MacRitchie.

Angelo J. Calfo, Damon C. Elder, and Henry Charles Phillips, MORGAN, LEWIS & BOCKIUS LLP, 1301 Second Ave., Suite 2800, Seattle, WA 98101; Bakari E. Ziegler, MORGAN, LEWIS & BOCKIUS LLP, One Market, Spear Tower, San Francisco, CA 94105; and Kent Robinson, LAW OFFICES OF KENT S. ROBINSON, 5200 Meadows Road, Suite 200, Lake Oswego, OR 97035. Of Attorneys for Defendant Brian K. Rice.

**Michael H. Simon, District Judge.**

This case involves one of the largest fraud schemes ever prosecuted in the District of Oregon. According to the government, more than a thousand investors were defrauded of more than $366 million. On May 15, 2023, after 31 days of trial, which included three days of deliberations, a jury found Robert J. Jesenik, Andrew N. MacRitchie, and Brian K. Rice (collectively, "Defendants") guilty of conspiracy to commit mail and wire fraud and 28 counts of wire fraud. The jury also convicted Mr. Jesenik guilty of aiding and abetting the making of a false statement on a loan application to a federally insured bank but found all three Defendants not guilty of conspiracy to commit money laundering. At trial, the jury received 763 exhibits and heard testimony from 33 witnesses. On August 30, 2023, the Court denied Defendants' motions for judgment of acquittal and alternative motions for new trial. ECF 677.

On September 8, 2023, the Court sentenced Mr. Jesenik to a term of imprisonment of 168 months, Mr. MacRitchie to a term of imprisonment of 70 months, and Mr. Rice to a term of imprisonment of 37 months. The Court allowed all three Defendants to self-surrender not later than November 2, 2023.[1] All three Defendants timely filed notices of appeal. Now before the Court is Mr. Jesenik's motion for release pending appeal (ECF 748), which Mr. MacRitchie has joined (ECF 750).[2] The government opposes Mr. Jesenik and Mr. MacRitchie's motions. For the reasons explained below, the Court denies release pending appeal.[3]

---

[1] The Court later extended to February 8, 2024, the deadline for Mr. Rice to self-surrender, for reasons unique to Mr. Rice.

[2] Mr. Rice did not request release pending appeal.

[3] The Court has considered the entire record, including the submitted briefing, and does not believe that oral argument will assist in the resolution of this issue.

**STANDARDS**

Under the Bail Reform Act of 1984, a defendant who has been found guilty and sentenced to a term of imprisonment shall be detained notwithstanding the filing of an appeal unless the Court makes certain findings. 18 U.S.C. § 3143(b). In *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985), the Ninth Circuit held that for a court to release a defendant pending appeal, the court must find that:

1.  the defendant is not likely to flee or pose a danger to the safety of any other person in the community if released;

2.  the appeal is not for purpose of delay;

3.  the appeal raises a substantial question of law or fact; and

4.  if the substantial question is determined favorably to the defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*Handy*, 761 F.2d at 1283 (citations omitted).[4] For purposes of a motion seeking release pending appeal, Congress shifted the burden of proof from the government to the defendant. *Id.*[5]

In addition, the Ninth Circuit in *Handy* explained the phrase "substantial question" as follows:

---

[4] An amendment to the Bail Reform Act modifies the fourth *Handy* factor to require that the appeal "raises a substantial question of law or fact likely to result in— (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B). This amendment does not affect the question pending before the Court.

[5] The text of the statute requires that a defendant must show the first *Handy* factor by "clear and convincing evidence." 18 U.S.C. § 3143(b)(1)(A). Because the statute does not expressly require a "clear and convincing" standard for the remaining three factors, 18 U.S.C. § 3143(b)(1)(B), the Court assumes that a defendant must show those factors only by a preponderance of the evidence.

> We conclude that a "substantial question" is one that is "fairly debatable," . . . or "fairly doubtful," . . . . In short, a "substantial question" is one of *more substance than would be necessary to a finding that it was not frivolous*.

*Handy*, 761 F.2d at 1283 (emphasis added) (citations and quotations marks omitted).[6]

Finally, the fourth *Handy* factor requires that the substantial question be such that if error were found, that decision would likely result in reversal or an order for a new trial of all counts on which imprisonment has been imposed. "If the error would be considered harmless or reversal or new trial would otherwise not be the remedy, the Act's requirements are not satisfied." *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985); *see also Handy*, 761 F2d at 1280 (adopting *Miller*). As the Ninth Circuit explained in *Handy*: "Each of the changes contained in the Bail Reform Act of 1984 makes it *considerably more difficult* for a defendant to be released on bail pending appeal." *Id*. at 1283 (emphasis added).

## BACKGROUND

This federal case concerns Defendants' activities with the Aequitas group of companies based in Lake Oswego, Oregon. These companies include, among others, Aequitas Management LLC, Aequitas Holdings LLC ("Aequitas Holdings"), Aequitas Commercial Finance LLC ("ACF"), Aequitas Capital Management Inc., and Aequitas Investment Management LLC, (collectively, "Aequitas"). Viewed in the light most favorable to the government based on the jury's verdict, the evidence shows that Defendants conspired to mislead investors by using one

---

[6] In a footnote in *United States v. Garcia*, decided after *Handy*, the Ninth Circuit quotes with approval the statement in *Handy* that a "substantial" issue is "of more substance than would be necessary to a finding that it was not frivolous," yet that same footnote states that a defendant "need not, under *Handy*, present an appeal that will likely be successful, *only a non-frivolous issue* that, if decided in the defendant's favor, would likely result in reversal or could satisfy one of the other conditions." 340 F.3d 1013, 1020 n.5 (9th Cir. 2003) (emphasis added). Because the Ninth Circuit in that footnote was focusing on a different issue, the Court does not conclude that *Garcia* intended to modify *Handy's* conclusion that a substantial issue is of more substance than simply a non-frivolous issue.

or more Aequitas-affiliated entities to solicit investors through the issuance of promissory notes (often referred to as "Private Notes") and other interests in Aequitas-created investment funds. These investments were purportedly backed by trade or loan receivables in education, health care, transportation, and other consumer credit areas, but in fact new investments were used predominantly to repay earlier investors and defray Aequitas's operating expenses. Defendants made material misrepresentations and half-truths when soliciting new investments and discussing the status of existing investments and other issues with investors, investment advisors, and others.

Defendants also used intercompany loans to Aequitas Holdings to prop up ACF and other Aequitas entities and mislead investors, concealing from investors and others information that the intercompany loans with Aequitas Holdings were significantly under-collateralized and could not be repaid without the occurrence of several speculative contingencies. Individual accredited investors invested more than $400 million between January 2014 and February 2016, when Aequitas collapsed, owing its investors more than $600 million. Aequitas had been insolvent at least since July 2014, which continued through the date of its collapse.[7]

In the 1990s, Mr. Jesenik founded JMW Capital Partners, and in approximately 2005, that company was rebranded as "Aequitas." Mr. Jesenik was its Chief Executive Officer. He controlled the structure of Aequitas and had ultimate decision-making authority over its

---

[7] In March 2016, the Securities and Exchange Commission ("SEC") commenced a civil lawsuit in the District of Oregon (the "Receivership Case"). Along with a complaint, the SEC filed in the Receivership Case a stipulation between the SEC and the Aequitas-entity defendants, requesting a preliminary injunction and the appointment of a receiver. The district court in that case appointed Ronald Greenspan as Receiver of the Aequitas-entity defendants, their subsidiaries, and their majority-owned affiliates (collectively, the "Receivership Entity"). Along with freezing the assets of the Receivership Entity, the court in the Receivership Case authorized the Receiver to take possession of all books and records of the Receivership Entity. The court also authorized the Receiver to investigate, prosecute, defend, or otherwise participate in actions in any state, federal, or foreign court to recover or conserve property of the Receivership Entity.

activities. Mr. MacRitchie joined Aequitas in 2007 as an Executive Vice President and Chief Compliance Officer. Mr. MacRitchie was responsible for the development and implementation of risk management and compliance procedures. He also oversaw accounting, legal, and audit functions, as well as fundraising. Mr. Rice joined Aequitas in October 2014 as an Executive Vice President. Mr. Rice oversaw the solicitation of investments through registered investment advisors ("RIAs") and managed Aequitas's RIAs.[8]

By 2014, Aequitas was heavily invested in student loan receivables owed to the private, for-profit Corinthian Colleges ("Corinthian"). Indeed, in early 2014, the largest category of receivables owned by Aequitas was from Corinthian. By 2014, however, Corinthian was suffering from significant financial difficulties. In June 2014, Corinthian defaulted on a multimillion-dollar payment owed to Aequitas, and from that time forward Corinthian made no further payments to Aequitas, including on its agreement to buy back from Aequitas the full value of any student loans that became delinquent by 90 days or more. This caused substantial cash shortfalls for Aequitas, which previously had been experiencing liquidity issues based on the nature of its business.

Aequitas, however, did not disclose to its investors or potential investors the extent of the serious economic problems caused by Corinthian's default and breaches. Aequitas also wanted to avoid defaulting on its own interest and principal obligations owed to its noteholders, which were coming due on a frequent and regular basis. Thus, Aequitas undertook to raise new money

---

[8] Three other individuals affiliated with Aequitas, Brian Oliver, Olaf Janke, and Scott Gillis, were indicted on related conspiracy and fraud charges. They all pleaded guilty. Mr. Oliver, the government's first witness at trial, was an Executive Vice President of several Aequitas entities. Mr. Janke, who also testified at trial, joined Aequitas in 2011 and was its Chief Financial Officer and an Executive Vice President of Aequitas Capital Management through June 2015. Mr. Gillis, who did not testify, was a Chief Operating Officer and Chief Financial Officer of Aequitas. Mr. Oliver passed away after trial and before sentencing.

from new and existing investors. Aequitas used the bulk of this newly raised capital to pay

interest and repay principal (called "redemptions") owed to earlier Aequitas investors and for its

own significant operating expenses. Aequitas did *not* use the bulk of its newly raised capital to

buy new income-generating receivables, as Aequitas had represented to new investors and to

earlier investors whom Aequitas persuaded to rollover their earlier investments. Aequitas also

misrepresented to investors the extent of the adverse economic consequences to Aequitas caused

by Corinthian's default and breaches.

## DISCUSSION

For the reasons explained below, the Court finds that neither Mr. Jesenik nor

Mr. MacRichie have met their burden of showing that the third and fourth *Handy* factors have

been satisfied. Regarding the second *Handy* factor, the government does not contend that either

appeal is being pursued for purposes of delay. ECF 773 at 8 n.3. Accordingly, the Court finds

that the second *Handy* factor is satisfied. The analysis of the first *Handy* factor is more nuanced.

Regarding Mr. Jesenik, the government argues that he has not carried his burden of

showing by clear and convincing evidence that he does not pose a continuing danger to society.

*Id*. at 8-12.[9] The government notes that the Ninth Circuit has explained that "danger may . . .

encompass pecuniary or economic harm." *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th

Cir. 1992) (per curiam) (affirming denial of bail pending appeal from convictions on "13 counts

of mail fraud . . . and two counts of witness tampering"). The government correctly observes that

Mr. Jesenik points to no evidence that he does not pose a continuing economic danger to the

community. ECF 773 at 9. The Court agrees with the government on this point but will focus

primarily on the third *Handy* factor.

---

[9] The government does not argue that Mr. Jesenik poses a risk of flight. ECF 773 at 8 n.3.

Regarding Mr. MacRitchie, the government does not argue that Mr. MacRitchie poses a continuing danger to the community but only that he has not carried his burden of showing that he is not a risk of flight because he resides outside the jurisdiction of the United States. *Id.* at 8 n.3. On this point, the Court disagrees with the government. After the jury returned its verdict finding Mr. MacRitchie guilty, the Court allowed Mr. MacRitchie to return to his home in Scotland pending sentencing. The Court ordered Mr. MacRitchie to appear for sentencing on September 8th, and he did, notwithstanding the fact that the government was recommending that the Court sentence Mr. MacRitchie to 17.5 years of imprisonment. ECF 680 at 15.[10] Mr. MacRitchie's voluntary return from Scotland and his appearance at the sentencing hearing demonstrates clear and convincing evidence that Mr. MacRitchie does not pose a risk of flight.

The Court agrees with the government that neither Mr. Jesenik nor Mr. MacRitchie satisfies the fourth *Handy* factor, in addition to Mr. Jesenik not satisfying the first factor. Mr. Jesenik, however, spends the bulk of his motion for release pending appeal arguing about the merits of the third *Handy* factor. As explained below, the Court agrees with the government that Mr. Jesenik has not satisfied his burden with any of the 14 specific arguments that he makes regarding whether his appeal raises a substantial question of law or fact.[11] That is where the Court now turns.

**A.  Mr. Jesenik's Withdrawn Expert Witness Jason Ambers**

Before trial, Mr. Jesenik and Mr. MacRitchie moved to dismiss all charges, arguing that the government engaged in misconduct by interfering with one of Mr. Jesenik's retained expert

---

[10] As previously noted, the Court sentenced Mr. MacRitchie to 70 months of imprisonment.

[11] Mr. MacRitchie's joinder in Mr. Jesenik's motion offers no additional arguments regarding the third and fourth *Handy* factors.

witnesses, Jason Ambers. Defendants asserted that the government pressured Mr. Ambers'
employer, the Oregon Department of Consumer Business Services (DCBS), to stop Mr. Ambers
from testifying for the defense. ECF 345. Defendants also requested discovery and an
evidentiary hearing.

A defendant alleging substantial governmental interference is required to show
misconduct by a preponderance of the evidence. *See United States v. Vavages*, 151 F.3d 1185,
1188 (9th Cir. 1998). With their motion to dismiss, Defendants submitted email communications
between the U.S. Attorney's Office and the DCBS regarding Mr. Ambers. The Court also
reviewed the government's summary of communications with DCBS, which was disclosed to
Defendants with material related to an unrelated investigation redacted. The Court issued an
Opinion and Order denying the joint motion to dismiss, in which the Court found:

> [T]here was no substantial *interference* by the prosecution with
> Mr. Amber[s'] testimony. Defendants present no evidence that the
> prosecution ever asked DCBS to stop Mr. Ambers from testifying
> or even to limit his testimony in any way. At most, the prosecution
> simply asked DCBS staff if they knew that Mr. Ambers was
> testifying and whether there were any "guardrails" on what he
> could say. Making such an inquiry as part of investigating an
> adverse expert witness for purposes of fashioning a motion in
> limine or preparing for cross examination is not interference and is
> not improper.

ECF 386 at 12 (emphasis in original). The Court further found no misconduct by the
government. *Id*. The Court also concluded that there was no need for an evidentiary hearing. *Id*.
at 7 n.3.

In addition, the unavailability of Mr. Ambers as a defense witness could not have affected
the outcome of the trial because Mr. Jesenik secured a different expert to offer the same
opinions, and the Court allowed Mr. Jesenik to substitute that expert for Mr. Ambers. At trial,
however, Mr. Jesenik decided not to call the new expert as a witness.

The government previously had moved to exclude all or part of Mr. Ambers' expert testimony, but he became unavailable to Mr. Jesenik before the Court could rule on that motion. Mr. Jesenik later identified Mark von Bergen as his substitute expert witness to opine on essentially the same matters that were disclosed in Mr. Ambers' expert report. The government moved to exclude all or part of Mr. von Bergen's testimony. In a written Order, the Court deferred ruling on the government's objections to Mr. von Bergen's disclosed expert testimony, explaining that it needed to hold a Rule 104 hearing with Mr. von Bergen outside the presence of the jury before deciding what, if anything, Mr. von Bergen would be permitted to say to the jury. ECF 481 at 10-13, 15. At trial, however, Mr. Jesenik declined to call Mr. von Bergen, thus obviating the need for a Rule 104 hearing.

**B.  Government's Opening Statement**

During the government's opening statement, the government told the jury that they would be hearing testimony from Brian Oliver, "the No. 2 at Aequitas." Trial Tr. 62. The government continued in its opening statement as follows:

> He will tell you that he was Bob Jesenik's right-hand man. Out of everyone at Aequitas, Brian Oliver knew Bob Jesenik the best. Before this trial, Brian Oliver stood in a courtroom, just like this one, and pled guilty to conspiring to defraud investors—the No. 2 of the company. He pled guilty to crimes that all three defendants, his alleged co-conspirators, are charged with.

*Id*. Counsel for Mr. Rice objected "to the use of the plea agreements—the way he is using the plea agreements." *Id*. The Court sustained the objection. *Id*. After the government's opening concluded, counsel for Mr. Jesenik delivered an opening statement. The Court then took a recess, and counsel for Mr. Rice moved for a mistrial. *Id*. at 127. The Court took the matter under advisement, adding that "if it ultimately turns out that the guilty pleas do become admitted, then I

would anticipate no basis for a motion for mistrial." *Id*. at 129. Mr. Jesenik and Mr. MacRitchie joined Mr. Rice's motion for mistrial. *Id*. at 130.

After the jury returned, counsel for Mr. MacRitchie and counsel for Mr. Rice delivered opening statements. The government then called Mr. Oliver as its first witness. Early in Mr. Oliver's direct examination, the government elicited that Mr. Oliver had pleaded guilty to conspiracy to commit mail and wire fraud and conspiracy to commit money laundering, based on his activities at Aequitas. *Id*. at 211. The trial later recessed for the day, with Mr. Oliver still in direct examination.

The next morning, before the jury entered the courtroom, the Court discussed with counsel the Court's decision to deny Defendants' motion for mistrial but explained that the Court would give a curative instruction. *Id*. at 285-91. Indeed, earlier that morning, Mr. Jesenik filed a written motion for mistrial and alternative motion for curative instruction. ECF 491. The jury entered the courtroom, and the Court's curative instruction was the first substantive matter addressed by the Court, which occurred before Mr. Oliver's direct examination resumed. The Court instructed the jury, in relevant part, as follows:

> Yesterday we heard four opening statements from counsel for all four parties—the Government, Mr. Jesenik, Mr. MacRitchie, and Mr. Rice. We heard opening statements from counsel, and I have been thinking about the opening statements. I thought about it last night, and I have been thinking about it some more this morning. I want to give you all, members of the jury, some further instructions. This is part of my duty to instruct the jury about the law. Some of what I'm about to say repeats some of what I have already told you, but I think it's important for you to hear that again and some new points. There are really four points that I would like to make right now.
>
> First, as I have previously said, what the lawyers say or said in their opening statements is not evidence. It was intended to help you follow the evidence that will be presented and received during the trial, but what the lawyers say and what the lawyers have said is not evidence and should not be considered as evidence.

Second, you heard during the Government's opening statement, several times I believe, that former high-level Aequitas executives who will be witnesses in this trial, including Mr. Brian Oliver, who is currently testifying, and he will be back here in a few minutes, have already pleaded guilty.

During Mr. Oliver's testimony, I allowed Mr. Oliver to tell you that he has already pleaded guilty to the crimes of conspiracy to commit mail and wire fraud and conspiracy to commit money laundering related to his activities at Aequitas. This evidence of his guilty plea is not evidence against any of the three defendants who are now on trial, and you may consider it only in determining the witness's—Mr. Oliver's—believability or credibility. It means the same thing.

Of course, any witness may talk about what he or she did, what he or she knew, and what he or she saw and may talk about one or more of the defendants. The testimony received on any of those issues from a witness is evidence that you may consider. But you may not consider Mr. Oliver's guilty plea or, frankly, any other witness's guilty plea as evidence that one or more of the defendants here on trial lied to investors or are guilty of any of the crimes charged.

As I told you yesterday, now that you've heard the evidence from Mr. Oliver, and not the statement of counsel regarding Mr. Oliver's guilty plea, I wanted to remind you that his guilty plea is not evidence against any defendant, and you may consider it only in determining Mr. Oliver's believability. Indeed, you should evaluate the testimony of any witness who has pleaded guilty with greater caution than that of a witness who has pleaded not guilty, and you should consider the extent to which that witness's testimony may have been influenced by this factor.

Trial Tr. at 316-19 (omitting third and fourth points that the Court discussed with the jury regarding other issues). The fact of a cooperating witness's guilty plea is admissible for purposes of "evaluating witness credibility." *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981). Thus, the Court's curative instruction placed proper limits on this information.

**C. Court's Comment to the Jury that "We Don't Blame the Victims"**

During cross examination of the government's witness Robert Zamarippa, who was the government's first investor witness, the government objected to certain questions by defense counsel, and the Court sustained those objections. The Court also instructed the jury as follows:

> Let me explain to the jury a little bit about why I'm sustaining the objections, and I'll give you more legal instructions later. But under the criminal law of mail fraud and wire fraud, *we don't blame the victims.* If fraud has been committed—and that's going to be your decision later to decide whether or not a scheme to defraud has been committed or a conspiracy to defraud has been entered into—that's sufficient. We do not ask under the criminal law whether or not the victim in any way was negligent in incurring the loss. I will give you the details about this later in my final instructions.
>
> But I'm sustaining these objections because it is irrelevant whether or not the victim of an alleged criminal fraud was or was not negligent, and we do not seek to blame the victim of criminal fraud.
>
> This is not a civil trial. Mr. Zamarippa is not suing to recover money back. Different legal principles may apply and do apply in a civil lawsuit. This is not a civil lawsuit. This is a criminal case. And as I will instruct you more fully at the end of the trial, in criminal cases, the victim's negligence, or not is irrelevant.

Trial Tr. at 1508-09 (emphasis added). Mr. Jesenik argues that the Court's evidentiary rulings, "coupled with the Court having told the jury, in effect, that Mr. Jesenik was trying to 'blame the victim' caused substantial and unfair harm to Mr. Jesenik's defense." ECF 748 at 22. Defendants objected at trial and moved for a mistrial.

The Court discussed the issue with counsel out of the presence of the jury and then gave the jury the following curative instruction:

> THE COURT: Welcome back, members of the jury. Before I invite the Government to call the next witness, I want to clarify some of my earlier comments to you during that last witness. And I want to make a couple of things perfectly clear:

No. 1, I certainly did not mean to imply that a crime has been committed; only that one has been alleged. We talked about that at the beginning of the trial in the preliminary instructions. The indictment alleges certain offenses, and it is now the Government's burden to prove all of the essential elements of any offense that has been alleged beyond a reasonable doubt.

As we discussed in the beginning, the defendants are presumed innocent, and they continue to be presumed innocent, and they will be presumed innocent unless and until at the end of the trial, after hearing my final instructions and hearing closing arguments, the jury deliberates and reaches a unanimous conclusion to the contrary. But until then, they are presumed innocent. So I'm not implying that a crime has been committed; only that one has been alleged.

In addition, as I said in the very beginning, the jury should never construe any of my comments as expressing an opinion as to what facts or conclusions you should reach or find. That's entirely in your hands and your decision. I will instruct you on the law. I will make evidentiary rulings. I will try to keep things moving. But what decision you ultimately come to, based upon the evidence, your conclusions of the evidence, and my legal instructions, that is entirely for you to make. Please do not ever read into anything that I say that I have any opinion about what verdict you should reach. That is entirely in your hands.

Trial Tr. at 1528-30. Thus, even if there might have been some prejudice from the Court's statement to the jury that "we don't blame the victims," it was promptly and effectively cured.

### D.  Court's Limitation on Cross Examination of Investor Witnesses

Before trial, the government moved in limine to exclude evidence or argument regarding the relative sophistication of Aequitas investors, whether they should have exercised greater care in making their investments, and whether they relied on any alleged false or misleading statements made by Defendants. ECF 325 at 28. The Court granted the government's motion. ECF 404 at 16.

Mr. Jesenik challenges the limitations that the Court placed on his cross examination of the government's first investor witness, Mr. Zamarripa. The Court, however, received in

evidence Mr. Zamarripa's Private Note subscription agreement (Def. Ex. 1416) and allowed Defendants to ask him whether he had read it; when Mr. Zamarripa answered that he had only "skimmed it," the Court allowed Defendants to ask whether he agreed that it contained a passage encouraging him to read the Private Placement Memorandum (PPM). Trial Tr. at 1494-96. The Court also received in evidence the entire PPM itself. *Id.* at 1498-99. The Court, however, limited Defendants from asking the witness detailed questions about the contents of the PPM.

Mr. Jesenik argues that he should have been permitted to "cross-examine Mr. Zamarripa about the contents of the PPM in order to confront him as to whether Mr. Jesenik truly lied to him in the manner he claimed, and whether, instead, Aequitas conveyed to him the very information he claimed was withheld." ECF 748 at 25. Mr. Jesenik describes this line of inquiry as "impeachment" but fails to explain how statements in a document written by a third party could "impeach" a witness's characterization of oral representations that he testified he heard from Defendants. Instead, the Court concluded that this line of questioning about specific statements in the PPM that Mr. Zamarripa did not see was primarily intended to show the jury that this investor was less than fully diligent in his investment decision-making. Nothing about this line of questioning, however, would show Mr. Zamarripa's biases, motives, or credibility, and he had already admitted to not having read the PPM "in detail." Trial Tr. at 1488.

### E. Court's Final Jury Instruction Regarding Reliance

The Court's Final Jury Instruction No. 19 (Mail and Wire Fraud: Materiality) reads:

> In the second element of mail or wire fraud, I used the word "material." An oral or written statement is material if it has a natural tendency to influence, or was capable of influencing, a person to part with money. Neither proof of reliance on a false statement nor actual harm is needed to show materiality.

> It is not a defense to a charge of mail or wire fraud or a charge of conspiracy to commit mail or wire fraud that an investor or registered investment advisor may have been gullible, careless,

> naïve, or negligent *or even that an investor or registered*
> *investment advisor intentionally disregarded information*.

ECF 622 at 23-24 (emphasis added). Mr. Jesenik argues that in the circumstances of this case, the italicized portion of this instruction was erroneous because it allowed the jury to find Mr. Jesenik guilty of wire and mail fraud even if the jury was satisfied that the PPMs and other documents adequately disclosed how investment proceeds could be used and other information about which the investors and RIAs claimed they were misled. The Ninth Circuit, however, has held that "a victim's intentional disregard of relevant information is not a defense to wire fraud." *United States v. Lindsey*, 850 F.3d 1009, 1016 (9th Cir. 2017). Taken as a whole, the jury instructions are correct, and "[j]urors are presumed to follow the court's instructions." *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011).

## F.  Testimony by Government's Witness Charles Bradley Foster

Charles Bradley Foster testified as both a fact and an expert witness for the government, and the Court gave a proper "dual role" instruction to the jury. ECF 622 at 11-12 (Final Jury Instruction No. 11). The Court allowed Mr. Foster to testify about Aequitas exhibiting characteristics of a Ponzi scheme and about "badges of fraud." Mr. Jesenik states that on appeal he will argue that: (1) the government failed to lay an adequate foundation for the reliability and helpfulness of Mr. Foster's opinions; and (2) Mr. Foster's testimony about Ponzi schemes and badges of fraud was irrelevant or unduly prejudicial.

Before the Court allowed Mr. Foster to testify, the Court reviewed his lengthy forensic report on Aequitas's operations (Trial Tr. at 2170), considered the parties' briefing on the admissibility of his testimony under Rule 702 (*id*. at 2169), and held a Rule 104 hearing to probe the bases and reliability of his proffered opinions. *Id*. at 2170-98. During the Rule 104 hearing, the Court questioned Mr. Foster directly and allowed the parties to do so. *Id*.

At the conclusion of that hearing, the Court ruled that the proffered testimony from Mr. Foster was admissible under Rule 702 and would not violate Rule 704(b). *Id.* at 2197. The Court found that Mr. Foster was qualified, that his testimony would assist the jury in understanding inferences that could be drawn from the presence of "badges of fraud," and that his opinions were based on sufficient facts and were the product of reliable principles and methods. *Id.* at 2197-98. Moreover, to address any concerns about Rule 704(b), the Court expressly instructed the jury that "Mr. Foster has not stated any opinion as to . . . whether any defendant in fact had an intent to defraud, or another way of saying that, had an intent to deceive and cheat." *Id.* at 2718.

The Ninth Circuit has held that trial courts may admit expert testimony about "fraudulent schemes" to assist juries in assessing defendants' methods from "combinations of seemingly innocuous events." *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984) ("Such evidence helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior."); *see also United States v. Sabha*, 993 F.2d 886 (9th Cir. 1993) (allowing testimony about immigration fraud); *United States v. Barkley*, 985 F.2d 574 (9th Cir. 1993) ("The expert's testimony was admissible to assist the jury in understanding that the defendants' activities were part of a complex scheme to evade taxes."); *United States v. McCollum*, 802 F.2d 344, 346 (9th Cir. 1986) ("Expert testimony regarding the typical structure of mail fraud schemes could help the jury to understand the operation of the scheme . . . .").

### G.  Mr. Jesenik's Statute of Limitations Motion

Before trial, Mr. Jesenik moved to dismiss Counts 1, 3, 4, 9-13, 15, 22, 26, and 30 of the Superseding Indictment based on the applicable statute of limitations. ECF 221. In a written Opinion and Order, the Court denied Mr. Jesenik's pretrial motion to dismiss. ECF 267 at 29-38.

Further, even if Mr. Jesenik were to prevail on his appeal on this issue, more than a dozen wire fraud counts (as well as the count of loan fraud) would remain unaffected.

## H.  Mr. Jesenik's Motion for New Trial

Mr. Jesenik moved for a new trial, arguing, among other things, that the government presented improper and overly expansive theories of fraud to the jury that lacked a necessary factual predicate. ECF 659. He argued that the government presented a theory heavily reliant on an omissions theory without proving the necessary element of a special relationship and that the government's "half-truths" theory was invalid because the government failed to establish the necessary nexus between any technically true statement and any omitted qualifying information. Mr. Jesenik asserted that what the government claimed were half-truths were really omissions without the required special relationship. In a written Opinion and Order, the Court denied Defendants' post-trial motions, including on this specific point. ECF 677 at 16-17.

As the Court previously explained, the government sought to prove fraud by presenting evidence of intentional and material misrepresentations and half-truths. Although a fraud case based only on a theory of material omission may require proof of an independent duty to disclose information, *see United States v. Shields*, 844 F.3d 819, 822-23 (9th Cir. 2016), the government need not prove such a duty in a fraud case based on either affirmative misrepresentations or misleading half-truths. *See United States v. Lloyd*, 807 F.3d 1128, 1153 (9th Cir. 2015); *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986). In cases involving misleading half-truths, the duty to disclose automatically arises from the misleading nature of the half-truth, not from any independent duty to disclose. *See Lloyd*, 807 F.3d at 1153.

Throughout the trial, the government presented testimony and exhibits showing both affirmative material misrepresentations and misleading half-truths. Regarding the misleading half-truths, the government presented extensive testimony and exhibits showing the "critical

qualifying information" that Defendants failed to include, which was information that would have made what was disclosed by Defendants not materially misleading. Among other things, this included the true nature of the intercompany promissory note from Aequitas Holdings (the Holdings Note) to other Aequitas entities and how Aequitas actually intended to use the investors' money.

Among other things, the 2014 ACF Private Note PPM (Trial Ex. 497) and Private Note "tear sheets" (Trial Ex. 600) were distributed to investors throughout the entire indictment period. These documents were written to show investors that ACF used and would continue to use investor funds to invest in new receivables, but the documents omitted the critical qualifying information that in fact most of the investors' money would be used to pay for Aequitas's operating expenses or to pay interest and repay principal (*i.e.*, make redemptions) to earlier investors. Also, the October 2014 Private Note PPM told investors that proceeds would be used "[f]rom time to time" to pay earlier investors their principal and interest. Trial Ex. 497, at 14. That was either false or, at best, materially misleading. *See* Trial Ex. 213, at 12. Similarly, the PPM used for the investment known as "IOF II" told investors that their investments would be used to finance the purchase receivables. Trial Ex. 57, at 4, 8, 9, 20. That too was false.

The Court instructed the jury, in relevant part: "Deceitful statements of half-truths may constitute false or fraudulent representations. A half-truth is a representation that states the truth only so far as it goes, while omitting critical qualifying information." ECF 622 at 21-22 (Final Jury Instruction No. 17). The government's evidence showing the critical qualifying information that was omitted from Defendants' half-truths (or that proved the falsity of what Defendants said) did not convert the government's case into one based on a theory of omissions, which

requires proof of a special relationship, rather than one by on a theory of affirmative

misrepresentations and half-truths.

## I.  Failure to Give Requested Instruction on Half-Truths and Omissions

Mr. Jesenik requested that the Court add the following italicized text to the Court's Final

Jury Instruction No. 17, regarding half-truths:

> * * * * Deceitful statements of half-truths may constitute false or
> fraudulent representations. A half-truth is a representation that
> states the truth only so far as it goes, while omitting critical
> qualifying information. *If the speaker does provide that critical
> qualifying information, the duty to speak is satisfied and the
> statement does not amount to a misrepresentation. An omission
> alone—absent a connection to a half-truth—does not constitute a
> misrepresentation.*

ECF 615, page 5; *see also* ECF 622 (Final Jury Instruction No. 17).

The Court's Final Jury Instructions stated four elements that a jury must find before

someone may be found guilty of mail or wire fraud. The first element was that "a defendant

knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money

by means of false or fraudulent representations." ECF 622 at 21 (Final Jury Instruction No. 17).

Only after that statement did the Court continue with the text quoted above. *Id*. at 21-22. Thus,

the Court's instruction, considered as a whole, made it clear to the jury that an omission alone—

absent a connection to a half-truth—does not constitute a misrepresentation.

## J.  Failure to Instruct Jury about Advice of Counsel and Reliance on Accountants

Mr. Jesenik argues that his purported reliance on the advice of counsel and accountants,

including professionals working inside Aequitas and outside professionals working for Aequitas,

was central to his defense that he never intended to deceive and cheat investors. Mr. Jesenik

requested a specific jury instruction regarding advice of counsel and reliance on accountants.

ECF 410 at 50-51. The Court declined to give the requested instruction.

The Court, however, did not preclude any Defendant from presenting evidence to the jury relating to their interactions with attorneys and accountants. *See* ECF 485 (Order on Advice of Counsel Issues). Indeed, the Court ruled: "Defendants may offer testimony or other evidence at trial that defense counsel believes will show a Defendant's good faith reliance on advice of counsel (or accounting professionals) without first receiving leave of Court outside the presence of the jury." *Id*. at 5.

As noted, the Court did not give an express "advice-of-counsel" instruction, which Defendants requested. As the Ninth Circuit has explained: "An advice-of-counsel instruction requires that the defendant show that he made a *full disclosure of all material facts* to his attorney and that he then relied 'in good faith on the *specific course of conduct recommended* by the attorney.'" *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (emphasis added) (citation omitted). Reliance on advice of accountants requires the same full disclosure, specific advice, and good-faith conduct in conformity with that advice. *See United States v. Prezioso*, 782 F. App'x 586, 588 (9th Cir. 2019) (approving instruction that "[u]nlawful intent has not been proved if the defendant, before acting, made full disclosure of all material facts to an accountant, received the accountant's advice as to the specific course of conduct that was followed, and reasonably relied on that advice in good faith").

Defendants point to no evidence at trial of their good-faith reliance on the advice or recommendations of attorneys or accountants in soliciting investors after having made "full disclosure of all material facts" to those attorneys or accountants. The Aequitas attorneys who testified at trial explained that they were misled about the uses of investor funds or otherwise lacked material information. Further, there was no evidence presented at trial that any accountants advised any Defendant about what may or may not be said to investors during

investment solicitations. Moreover, in his motion for release pending appeal, Mr. Jesenik refers to a memorandum from Aequitas's General Counsel Robert Holmen drafting potential responses to an anticipated SEC inquiry. That memorandum, however, is not advice on a "specific course of conduct recommended by the attorney," *Bush*, 626 F.3d at 539, regarding what may or may not be said to investors during investment solicitations.

Finally, the Court instructed the jury as follows regarding the element of intent to defraud:

> ### Instruction No. 20: Mail and Wire Fraud: Intent to Defraud
>
> In stating the third element of mail or wire fraud above, I said that the government must prove beyond a reasonable doubt that a defendant had the intent to defraud. An intent to defraud is an intent to deceive and cheat.
>
> *You may determine whether a defendant had an honest, good-faith belief in the truth of the specific alleged misrepresentations in deciding whether that defendant acted with an intent to defraud. If you find that a defendant had such an honest, good-faith belief, the necessary intent to defraud did not exist.*
>
> If you find beyond a reasonable doubt that a defendant did not act in good faith and intentionally made material misrepresentations or misleading half-truths, then a belief in the ultimate success of an enterprise, a belief that investors will sustain no economic loss, or a belief that investors eventually will be repaid is no defense to wire or mail fraud or conspiracy to commit wire or mail fraud.

ECF 622 at 24 (Final Jury Instruction No. 20) (emphasis added). The Ninth Circuit has explained that a "broader good-faith instruction . . . subsumes [the] proposed instruction" on reliance on advice of counsel. *Bush*, 626 F.3d at 540. By logical extension, this conclusion would also apply to reliance on advice of an accountant. Thus, there was no error in failing to give Defendants' specifically requested text for an advice-of-counsel and reliance-on-accountant instruction.

**K.  Instruction that Intent to Repay Is Not a Defense**

The Court's Final Jury Instruction No. 20 is quoted in full in the immediately preceding discussion in Subsection J. *See* ECF 622 at 24 (Final Jury Instruction No. 20). At trial, Mr. Jesenik objected to this instruction, both in its entirety and specifically relating to the following text: "a belief in the ultimate success of an enterprise, a belief that investors will sustain no economic loss, or a belief that investors eventually will be repaid is no defense to wire or mail fraud or conspiracy to commit wire or mail fraud."

As the Court previously explained (ECF 637 at 2), this instruction was taken from the Ninth Circuit's own statement of the law in *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020). In that case, the Ninth Circuit held: "Intent to repay . . . is not a defense to wire fraud." *Id.* at 1103. At trial, Mr. Jesenik argued (and he now continues to argue) that the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), changes the law on this point. As the Court previously explained, however, *Miller* remains binding law in the Ninth Circuit. ECF 637 at 4-5 (noting that *Miller* is not "clearly irreconcilable with the reasoning or theory of" *Ciminelli* (citing *Miller v. Gammie*, 334 F.3d 889, 893 (9th Cir. 2003) (en banc))).

Further, as the government correctly argues, the holding in *Ciminelli* had nothing to do with a defendant's "intent to repay" in a wire fraud scheme. The object of the fraud in *Ciminelli* was not money that could have been repaid but instead "economic information," *see Ciminelli*, 598 U.S. at 310, which is precisely why the Supreme Court reversed that conviction. *See id.* at 316 ("[T]he wire fraud statute reaches only traditional property interests. The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest."); *cf. United States v. Pasternak*, 2023 WL 4217719, at \*2 (E.D.N.Y. June 27, 2023) ("The [*Pasternak*] case did not involve a more abstract property

PAGE 23 – OPINION AND ORDER DENYING RELEASE PENDING APPEAL

interest like the bid-rigging scheme in *Ciminelli*; these victims lost cold hard cash. This was fraud before *Ciminelli*, and it is fraud today.").

## L.  Exclusion of Evidence of Receivership Distributions

Before trial, the government moved in limine to exclude evidence of the Receiver's activities, including the sale of Aequitas's assets to pay investors. Mr. Jesenik opposed that motion, arguing that the Receiver's activities may be relevant to rebut the government's evidence that Aequitas was insolvent, or that Aequitas's intercompany loan was undercollateralized. Mr. Jesenik also argued that this evidence could be relevant to his specific intent or to show Mr. Foster's bias or lack of credibility. The Court deferred ruling, pending timely objections at trial. ECF 404 at 7. At trial, the Court, in a written Order, agreed with the government's analysis that the Receiver's recovery of assets for the benefit of Aequitas's Private Note holders was irrelevant and, alternatively, that any probative value was substantially outweighed by the danger of confusing the issues and misleading the jury. ECF 535 at 4 (Order Regarding Evidence of Investor Recovery).

Moreover, at trial Mr. Jesenik called his expert witness Serena Morones, CPA, who testified extensively about the valuation prepared by Duff & Phelps of Aequitas's assets. She explained that CarePayment Technologies Inc. ("CarePayment"), the largest equity asset held by Aequitas, and other companies owned by ACF had a fair market value of $142 million in 2014 and that CarePayment had been valued at $140 million in 2015. Mr. Jesenik also called Aequitas's former officer Craig Froude, who testified at length about the value of CarePayment and Aequitas's other equity investments. Mr. Froude testified that, in August 2015, Aequitas received bids ranging from $70 to $175 million to buy its assets and that he believed CarePayment alone could be worth between $400 and $500 million if they continued to operate it for another 12 months. Thus, the Court's rulings regarding the activities of the Receiver did not

prevent Mr. Jesenik from fully presenting evidence about the amount of assets that purportedly backed the investments in Aequitas.

**M. Mr. Jesenik's Conviction for Aiding and Abetting False Statement to Bank**

In Count 31, the government alleged that Mr. Jesenik aided and abetted another person in the commission of a violation of 18 U.S.C. § 1014, which prohibits the making of a false statement for the purpose of influencing the action of a federally insured financial institution in connection with a loan application. The government alleged that Mr. Jesenik aided and abetted Scott Gillis in making a false statement in a loan application in January 2016 for the purpose of influencing Wells Fargo Bank to advance to ACF $4.2 million under a Receivables Loan Agreement. The false statement was that "[n]o Potential Event of Default or Event of Default has occurred and is continuing."

After trial, Mr. Jesenik moved for judgment of acquittal on several grounds, including: (1) the evidence was insufficient that Wells Fargo Bank, rather than a non-FDIC insured affiliate, Wells Fargo Securities, LLC, was the lender; (2) the evidence was insufficient that Wells Fargo Bank was FDIC-insured at the relevant time; and (3) the evidence was insufficient to prove that Mr. Jesenik aided and abetted Mr. Gillis in making the false statement. In its Opinion and Order on Post-Trial Motions, the Court expressly rejected each of those arguments. ECF 677 at 8-10.

As the Court explained, at trial, the government called Steve Ellis as a witness. Mr. Ellis testified that he worked as a Managing Director at "Wells Fargo" for about 18 years and was responsible for, among other things, making commercial loans. He added that during this time he had interactions with Aequitas. He described a $100 Million Receivables Loan Agreement with Aequitas-affiliated entities, which is reflected in Trial Ex. 83. That trial exhibit shows a $100 Million Receivables Loan Agreement with CarePayment as the "Servicer," CP Funding I Trust

as the "Borrower," Wells Fargo Securities LLC as the "Administrative Agent," *and Wells Fargo Bank National Association as the "Lender*." Ex. 83, at 1, 103 (emphasis added).

At trial, the government asked Mr. Ellis whether "Wells Fargo" is or was insured by the FDIC. To be precise, the government asked: "First, I forgot to ask the basic question, is Wells Fargo or was it at the time insured by FDIC?" Mr. Ellis responded "yes," and the government then clarified that the FDIC was the Federal Deposit Insurance Corporation. Both in context and by reasonable inference, it is clear that "Wells Fargo," in this question refers to the Lender on this transaction, Wells Fargo Bank National Association, not the Administrative Agent, Wells Fargo Securities LLC. Also, in context, tone of voice, and by reasonable inference, the government's attorney was clarifying his question to ask whether, at the time of the events at issue, Wells Fargo Bank was insured by the FDIC, not whether it was FDIC insured at the time the question was being asked at trial.

Mr. Jesenik also argues that there was no evidence showing that he knew that Scott Gillis intended to make a false statement to Wells Fargo Bank on or about January 15, 2016. Mr. Jesenik states that to aid and abet a violation of 18 U.S.C. § 1014, a defendant must have acted with the knowledge and intention of helping another commit the crime of making a false statement on a loan application to a bank or credit union. The evidence presented at trial, primarily through emails, however, shows Mr. Jesenik directing that the loan request made to Wells Fargo Bank by Mr. Gillis be submitted to obtain cash to pay the interest obligations owed to Aequitas investors. *See* Trial Exs. 415, 416, 418, 419, and 421.

Several of these email communications occurred between 3:01 p.m. on January 13, 2016, and 10:43 a.m. on January 15, 2016. On January 12, 2016, however, Aequitas General Counsel Robert Holmen sent an email advising both Messrs. Jesenik and Gillis that Aequitas should cease

borrowing on the Bank of America and Wells Fargo lines of credit due to the presence of certain cross-events of default. Trial Ex. 412. The misrepresentations to Wells Fargo Bank included the statement that there were no "Events of Default" or even "Potential Events of Default," as those terms were defined and used in the Aequitas's loan agreement with Wells Fargo Bank. *See* Trial Exs. 83, 409, 412, 415, 418, 419, 420, 421.

Finally, the government also called Surena Vukovich as a witness. She was Mr. Jesenik's executive assistant from 2012 "until the end." She testified that based on her observations at Aequitas, there was "no way" that Mr. Gillis would have caused Aequitas to ask Wells Fargo for a $4.2 million draw on the Aequitas line of credit without Mr. Jesenik's knowledge and approval. As she testified, Mr. Jesenik "would not have tolerated any kind of signing, especially of that kind of money, without his knowledge or approval."

**N.  Court's Denial of Defendants' Motions to Sever**

Before trial, Defendants filed motions to sever the trial of all defendants under Rule 14 of the Federal Rules of Criminal Procedure. The Court denied that motion, including Mr. Jesenik's motion. ECF 267 (Opinion and Order Denying Motions to Sever and Other Matters). Mr. Jesenik later renewed that motion, which the Court again denied. ECF 470 (Order Denying Motions for Severance).

In his motion for release pending appeal, Mr. Jesenik states: "In closing, Mr. Rice portrayed Mr. Jesenik as a diabolical person for having lured Mr. Rice into an executive position at Aequitas with lies about its financial stability." ECF 748 at 59. Mr. Rice's counsel, however, did not refer to Mr. Jesenik as "diabolical." Moreover, counsel for Mr. Jesenik requested the opportunity to have a "rebuttal" closing argument to respond to what Mr. Rice's counsel did say about Mr. Jesenik. The Court allowed Mr. Jesenik's counsel to have a rebuttal closing argument that came after the closing argument presented by Mr. Rice's counsel.

As the Ninth Circuit has explained: "Criminal defendants bear a heavy burden when attempting to obtain reversal of a district court's denial of a motion to sever." *United States v. Johnson*, 297 F.3d 845, 855 (9th Cir. 2002). "[A] defendant must show that the failure to sever prevented him from obtaining a fair trial [and that any] curative instructions were inadequate." *Id*. Here, the Court instructed the jury, in relevant part: "You must decide the case of each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant." ECF 622 at 10-11 (Final Jury Instruction No. 10). The Court did not err in denying Defendants' motions for severance, and the Court's decision did not prevent any Defendant from obtaining a fair trial.

## CONCLUSION

The Court DENIES the Motion for Release Pending Appeal filed by Mr. Jesenik (ECF 748) and joined by Mr. MacRitchie (ECF 750).

**IT IS SO ORDERED.**

DATED this 16th day of October, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge