# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:20-cr-228-SI |
| v. | **OPINION AND ORDER ON RESTITUTION METHODOLOGY** |
| **ROBERT J. JESENIK**, **ANDREW N. MacRITCHIE**, and **BRIAN K. RICE**, | |
| Defendants. | |

Natalie K. Wight, United States Attorney, and Ryan W. Bounds, Christopher L. Cardani, Siddharth Dadhich, and Hannah Horsley, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Ave., Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Conor Huseby, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204; Scott L. Mullins, MULLINS LAW OFFICE LLC, 1000 SW Broadway, Suite 2300, Portland, OR 97205; and Per C. Olson and Megan E. McVicar, HOEVET OLSON, PC, 1000 SW Broadway, Suite 1740, Portland, OR 97205. Of Attorneys for Defendant Robert J. Jesenik.

Michael Tremonte and Anna Maria Estevao, SHER TREMONTE LLP, 90 Broad St., 23rd Floor, New York, NY 10004; and Samuel C. Kauffman, KAUFFMAN KILBERG LLC, 1050 SW Sixth Ave., Suite 1414, Portland, OR 97204. Of Attorneys for Defendant Andrew N. MacRitchie.

Angelo J. Calfo, Damon C. Elder, and Henry Charles Phillips, MORGAN, LEWIS & BOCKIUS LLP, 1301 Second Ave., Suite 2800, Seattle, WA 98101; Bakari E. Ziegler, MORGAN, LEWIS & BOCKIUS LLP, One Market, Spear Tower, San Francisco, CA 94105; and Kent Robinson, LAW OFFICES OF KENT S. ROBINSON, 5200 Meadows Road, Suite 200, Lake Oswego, OR 97035. Of Attorneys for Defendant Brian K. Rice.

**Michael H. Simon, District Judge.**

This case involves one of the largest fraud schemes ever prosecuted in the District of Oregon. After a 31-day trial, a jury found Robert J. Jesenik, Andrew N. MacRitchie, and Brian K. Rice (collectively, "Defendants") guilty of one count of conspiracy to commit mail and wire fraud and 28 counts of wire fraud, using the Aequitas group of companies based in Lake Oswego, Oregon. The Court sentenced Mr. Jesenik to a term of imprisonment of 168 months, Mr. MacRitchie to a term of imprisonment of 70 months, and Mr. Rice to a term of imprisonment of 37 months. The Court also ordered each Defendant to pay restitution in an amount to be determined by the Court.

According to the government, more than 2,000 Aequitas investors were defrauded out of more than $454 million between June 1, 2014, and March 31, 2016. ECF 747-1. In March 2016, the Securities and Exchange Commission ("SEC") commenced a civil lawsuit in the District of Oregon and sought a receiver (the "Receivership Case"). The Court entered a preliminary injunction and appointed a receiver (the "Receiver") for the Aequitas-entity defendants, their subsidiaries, and their majority-owned affiliates (collectively, the "Receivership Entity"). Along with freezing the assets of the Receivership Entity, the court in the Receivership Case authorized the Receiver to take possession of all books and records of the Receivership Entity and investigate and, when appropriate, file civil lawsuits to recover or conserve property of the Receivership Entity. With court approval, the Receiver made four distributions of recovered and liquidated assets to the victim investors. According to the government, after accounting for all distributions made by the Receiver, 1,387 Aequitas investors[1] were still short $366,859,308.[2]

---

[1] This figure excludes Mr. MacRitchie and Mr. Oliver (discussed *infra*), who were perpetrators, rather than victims, of the Aequitas scheme to defraud. The total amount of their investment losses is $985,164.

That is the amount sought by the government in restitution against Messrs. Jesenik and MacRitchie[3] under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA").[4]

Before the criminal trial of Messrs. Jesenik, MacRitchie, and Rice began, many Aequitas investors brought and settled lawsuits in state court against, among others, the professional accounting and law firms that worked for Aequitas, alleging civil liability under the Oregon Securities Laws. At least five lawsuits were filed, including at least one certified class action. Mr. Jesenik asserts that, according to the publicly filed notice of class settlement, $234,613,000 was paid to Aequitas investors as part of the settlement of this class action. ECF 758 at 7. He also states that the settlements and allocations from the four other lawsuits are "secret" and unknown to the parties and the Receiver. *Id*. Mr. Jesenik adds that some civil defendants even removed claims asserted against them to private arbitration before settling. The Court recognizes that the bottom line is that many, if not most, of the 1,389 Aequitas investor victims for whom the government is seeking restitution have already received payments that substantially reduced their investment losses.

---

[2] The government arrives at this figure by taking $364,057,801 (the "Post-Receiver Fraud Loss" determined by the Receiver), subtracting $985,164 (the losses attributable to Mr. MacRitchie and Mr. Oliver), and adding $3,786,671 (investor losses attributable to bonds issued by Aequitas International Opportunities, LP, also known as the "Lux Bond," discussed *infra*). *See* ECF 745 at 11; ECF 747-1 at 45; and ECF 567-1 at 7.

[3] The situation is different for Mr. Rice, who joined the conspiracy later. The government proposes that Mr. Rice be responsible only for $232,470,195 in restitution to a slightly smaller group of Aequitas investors. ECF 747-2.

[4] The average restitution award proposed by the government for these 1,387 victims is $264,498. The government's proposed individual restitution awards span from $899 to $12,958,355, and most are in the range of five or six figures. ECF 747-1.

At the parties' request, the Court has bifurcated these restitution proceedings to resolve several key disputes regarding restitution methodology before identifying the specific victims entitled to restitution and the specific amounts to which each victim is entitled. The parties have filed memoranda regarding the disputed issues of restitution methodology, and the Court heard oral argument. In this Opinion and Order, the Court addresses several of the most significant restitution methodology disputes presented by the parties and will defer other issues with the consent of the parties. The key question before the Court is whether a victim's loss for purposes of restitution should be reduced by payments *already received* from the settlement of civil lawsuits brought against parties who may not be entirely innocent of wrongdoing. In addition, a related issue is how to determine the amount of these reductions if the information is not readily available, which appears to be the case. Further, both are matters of first impression.

## BACKGROUND

As noted, this case concerns Defendants' activities with the Aequitas group of companies based in Lake Oswego, Oregon. These companies include, among others, Aequitas Management LLC, Aequitas Holdings LLC ("Aequitas Holdings"), Aequitas Commercial Finance LLC ("ACF"), Aequitas Capital Management Inc., Aequitas Investment Management LLC, and other Aequitas-affiliated entities (collectively, "Aequitas"). The evidence at trial showed that Defendants conspired to mislead investors by using one or more Aequitas-affiliated entities to solicit investors through the issuance of promissory notes (often referred to as "Private Notes," or "ACF PN," or "PN") and other interests in Aequitas-created investment funds. These investments were purportedly backed by trade or loan receivables in the fields of education, health care, transportation, and other consumer credit, but in fact new investments were used predominantly to pay interest and repay principal to earlier investors and defray Aequitas's substantial operating expenses. Defendants made material misrepresentations and half-truths

when soliciting new investments and discussing the status of existing investments and related issues with investors, investment advisors, and others.

Defendants also used intercompany loans to Aequitas Holdings to prop up ACF and other Aequitas entities and mislead investors, concealing from investors and others information that the intercompany loans with Aequitas Holdings were significantly under-collateralized and could not be repaid without the occurrence of several speculative contingencies. As noted, individual accredited investors invested more than $454 million between January 2014 and March 2016, when Aequitas collapsed, owing investors more than $600 million before the appointment of the Receiver. Aequitas had been insolvent at least since July 2014, which continued through the date of its collapse.

In the 1990s, Mr. Jesenik founded JMW Capital Partners, and in approximately 2005, he rebranded that company as "Aequitas." Mr. Jesenik was its Chief Executive Officer. He controlled the structure of Aequitas and had final decision-making authority over its activities. Mr. MacRitchie joined Aequitas in 2007 as an Executive Vice President and Chief Compliance Officer. Mr. MacRitchie was responsible for the development and implementation of risk management and compliance procedures. He also oversaw Aequitas's accounting, legal, and audit functions, as well as fundraising. Mr. Rice joined Aequitas in October 2014 as an Executive Vice President. Mr. Rice oversaw the solicitation of investments through registered investment advisors ("RIAs"), and he managed Aequitas's RIAs.[5]

---

[5] Three other names of former Aequitas officers should be mentioned for completeness. They are Brian Oliver, Olaf Janke, and Scott Gillis. All three were indicted on conspiracy and fraud charges related to Aequitas, and they all pleaded guilty. Mr. Oliver, the government's first witness at trial, was an Executive Vice President of several Aequitas entities. Mr. Janke, who also testified at trial, joined Aequitas in 2011 and was its Chief Financial Officer and an Executive Vice President of Aequitas Capital Management through June 2015. Mr. Gillis, who did not testify, was a Chief Operating Officer and Chief Financial Officer of Aequitas.

By 2014, Aequitas was heavily invested in student loan receivables owed to the private, for-profit Corinthian Colleges ("Corinthian"). Indeed, in early 2014, the largest category of receivables owned by Aequitas was from Corinthian. By 2014, Corinthian was suffering from significant financial difficulties of its own. In June 2014, Corinthian defaulted on a multimillion-dollar payment owed to Aequitas, and from that time forward Corinthian made no further payments to Aequitas, including on its agreement to buy back any student loans that had become delinquent by 90 days or more. This caused substantial cash shortfalls for Aequitas, which already had been experiencing liquidity issues based on the nature of its business.

Aequitas, however, did not disclose to its investors or potential investors the extent of its serious economic problems caused by Corinthian's default and breaches. Aequitas also wanted to avoid defaulting on its own interest and principal obligations owed to its noteholders, which were coming due on a frequent and regular basis. Thus, Aequitas undertook to raise new money from new and existing investors. Aequitas, however, used the bulk of this newly raised capital to pay interest and repay principal (which Aequitas called "redemptions") owed to earlier Aequitas investors and for its own significant operating expenses. Aequitas did *not* use the bulk of its newly raised capital to buy new income-generating receivables, as Aequitas had represented to new investors and to earlier investors whom Aequitas persuaded to rollover their earlier investments. Aequitas also misrepresented to investors the extent of the adverse economic consequences to Aequitas caused by Corinthian's default and breaches. As also noted, Aequitas could not sustain this Ponzi-like scheme and collapsed in March 2016.

---

Mr. Oliver passed away after trial and before sentencing. The Court has already sentenced Messrs. Janke and Gillis. The government did not seek restitution against Mr. Gillis, and the Court will address the issue of restitution against Mr. Janke in a separate order in Mr. Janke's case.

Later that month, the SEC filed its Receivership Case and secured the appointment of the Receiver. The Receiver gathered Aequitas's assets, liquidated them, and distributed the proceeds to the Aequitas investors, among other creditors, all under court supervision. During this time, many Aequitas investors sued the professional accounting and law firms, among others, who assisted Aequitas's scheme. Civil settlements were reached, and the proceeds from those settlements have already been distributed to the Aequitas investors. The Receiver was not a party to these investor lawsuits and was not involved in the distribution of these settlement funds. Indeed, neither the government, the Defendants, nor the Receiver know all the details about who received what amounts from these civil settlements. The parties appear to agree that no additional money is likely to be paid to the Aequitas investors other than whatever may come in through restitution ordered by the Court under the MVRA.

## STATUTORY FRAMEWORK OF THE MVRA

In the MVRA, Congress directed federal courts to order defendants who are convicted of certain offenses to make restitution to their victims. 18 U.S.C. § 3663A(a); *Robers v. United States*, 572 U.S. 639, 640 (2014). Mandatory restitution under the MVRA applies only to certain identified crimes, which include offenses "committed by fraud or deceit . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1).

For purposes of the MVRA,

> the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2).[6] Thus, unless an offense involves as an element a scheme, conspiracy, or pattern of criminal activity, restitution under the MVRA is available only to victims directly and proximately harmed by the commission of a defendant's crime of conviction. *United States v. Yijun Zhou*, 838 F.3d 1007, 1012-13 (9th Cir. 2016).

The definition of "victim," and thus the scope of persons entitled to recover restitution under the MVRA, expands when the crime of conviction has as an element a conspiracy or a scheme or pattern of misconduct. 18 U.S.C. § 3663A(a)(2). Mail fraud and wire fraud are among the crimes that have as an element such a scheme or pattern. Accordingly, in the case of a conviction for mail or wire fraud or conspiracy to commit mail or wire fraud, restitution may be ordered in favor of all persons directly and proximately harmed by the entire scheme or conspiracy and is not limited to harm caused only by the specific crime of conviction. *United States v. Thomsen*, 830 F.3d 1049, 1065-66 (9th Cir. 2016).

Under the MVRA, however, restitution requires that the defendant's offense, scheme, or conspiracy be both the "direct" (or actual or but for) cause of the victim's loss and the "proximate" cause of that loss. 18 U.S.C. § 3663A(a)(2); *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013). For proximate causation under the MVRA, "[t]he basic question that a proximate cause requirement presents is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue." *Robers*, 572 U.S. at 645 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). Further, the MVRA requires only a reasonable estimate of the amount of a victim's damages; mathematical precision is not required. *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir. 2011). As will be discussed next, the

---

[6] Under the Dictionary Act, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.

procedures for issuing and enforcing orders of restitution are governed by 18 U.S.C. § 3664.

These procedures apply to all orders of restitution under Title 18, including under the MVRA.

*Id*. § 3664(a).

**DISCUSSION**

**A.  Whether a Victim's Loss for Purposes of Restitution Should Be Reduced by Payments Already Received from Lawsuits Against Parties Who Are Not Innocent of Wrongdoing**

The government argues that the total restitution that Messrs. Jesenik and MacRitchie

should be ordered to pay is at least $366,859,308. ECF 745 at 11. Relying primarily on the text

of § 3664(f)(1)(B), the government argues that this sum is unaffected by any funds that victim

investors already recovered in settlements from third-party professionals whom they sued under

Oregon Securities Laws for the same losses. *Id*. For the reasons explained below, the Court

rejects the government's argument. In reaching this conclusion, the Court considers the text not

only of § 3664(f)(1)(B), but also both § 3664(j)(1) (which uses an identical operative phrase) and

§ 3664(j)(2). The Court also considers one of the fundamental principles of restitution, as

articulated by the Ninth Circuit.

The relevant statutory subsections read as follows:

> (f)(1)(B)    In no case shall the fact that a victim has received or
> is entitled to receive compensation with respect to a loss *from
> insurance or any other source* be considered in determining the
> amount of restitution.

> (j)(1)    If a victim has received compensation *from
> insurance or any other source* with respect to a loss, the court shall
> order that restitution be paid *to the person who provided or is
> obligated to provide the compensation* . . . .

> (j)(2)    Any amount paid to a victim under an order of
> restitution *shall be reduced by any amount later recovered as
> compensatory damages for the same loss by the victim* in (A) any
> Federal civil proceeding; and (B) any State civil proceeding, to the
> extent provided by the law of the State.

18 U.S.C. § 3664 (emphases added). In addition, one of the fundamental principles of restitution is that "victims may not receive restitution that exceeds the losses they actually suffered." *United States v. Dadyan*, 76 F.4th 955, 959 (9th Cir. 2023); *see also United States v. Rizk*, 660 F.3d 1125, 1137 (9th Cir. 2011) ("A district court may not order restitution such that victims will receive an amount greater than their actual losses; to do so is plain error."); *United States v. Stanley*, 309 F.3d 611, 613 (9th Cir. 2002) (holding that the MVRA does not allow "double recovery by a victim").[7]

Reading § 3664(f)(1)(B) by itself, the government focuses on the phrase "from insurance or any other source." The government argues that settlement proceeds recovered in a victim's civil lawsuit against the Aequitas professionals are "any other source." Therefore, concludes the government, this subsection directs that such third-party settlement proceeds shall not be considered in determining the amount of restitution.

In its reply, the government relies heavily on the Ninth Circuit's decision in *Stanley*, which the government asserts compels its reading of § 3664(f)(1)(B). *Stanley*, however, is factually distinguishable. In that case, several defendants were convicted of conspiring to provide and receive kickbacks on Navy contracts and for filing false income tax returns. *Id.* at 612. PacShip Repair and Fabrication Inc. ("PacShip"), the victim of a kickback scheme, suffered a loss of more than $900,000. *Id.* Because of an error at the time of defendant Stanley's plea, his restitution liability was capped at $500,000. *Id.* at 613. Stanley's codefendants paid more than $300,000 in restitution, reducing PacShip's loss to approximately $600,000. *Id.* After the Ninth

---

[7] A victim is entitled to an order of restitution in the full amount of that victim's loss without consideration of the economic circumstances of the defendant. 18 U.S.C. § 3664(f)(1)(A). Also, no victim is required to accept restitution. 18 U.S.C. § 3664(g)(1). Further, "[a] victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments." 18 U.S.C. § 3664(g)(2).

Circuit remanded for a new hearing on the amount of Stanley's restitution, Stanley argued that

the payments already made by his codefendants should be deducted from his $500,000 restitution

cap, thus reducing his maximum restitution exposure to approximately $200,000. *Id*. The district

court rejected Stanley's argument and noted that the victim's loss of $900,000 would be

approximately $600,000 after being reduced by $300,000 to reflect the payments made by

Stanley's codefendants, and this $600,000 loss would still be above Stanley's $500,000 cap. *Id*.

The district court then ordered Stanley to pay $500,000 in restitution. *Id*. The Ninth Circuit

affirmed, stating:

> [W]hen other parties have paid civil damages for the same loss for
> which a defendant is liable, the calculation of the amount of
> restitution remaining is a two-step process. First, the court
> ascertains the full amount of the victim's loss. In this case, that was
> determined to be $913,820.50. The court then subtracts the amount
> paid by the other parties. Here, that was $318,625. What is left is
> the unpaid portion of the victim's loss, in this case, $595,195.50.
> The amount of a restitution cap does not figure into the equation.

*Stanley*, 309 F.3d at 613.

> The Ninth Circuit concluded:

> To prevent double recovery, payments such as those made by
> Stanley's codefendants are subtracted from the amount of the
> victim's loss. To that extent, Stanley may benefit from them.
> However, such payments have nothing to do with the cap on
> restitution that resulted from the error at the time of the plea that
> served to limit the defendant's maximum exposure to no more than
> a certain amount. *There is no question of double recovery here*.
> Accordingly, the district court correctly subtracted the
> codefendants' payments from PacShip's loss, but not from the
> restitution cap. The $500,000 restitution order imposed on Stanley
> neither exceeded the restitution ceiling nor authorized a double
> recovery for the victim.

*Id*. at 613-14 (emphasis added). As the Ninth Circuit explained, "[t]here is no question of double

recovery here." *Id*. at 614. For the reasons explained below, however, unless the third-party

settlement payments made to the Aequitas victims are deducted from the restitution ordered

against Messrs. Jesenik and MacRitchie, the "question of double recovery" will be present in this

case. For that reason alone, *Stanley* does not assist the government.

The government also cites *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008), in

support of its broad reading of the words "any other" in § 3664(f)(1)(B). In *Ali*, the Supreme

Court interpreted 28 U.S.C. § 2680(c) of the Federal Tort Claims Act. That subsection exempts

from the waiver for sovereign immunity "[a]ny claim arising in respect of the assessment or

collection of any tax or customs duty, or the detention of any . . . property by *any officer of*

*customs or excise or any other law enforcement officer*." 28 U.S.C. § 2680(c) (emphasis added).

In *Ali*, a federal inmate sued employees of the Federal Bureau of Prisons (BOP) for allegedly

mishandling the inmate's property. The Supreme Court explained:

> The word "any" is repeated four times in the relevant portion of
> § 2680(c), and two of those instances appear in the particular
> phrase at issue: "*any* officer of customs or excise or *any* other law
> enforcement officer." (Emphasis added.) Congress inserted the
> word "any" immediately before "other law enforcement officer,"
> leaving no doubt that it modifies that phrase. To be sure, the text's
> references to "tax or customs duty" and "officer[s] of customs or
> excise" indicate that Congress intended to preserve immunity for
> claims arising from an officer's enforcement of tax and customs
> laws. The text also indicates, however, that Congress intended to
> preserve immunity for claims arising from the detention of
> property, and there is no indication that Congress intended
> immunity for those claims to turn on the type of law being
> enforced.

*Id*. at 220-21 (emphasis in original). Based on the differences in the statutory text contained in 18

U.S.C. § 3664(f)(1)(B) and 28 U.S.C. § 2680(c), *Ali* does not assist the government's

interpretation here. Context, as well as text, matters.

Reading the phrase "any other source" in § 3664(f)(1)(B) as broadly as the government

proposes would render the text of this subsection equivalent to the following: "In no case shall

the fact that a victim has received or is entitled to receive compensation with respect to a loss

from [~~insurance or~~] any [~~other~~] source be considered in determining the amount of restitution."
In other words, the government's reading would render superfluous the words "insurance or" and
"other." Such a reading, however, is contrary to well accepted methods of statutory
interpretation, which advises a court to avoid reading a statute in such a way as to make
superfluous several words found in the text of that statute. This is known as the Surplusage
Canon (or, sometimes, the Anti-Surplusage Canon).[8]

      The reading proposed by the government also is contrary to the Associated Word Canon,
which is another contextual canon of statutory interpretation, also known as *noscitur a sociis* ("it
is known by its associates"). As explained by the Supreme Court, a word in a statute

> is known by the company it keeps (the doctrine of *noscitur a
> sociis*). This rule we rely upon to avoid ascribing to one word a
> meaning so broad that it is inconsistent with its accompanying
> words, thus giving unintended breadth to the Acts of Congress.

*Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quotation marks omitted); *see also United
States v. Carpenter*, 933 F.2d 748, 750-51 (9th Cir. 1991) (explaining that "words are to be
judged by their context and that words in a series are to be understood by neighboring words in
the series").[9] Applying this principle to the operative phrase "insurance or any other source," the
Court interprets the words "or any other source" to mean sources *like insurance*, and not literally
*any* conceivable source. What sources are like insurance? Third-party guarantors and
indemnitors, just like insurers, can provide payment to compensate for a loss when certain

---

     [8] This contextual canon provides: "If possible, every word and every provision is to be
given effect. . . . None should be ignored. None should needlessly be given an interpretation that
causes it to duplicate another provision or to have no consequence." ANTONIN SCALIA & BRYAN
A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) (*Scalia & Garner*)
at 174-79; *see also* WILLIAM N. ESKRIDGE, JR., INTERPRETING LAW: A PRIMER ON HOW TO READ
STATUTES AND THE CONSTITUTION (2016) (*Eskridge*) at 112-14.

     [9] *See also Scalia & Garner* at 195-98; *Eskridge* at 76-78.

conditions are satisfied. And like insurers, guarantors and indemnitors often, for compensation, become subrogated to the rights of their payee, and are entirely innocent of the wrongdoing that caused the loss in the first place.

The right of subrogation also is entirely consistent with the provision in § 3664(j)(1), which uses precisely the same operative phrase that is found in § 3664(f)(1)(B), "insurance or any other source." Under the contextual canon known as the "Presumption of Consistent Usage," "[a] word or phrase is presumed to bear the same meaning throughout a text." *Scalia & Garner* at 170-173; *see also Eskridge* at 108-109 (discussing the Consistent Use Canon).[10]

Section 3664(j)(1) provides, in relevant part: "If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation." That provision makes perfect sense if the phrase "or any other source" is limited to sources like insurers, such as guarantors and indemnitors, who are entirely innocent third parties. Such sources also would be subrogated to the rights of their payee. Indeed, the Ninth Circuit expressly employed the concept of subrogation when describing § 3664(j)(1). In *United States v. Bright*, 353 F.3d 1114, 1122 (9th Cir. 2004), the Ninth Circuit explained the operation of § 3664(j)(1) by stating that the

---

[10] Further, under the government's unlimited interpretation of the phrase "any other source" in § 3664(f)(1)(B), the application of the Consistent Use Canon would require a similarly unlimited interpretation of the same phrase in § 3664(j)(1). That, however, would create an absurd result. If a codefendant paid restitution to a victim, that codefendant presumably would qualify as "any other source" under the government's reading. Section § 3664(j)(1) would then require a later codefendant who is also ordered to pay restitution to reimburse the earlier codefendant who paid the first restitution. That, of course, would be an absurd result. *See United States v. Katz*, 271 U.S. 354, 357 (1926) ("All laws are to be given a sensible construction; and a literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose."); *see also Scalia & Garner* at 234-239; *Eskridge* at 69-73 (discussing the Absurdity Doctrine/Canon).

government, as the third-party payor in that case, "would step into the victims' shoes as a subrogee of their restitution claims against" the defendant.

This concept also is reflected in the Seventh Circuit's decision in *United States v. Johnson*, 911 F.3d 849, 852 (7th Cir. 2018). In that case, the Seventh Court stated that § 3664(f)(1)(B) "is a statutory version of the collateral-source doctrine, familiar in tort law." As explained by Professor Dobbs, "[a]s a general rule, benefits received by the plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce the defendant's liability for damages." DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.6 at 185 (3d ed. 1973). He continues: "The arguments for the collateral source rule are that it preserves the rights of *subrogation* for those who have aided the plaintiff." *Id*. at 186 (emphasis added). Thus, the fact that a victim receives a payment from an insurer, or from other sources like insurers, will not reduce the amount of restitution that a wrongdoer owes to the victim, § 3664(f)(1)(B), and the payors (whether insurers or other sources like insurers) will be subrogated to the rights of the victim and entitled to have restitution paid to them under § 3664(j)(1).

Further, as the Seventh Circuit recognized in *Johnson*, any other interpretation, such as the interpretation offered by the government here, "would bring § 3664(f)(1)(B) into conflict with § 3664(j), which does deal with *credits* for third-party collections." *Johnson*, 911 F.3d at 852 (emphasis added). As noted, § 3664(j)(2) provides: "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in—(A) any Federal civil proceeding; and (B) State civil proceeding, to the extent provided by the law of the State." Payments made by insurers, guarantors, and indemnitors typically are not regarded as "recovered as compensatory damages for the same loss by the victim" in a civil proceeding. If they were, then subsections § 3664(j)(1)

PAGE 15 – OPINION AND ORDER ON RESTITUTION METHODOLOGY

and § 3664(j)(2) would be irreconcilable. This also is the point made by the Seventh Circuit in *Johnson*. Because the government's interpretation of § 3664(f)(1)(B), which includes the same operative phrase that is used in § 3664(j)(1), would cause an irreconcilable conflict between § 3664(j)(1) and § 3664(j)(2), that is a further reason to reject the government's proposed interpretation.[11]

Finally, the method provided under the MVRA for a defendant to move for credit after an order of restitution has been issued further undermines the government's interpretation. In *United States v. Yalincak*, 853 F.3d 629 (2d Cir. 2017), the Second Circuit explained how a defendant may bring a motion for credit under § 3664(j)(2) when a victim later recovers compensatory damages in a federal or state proceeding for the same loss covered by an order of restitution. As the Second Circuit stated:

> A district court's resolution of a motion for credit under § 3664(j)(2) comes after an order of restitution has already been issued—when a victim "later recover[s]" compensatory damages in a state or federal civil proceeding for the "same loss" covered by the order of restitution. In such circumstances, § 3664(j)(2) entitles a defendant to a reduction in the amount to be paid to that victim in order to "limit restitution that would result in an overpayment to the victim." Although the MVRA does not prescribe a particular procedure for resolving such claims, our sister Circuits have recognized that *defendants are entitled to move the district court for a credit or offset to their restitution obligations pursuant to § 3664(j)(2) once a victim has recovered such damages*[.] A defendant may seek such credit regardless of whether that credit is sufficient, standing alone, to discharge the defendant's restitution obligations entirely.
>
> A district court's resolution of a § 3664(j)(2) motion thus *generally* comes at some intermediate point in post-judgment restitution proceedings: after an order of restitution has been issued, but

---

[11] Under the "Harmonious-Reading Canon," which is another contextual canon, "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory." *Scalia & Garner* at 180-82; *see also Eskridge* at 131-33.

> before a defendant entirely discharges his or her restitution obligations.

*Id.* at 637 (emphasis added) (citations omitted).

As the Second Circuit recognized, a defendant's motion for credit under § 3664(j)(2) "generally" comes after an order of restitution has been issued but before a defendant entirely discharges that obligation. Thus, the Court, in theory, could enter an order of restitution against Messrs. Jesenik and MacRitchie in the larger amount that the government requests but then immediately entertain a motion by Defendants for credit pursuant to § 3664(j)(2). But given the uncertainties here about how much the victims already have received from the settlements in their civil lawsuits or private arbitrations, that might not be feasible. Moreover, if the complexity (or impossibility) of making such a determination resulted in the denial of any credit for settlements already paid and received, that could cause at least some (and perhaps many) victims to recover more than their actual losses. This, however, is not allowed. *See Dadyan*, 76 F.4th at 959 ("[V]ictims may not receive restitution that exceeds the losses they actually suffered."); *Rizk*, 660 F.3d 1125, 1137 (9th Cir. 2011) ("A district court may not order restitution such that victims will receive an amount greater than their actual losses; to do so is plain error.").

Accordingly, this case presents a reasonable exception to the general timing of a motion for credit under § 3664(j)(2) discussed in *Yalincak*. Indeed, by combining the initial determination of restitution with a motion to credit Defendants for a reduction based on the amount that a victim has *already recovered* as compensatory damages for the same loss in a federal or state civil proceeding, the process becomes more efficient, manageable, and equitable for all concerned.[12] The Court turns next to a discussion of that process.

---

[12] In a different context, the Ninth Circuit stated that § 3664(j)(2) "only comes into play after the district court has already ordered restitution in the full amount of the victim's loss." *Bright*, 353 F.3d at 1122 (quoting *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th

**B. How to Determine Each Victim's Payments from the Settlement of Private Civil Lawsuits to Calculate that Victim's Net Restitution Amount**

There are several alternative methods for distributing recovered proceeds to victims of a Ponzi scheme. *See Sec. and Exch. Comm. v. Huber*, 702 F.3d 903 (7th Cir. 2012) (comparing the "net loss" method to the "rising tide" method); *see also U.S. Commodity Futures Trading Comm'n v. Barki, LLC*, 2009 WL 3839389 (W.D.N.C. Nov. 12, 2009) (discussing five distribution methods); *see generally* Kathy Bazoian Phelps, *Handling Claims in Ponzi Scheme Bankruptcy and Receivership Cases*, 42 GOLDEN GATE U. L. REV. 567 (2012); Saul Levmore, *Rethinking Ponzi-Scheme Remedies in and out of Bankruptcy*, 92 B. U. L. REV. 969 (2012). Without reaching a final decision now, the Court tentatively favors a pro rata "net loss" approach. Applying this approach to the restitution question now before the Court, each victim of Defendants' fraud would be entitled to an order of restitution in an amount based on the method of counting money-in minus money-out ("MIMO"). In other words, all money that left the pockets (or checkbook) of a victim in an Aequitas-related investment would be considered to be money-in. When an investor was given the opportunity by Aequitas to "rollover" an original investment into a second (or later) investment, however, the amount rolled over would not be counted as additional money-in. That is because the investor would only be "out-of-pocket" for the original investment. This is how money-in would be determined.[13]

---

Cir. 2000)). For the reasons already discussed, this temporal distinction should not be applied here, either because it would needlessly increase judicial inefficiency or because it might result in a victim recovering more than that victim's loss.

[13] The Court recognizes that this approach ignores any secondary expenses incurred (or paid out-of-pocket) by the investor toward attempting to recover an Aequitas investment or to assist in calculating any tax obligations or benefits relating to the investor's Aequitas investments and losses. The Court is assuming that these amounts, relatively speaking, are either *de mimimis* or would be extremely complex to determine in an objective and consistent manner, or both. *See Kennedy*, 643 F.3d at 1261 (allowing a court to "estimate" losses and not requiring "mathematical precision").

Regarding the determination of money-out, this would include all money that in fact was received by a victim through: (1) payments of interest or return of principal (*i.e.*, redemption) by any Aequitas-related entity; (2) payments or distributions made by the Receiver in the Receivership Case; or (3) net settlement proceeds received from any settlement of any lawsuit (class action or otherwise) or arbitration or any prefiling settlement of any such claim.[14] Money-out, however, would not include any tax benefits received by a victim investor. This is so for two reasons. First, any further payments received by a victim investor in restitution may have tax consequences that might offset tax benefits already received. Second, the Court is assuming that any tax-related benefits, relatively speaking, are *de mimimis* or would be extremely complex to determine in an objective and consistent manner, or both. *See Kennedy*, 643 F.3d at 1261.

Thus, the net loss to any victim would be the difference between money-in and money-out, as defined in this fashion, and this would be the amount of any restitution order entered in favor of any given victim. The problem, however, remains that there does not appear to be any easy way of determining a victim's "net settlement proceeds received from any settlement of any lawsuit (class action or otherwise) or arbitration or any prefiling settlement of any such claim" without directly asking a victim for that information.[15]

Thus, to obtain this information (indeed, to obtain a MIMO calculation) from each victim, the Court anticipates directing either the U.S. Probation Office (or the U.S. Attorney's Office) to send (either by email or by U.S. Mail if an email address is unavailable) a Claim Form

---

[14] The Court is assuming that no victim investor would have received any "insurance" payment from any insurer directly insuring an investor against investment loss. Any such insurance payment would, of course, result in the payor becoming subrogated to the rights of the victim payee. But the Court is assuming that no insurer directly insured any victim investor against investment loss, even if caused by fraud. No party has brought to the Court's attention any evidence of any such insurance proceeds, and none appear to be likely.

[15] The parties appear to agree on this point.

similar to the sort of claim forms used in the administration of civil class action settlements. The Claim Form would advise each victim that the Court is preparing to enter an order of restitution in this matter and explain that additional information is needed from each victim who requests restitution.[16] The Claim Form should be personalized for each known victim and contain the amount of money-in and money-out that can be determined from the Receiver's records. Each victim would then be asked, under penalty of perjury, to: (1) confirm the accuracy of this information (or to correct the information and supply supporting documentation); and (2) indicate the amount of any settlement proceeds received from any other source that is not already reflected on the individualized Claim Form. If the victim completes this information and signs the Claim Form under penalty of perjury, the Court is of the opinion that the victim need not provide proof of any settlement amounts received. The Court would then enter a restitution order based on the net loss (or MIMO amount) for each victim who timely and properly returned a signed Claim Form.[17] These are the Court's tentative views on how to determine efficiently and fairly the amount of each victim's restitution, and the Court will give the parties an opportunity to be heard on these issues before making a final decision.

## C.  Whether Investors in Aequitas Pass-Through Entities and Similar Investments Are Entitled to Restitution as Victims

Defendants argue that the only evidence of misrepresentations and half-truths concerned the ACF PN and the Aequitas Income Protection Fund II ("IPFII"). Accordingly, Defendants contend, investors in all other Aequitas-related funds, including the Aequitas Enhanced Income

---

[16] The victim recipient also should be informed of the right to assign a restitution award to the federal Crime Victims Fund pursuant to 18 U.S.C. § 3664(g)(2), although complete MIMO information would still be required from that victim.

[17] Victims should be afforded a reasonable amount of time to sign and return the Claim Form. Sixty days should be sufficient.

Fund ("EIF"), Aequitas Income Opportunity Fund ("IOF"), Aequitas Income Opportunity Fund II ("IOFII"), Aequitas Income Protection Fund ("IPF"), Aequitas Private Client Fund ("PCF"), Aequitas direct note investments, and the Aequitas Lux Bond should be excluded from the Court's restitution order. Defendants' contention, however, ignores the evidence. *See* Government's Sentencing Memorandum (ECF 679) at 13-15; Government's Motion for Order of Restitution (ECF 745) at 7-12. For the reasons stated by the government, the Court rejects Defendants' argument and accepts the government's position on this issue.

**D.  Whether a Victim's Loss Should Include Accrued but Unpaid Interest**

Defendants argue that the government should be ordered to eliminate accrued but unpaid interest from its restitution calculation. ECF 758 at 6. The Court agrees with Defendants. Although a victim-investor's election to leave accrued interest invested with Aequitas rather than withdrawing it every quarter (as some did) constituted an investment decision that was inevitably informed by the same misrepresentations that elicited the underlying investment itself, the Court does not consider this to be part of the victim's MIMO loss. First, any interest paid was not likely to be from the earnings of a legitimate business operation but instead represented ill-gotten gains obtained from other, later investors who were similarly deceived. Although that money is not being "clawed back," it also should not increase a victim's restitution award. Second, the investment amounts comprising accrued interest would be relatively minor and thus may be ignored for efficiency and simplicity (for example, to prevent the need for any "claw-back" analysis). *See Kennedy*, 643 F.3d at 1261.

**E.  Whether Assets Must Be Valued at the Time When the Receiver Took Possession and Whether the Receiver's Fees and Expenses Should Be Credited Against Restitution**

Defendants argue that the professional fees and expenses incurred by the Receiver and the value of any corporate assets that backed ACF PN or IOFII, determined at the time the

Receiver took possession of those assets, must be credited against any restitution order. In support of this argument, Defendants rely on the Ninth Circuit's decision in *United States v. Lomow*, 266 F.3d 1013 (9th Cir. 2001). Defendants' reliance on *Lomow* is misplaced for at least two reasons. First, *Lomow* did not arise under the MVRA. Second, the Supreme Court's 2014 decision in *Robers*, which did interpret and apply the MVRA, requires a court to credit a defendant only with property that was in fact returned to the victims.

In *Lomow*, the Ninth Circuit arrived at a restitution amount by interpreting provisions of a plea agreement and the then-applicable restitution statute, 18 U.S.C. § 3663. *See* 266 F.3d at 1020. The fraudulent transactions at issue in that case occurred between 1991 and 1995. *Id.* at 1017. The MVRA was passed in 1996[18] and significantly changed the law of restitution. Congress declared that the purpose of the MVRA was to "improve the administration of justice in Federal criminal cases by requiring Federal criminal defendants to pay full restitution to the identifiable victims of their crimes." S. Rep. 104-179, at 12 (Dec. 6, 1995), *available at* govinfo.gov/app/details/CRPT-104srpt179. After surveying existing restitution statutes, including 18 U.S.C. § 3663, Congress determined that new statutory provisions were needed to "ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due." *Id.* at 12-14, 17-18. Here, the government seeks restitution under the MVRA, not the superseded provisions of § 3663 that were interpreted and applied in *Lomow*. Indeed, § 3663 was later amended to exclude its application to offenses subject to the MVRA, including fraud. *See* 18 U.S.C. § 3663 (a)(1)(A) (noting that § 3663 is applicable to a list of offenses "other an offense described in 3663A(c)").

---

[18] Pub. L. 104-132, Title II, 204(a) (Apr. 24, 1996).

In addition, *Lomow* is factually distinguishable from the present case. In *Lomow*, the court ordered restitution to be paid to a receiver, not the victim. *See* 266 F.3d at 1020. Thus, the court in *Lomow* evaluated whether that order was complied with by determining the value of assets provided to the receiver, rather than the value that the receiver later paid to the victim. *Id*. In the pending case, however, the MVRA requires the Court to order Defendants either to return property to their victims or "pay an amount equal to . . . the value of the property on the date of sentencing, less . . . the value . . . of any property that is returned." 18 U.S.C. § 3663A(b)(1)(A), (B). This text is found in the MVRA and was not the text interpreted by the Ninth Circuit in *Lomow*.

In *Robers*, the Supreme Court interpreted the text of § 3663A and held that when a victim has been defrauded of *money*, only money returned to the victim can reduce the amount due in restitution. 572 U.S. at 646. Defendants' argument that they should receive credit for the gross receipts of the receivership, rather than the net money that was actually returned to victims, is therefore contrary to controlling Supreme Court authority.[19] Defendants' victims were

---

[19] As noted, the Supreme Court in *Robers* reversed the Ninth Circuit's ruling in *United States v. Yeung*, 672 F.3d 594 (9th Cir. 2012), which had held that restitution should be reduced by the value of collateral at the time it was returned to a lender. *See Robers*, 572 U.S. at 642. *Yeung* relied on a series of earlier Ninth Circuit cases reaching similar conclusions, including *United States v. Smith*, 944 F.2d 618 (9th Cir. 1991), and *United States v. Catherine*, 55 F.3d 1462 (9th Cir. 1995). *See Yeung*, 672 F.3d at 601, 604. *Robers* effectively overruled this entire line of cases when the question before the court requires the application of the MVRA. *Lomow* relied on the same line of cases. *See Lomow*, 266 F.3d at 1020 (citing *Catherine*, 55 F.3d at 1465). Thus, although neither *Yeung* nor *Robers* specifically mentions *Lomow*, the Ninth Circuit's earlier practice of crediting defendants for value above what a victim actually received was repudiated in *Robers*.

Indeed, *Robers* is now routinely cited as settled law, including cases outside the mortgage context. *See United States v. Luis*, 765 F.3d 1061, 1067 (9th Cir. 2014); *United States v. Zogheib*, 2022 WL 15798663, at *2 (9th Cir. Oct. 28, 2022) (mem.) (Ponzi scheme); *Maasen v. United States*, 2022 WL 3644850 (9th Cir. Aug. 24, 2022) (SBA loan) (memorandum disposition); *United States v. Sarad*, 227 F. Supp. 3d 1153, 1158-59 (E.D. Cal. 2016) (securities fraud);

---

fraudulently deprived of the cash they invested with Aequitas. Thus, only the cash they received

back is "property . . . returned" to them for purposes of reducing Defendants' restitution

obligation, not the gross receipts gathered by the Receiver. *See* 18 U.S.C. § 3663A(b)(1)(A).

Finally, this is the approach adopted by the Second Circuit in *Yalincak*, discussed

previously. In that case, the Second Circuit held:

> Amounts recovered by a bankruptcy trustee for the benefit of the
> bankruptcy estate, and consumed in the administration of the estate
> or distributed to non-victim creditors, plainly are not
> "recovered . . . by the victim[s]" of a crime; only amounts actually
> distributed to the victim creditors fit that description.

53 F.3d at 635 (alterations in original). Precisely the same reasoning applies here.

## F.  Whether the Government Must Show Individual Reliance for Each Victim

Defendants (primarily, Mr. MacRitchie) argues that "the government has failed to

establish that each of the hundreds of alleged victims' losses were caused by material

misrepresentations." ECF 762 at 4 (internal p. 3). Mr. MacRitchie adds: "Whether investors'

losses actually resulted from the fraud must be evaluated on a case-by-case basis." *Id*. In support,

Mr. MacRitchie relies primarily on the district court's decision in *United States v. Holmes*, 2023

WL 3489320, at *9 (N.D. Cal. May 16, 2023).

Defendants are incorrect as a matter of law. To prove causation, the government need not

present individualized evidence that every victim "actually relied" on Defendants'

misrepresentations and half-truths. In a similar care, the Ninth Circuit rejected that argument,

explaining:

> Defendants argue that the district court could not have concluded,
> without more evidence, that those clients were victims of the
> conspiracy. We disagree. Defendants were convicted of criminal

*United States v. Holmes*, 2023 WL 3489320, at *4-5 (N.D. Cal. May 16, 2023) (investment
fraud).

> conspiracy to defraud clients specifically by recommending the house stocks; *in the circumstances shown in this record, it is reasonable to infer that all clients of Defendants who purchased the house stocks were duped by the conspiracy*. Except as described below, Defendants did not offer any evidence to rebut that inference.

*United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) (emphasis added). The Eleventh

Circuit has similarly held:

> As we see it, the government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence. The government may of course introduce individualized evidence of reliance—that is, direct evidence that each individual investor read the false information and relied on it when deciding to purchase stock. But, as the district court aptly recognized, requiring individualized proof of reliance for each investor is often infeasible or impossible. *Thus, in cases such as this one involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information*.

*United States v. Stein*, 846 F.3d 1135, 1153-54 (11th Cir. 2017) (emphasis added) (citations

omitted). Thus, it is enough to show that Defendants caused material misrepresentations and

half-truths to be made to the investors when soliciting their investments, which tended to elicit

reliance on those misrepresentations and half-truths. These facts have been amply shown.

Further, Defendants' reliance on *Holmes* is misplaced. There, the misrepresentations at

issue were alleged to have been in the conspirators' own utterances and certain marketing

materials that might never even have reached certain investors. They were not featured in the

investment documents and representations that nearly every victim investor received, as the

misrepresentations and half-truths were in this case. *See* Sentencing Memorandum at 7-8, *United

States v. Holmes*, No. 5:18-cr-00258-EJD (N.D. Cal. Nov. 11, 2022), ECF No. 1643 at 7-8

(summarizing offense conduct). Thus, *Holmes* does not aid Defendants under the facts here.

### G. Whether the Complexity Exception Warrants No Restitution Award

Under 18 U.S.C. § 3663A(c)(3)(B), restitution need not be awarded for any offense

> if the court finds, from facts on the record, that . . . determining
> complex issues of fact related to the cause or amount of the
> victim's losses would complicate or prolong the sentencing process
> to a degree that the need to provide restitution to any victim is
> outweighed by the burden on the sentencing process.

Defendants argue that this "complexity exception" to the MVRA warrants no restitution award.

If the Court follows the MIMO and Claim Form approach described above, however, it should

not be unreasonably complex to determine the issues of fact needed to enter an appropriate

restitution order.

### H. Whether the Court Should Fashion a Restitution Award that Accounts for Different Levels of Culpability

The parties agree that this question may be deferred until the next phase of the Court's

restitution determination.

### I. Whether a Defendant's Financial Situation Should Be Considered in Determining the Rate of Payment for Any Restitution Ordered

The parties agree that this question may be deferred until the next phase of the Court's

restitution determination.

**CONCLUSION**

The Court's resolves the restitution methodology issues presented by the parties as stated

in this Opinion and Order. *See* Government's Motion for Order of Restitution (ECF 745);

Defendant Jesenik's Response (ECF 758); Defendant MacRitchie's Response (ECF 762);

Defendant Rice's Response (ECF 763); Government's Reply (ECF 776). Before the next hearing

in this matter, the parties should confer and the government should prepare and file, for the

Court's review and approval, a proposed Claim Form with instructions consistent with this

Opinion and Order.

**IT IS SO ORDERED.**

DATED this 20th day of November, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge